# EXHIBIT A

# AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| **LET'S GO AERO, INC.,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 01-16-0003-8120** |
| | ) | |
| **CEQUENT PERFORMANCE** | ) | |
| **PRODUCTS, INC., n/k/a HORIZON** | ) | |
| **GLOBAL AMERICAS, INC., f/k/a** | ) | |
| **CEQUENT TOWING PRODUCTS, INC.,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## AWARD OF ARBITRATOR (REDACTED)

|  |  |
|---|---|
| Arbitrator: | Donald W. Rupert |
| | Marshall, Gerstein & Borun LLP |
| | 233 S. Wacker Drive |
| | Willis Tower, Suite 6300 |
| | Chicago, Illinois 60606-6357 |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................ 1

    A.    The Proceeding in this Matter ................................................... 3

        1.    Preliminary Matters ...................................................... 4

        2.    Procedural Matters ........................................................ 9

        3.    The Evidentiary Hearing ............................................. 10

        4.    Patent Ownership ........................................................ 12

II.  THE PATENTS AND ASSERTED PATENT CLAIMS .................................... 14

    A.    Introduction ................................................................................ 14

    B.    Applicable Legal Standards Relating to Utility Patents ............ 16

        1.    Infringement ................................................................ 16

        2.    Infringement Damages ................................................ 18

        3.    Claimant's Willful Infringement Assertion ................. 21

        4.    Respondent's Defenses of Non-infringement and Invalidity Regarding the Utility Patents ....................... 21

        5.    Respondent's Defense of Inequitable Conduct Regarding the Design Patents ...................................... 23

    C.    The Utility Patents at Issue ....................................................... 24

        1.    The '725 Patent ........................................................... 24

        2.    The '550 Patent ........................................................... 24

        3.    The '141 Patent ........................................................... 31

        4.    The '456 Patent ........................................................... 32

    D.    Priority Assessments of The Design Patents at Issue ............... 41

    E.    Infringement Assessment of the Design Patents ...................... 77

    F.    Validity Assessment of the Design Patents ............................. 79

        1.    Validity of D917 Patent .............................................. 80

|   |   | 2. | Validity of D716 Patent ................................................. 81 |
|---|---|---|---|
|   |   | 3. | Validity of D717 Patent ................................................. 81 |
|   |   | 4. | Validity of D289 Patent ................................................. 82 |
|   | G. | | Damages in Relation to the Design Patents ............................... 82 |
|   | H. | | Assessment of Respondent's Inequitable Conduct Assertions Involving the Design Patents ..................................... 82 |
|   | I. | | Exceptional Case Analysis .......................................... 84 |
| III. | | | CLAIMANT'S COPYRIGHT ALLEGATIONS ................................. 84 |
|   | A. | | Claimant's Copyright Registration Infringement Claim .......... 85 |
|   | B. | | Prevailing Party Relating to the Copyright Infringement Issues ............. 94 |
|   | C. | | Claimant's DMCA Claim ........................................ 95 |
| IV. | | | CLAIMANT'S TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION CLAIMS ..................................... 97 |
|   | A. | | Background ...................................................... 97 |
|   | B. | | Analysis of Trademark Infringement Damages ..................... 101 |
|   | C. | | Claimant's Unfair Competition Claim .................................. 108 |
| V. | | | CLAIMANT'S MISAPPROPRIATION OF TRADE SECERTS AND CONFIDENTIAL INFORMATION CLAIM ................................... 110 |
| VI. | | | CLAIMANT'S PATENT MISMARKING CLAIM ......................... 125 |
| VII. | | | CLAIMANT'S CIVIL CONSPIRACY CLAIM ............................. 129 |
| VIII. | | | RESPONDENT'S BREACH OF SETTLEMENT AGREEMEMT CLAIM..... 135 |
| IX. | | | ATTORNEYS' FEES AND COSTS UNDER THE PREVAILING PARTY PROVISION IN THE SETTLEMENT AGREEMENT....................... 140 |
| X. | | | THE PARTIES' ATTORNEYS' FEES AND COSTS CLAIMS ...................... 142 |
| XI. | | | ADMIINSTRATIVE AND ARBITRATOR FEES AND EXPENSES AND COSTS ..................................... 145 |
| XII. | | | FINDINGS AND CONCLUSIONS ................................. 145 |

XIII.   AWARD ...................................................................................... 145

    A.      Award Based on Stipulations.................................................. 145

    B.      Award Relating to the '725 and '550 Patents ......................... 146

    C.      Award Relating to the '456 Patent.......................................... 147

    D.      Award Relating to the '141 Patent.......................................... 148

    E.      Award Relating to the D917 Patent ........................................ 148

    F.      Award Relating to the D716 Patent ........................................ 149

    G.      Award Relating to the D717 Patent ........................................ 150

    H.      Award Relating to the D289 Patent ........................................ 151

    I.      Award Relating to Respondent's Assertions of Inequitable
          Conduct Involving the Design Patents.................................... 152

    J.      Award Relating to Claimant's Copyright Infringement Claim............... 152

    K.      Award Relating to Claimant's DMCA Claim........................ 153

    L.      Award Relating to Claimant's Trademark Infringement Claims............ 153

    M.      Award Relating to Claimant's Unfair Competition Claim ..................... 154

    N.      Award Relating to Claimant's Misappropriation of Trade Secrets
          and Confidential Information Claim........................................ 154

    O.      Award Relating to Claimant's False Patent Marking Claim ................. 154

    P.      Award Relating to Claimant's Civil Conspiracy Claim ........................ 155

    Q.      Award Relating to Respondent's Breach of Settlement Agreement
          Claim..................................................................................... 155

    R.      Award Relating to the Attorneys' Fees and Costs Under the
          Settlement Agreement............................................................ 155

    S.      Award Relating to Attorneys' Fees and Costs ....................... 155

    T.      Award Relating to Administrative Fees and Expenses and
          Arbitrator's Compensation and Expenses............................... 156

# TABLES

Table I -            Award Sections ................................................................. 2

Table II -           Hearing Witnesses ............................................................ 10

Table III -          Patent Assignments .......................................................... 12

Table IV -           Asserted Patents ............................................................... 14

Table V -            Asserted Utility Patent Claims ...................................... 15

Table VI -           SKUs Accused Of Infringing The '725 And '550 Patents ................ 25

Table VII -          SKUs Accused Of Infringing The '456 Patent ................................. 34

Table VIII           Catalogs Relied On By Claimant In Relatoin To Its Assertion Of
                     Infringement Of The '456 Patent ...................................... 39

Table IX -           Photographs Relied On By Claimant ................................. 39

Table X -            Design Patents ................................................................. 47

Table XI -           Comparison Of 'D917 Patent Drawings to The '456 Patent
                     Drawings ........................................................................ 55

Table XII -          Comparison Of 'D716 Patent Drawings to The '456 Patent
                     Drawings ........................................................................ 62

Table XIII -         Comparison Of 'D717 Patent Drawings to The '456 Patent
                     Drawings ........................................................................ 68

Table XIV -          Comparison Of 'D289 Patent Drawings to The '456 Patent
                     Drawings ........................................................................ 74

Table XV -           Listing Of Respondent's Products Accused Of Infringing The
                     Design PatentS And Claimant's Supporting Documents ................ 78

Table XVI -          Manuals Found As Part Of Claimant's Copyright Registration ....... 85

Table XVII -         Respondent's Accused Manuals And Claimant's Corresponding
                     Manuals .......................................................................... 87

Table XVIII -        Claimant's Asserted Trade Secrets ................................. 112

Table XIX -          Claimant's Remaining Asserted Trade Secrets ............... 118

Table XX -           Claimant's Requested Fees And Costs ........................... 142

Table XXI -      Respondent's Requested Fees And Costs .......................................143

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated January 28, 2012, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, hereby AWARD as follows:

## I.  INTRODUCTION

This represents the Award in the above-captioned arbitration proceeding, as required by Rules 46 and 47 of the Commercial Rules of the American Arbitration Association ("AAA"). This Award contains numerous individual sections. A portion of this matter concerns issues relating to United States utility and design patents. According to 35 U.S.C. §294(e), an award rendered in an arbitration involving patents "shall be unenforceable until the notice required by [35 U.S.C. §294(d)] is received by the Director [of the U.S. Patent and Trademark Office]." Section 294(d) provides, in part, that the "Director shall, upon receipt of . . . [the] notice, enter the same in the record of the prosecution of such patent."

Because certain aspects of this proceeding involve Claimant's alleged trade secrets and confidential information and Respondent's confidential information, any discussion of such secrets and information in this Award would become public upon filing with the U.S. Patent and Trademark Office ("PTO") and entered into the records of the respective patents. To avoid such situation, the Arbitrator has prepared two forms of this Award, one of which is unredacted and the other of which is identical to the unredacted version but has specific details of Claimant's alleged trade secrets and confidential information and Respondent's confidential information redacted. By doing so, the redacted form of the Award will be suitable for submission to the PTO under 35 U.S.C. §294(d). The redacted form replaces certain text with a random number of the letter X that is bolded to show text deleted from the unredacted form. The Arbitrator has tried to make the replacement on a character by character basis so as not to change the line endings and pagination throughout, if possible. The unredacted form shall be the version to be used by the parties.

In reaching this Award, the Arbitrator has considered the testimony presented and exhibits admitted into evidence during the evidentiary hearing held in this matter, the parties' deposition designations, the pleadings filed in this matter, the post-hearing briefs submitted by the parties, and publicly available information found in the files of the PTO concerning the patents and trademarks at issue in this proceeding and of which the Arbitrator has taken judicial notice.[1]

---

[1] Claimant LGA's Closing Argument Brief will be cited as "Claimant's Liability Brief," its Closing Argument Response Brief will be cited as "Claimant's Response Liability Brief," and its Closing Argument Reply Brief will be cited as "Claimant's Reply Liability Brief." In turn, Respondent's Post-Hearing Brief on Liability and Damages will be cited as "Respondent's Liability Brief," its Opposition to Claimant's Post-Hearing Brief on Liability and Damages will be cited as "Respondent's Opposition Liability Brief," and its Reply to Claimant's Post-Hearing Response Brief on Liability and Damages will be cited

This Award is divided into separate sections directed to Claimant's February 9, 2017, complaint in this proceeding, and to Respondent's March 3, 2017, counterclaims, found in its Answer and Counterclaim. Because both parties are requesting their attorneys' fees incurred in this arbitration and have submitted briefs on this issue, this Award will also address the requests for attorneys' fees. The matters addressed in this Award are shown in the table below.

## TABLE I - AWARD SECTIONS

| Award Section | Cross-Reference to Claimant's Complaint Claims and Respondent's Counterclaims |
|---|---|
| Introduction | N/A |
| Factual Background | N/A |
| **Patent Claims** | |
| Claimant's Utility Patent Infringement Claims | Claimant's Third Claim for Relief and Fourth Claim for Relief |
| Claimant's Design Patent Infringement Claims | Claimant's Third Claim for Relief |
| Claimant's Patent Mismarking Claims | Claimant's Ninth Claim for Relief |
| Respondent's Declaratory Judgment of Patent Invalidity and Unenforceability of each of Claimant's Patents | Respondent's Counterclaim Three |
| Respondent's Declaratory Judgment of Inequitable Conduct in relation to each of Claimant's Design Patents | Respondent's Counterclaim Two |
| Respondent's Declaratory Judgment of Patent | Respondent's Counterclaim Three |

as "Respondent's Reply Liability Brief." The parties supplied two forms of post-hearing briefs, one form in pdf format and the other in Word format. The Arbitrator has noted that the pagination of Claimant's Liability Brief differs between these two formats. Thus, all page citations to the parties' briefs in this Award are to the pdf versions.

| Award Section | Cross-Reference to Claimant's Complaint Claims and Respondent's Counterclaims |
|---|---|
| Inequitable Conduct | Respondent's Counterclaim Two |
| **Non-Patent Claims** | |
| Claimant's Declaratory Judgment Claim | Claimant's First Claim for Relief |
| Claimant's Misappropriation of Proprietary Intellectual Property and Unjust Enrichment Claim | Claimant's Second Claim for Relief |
| Claimant's Trademark Infringement and Unfair Competition Claim | Claimant's Fifth Claim for Relief |
| Claimant's Copyright Infringement Claim | Sixth Claim for Relief |
| Claimant's Copyright Information and Removal Claim | Claimant's Seventh Claim for Relief |
| Claimant's Passing Off Claim | Eighth Claim for Relief |
| Claimant's Civil Conspiracy Claim | Claimant's Tenth Claim for Relief |
| Respondent's Breach of Contract Claim | Respondent's Counterclaim One Claim |
| **Requests for Attorneys' Fees** | Both requests for attorneys' fees are considered in one section of this Award |

### A.     The Proceeding in this Matter

This arbitration has been hotly contested by the parties throughout the proceedings. Claimant's complaint and Respondent's answer and counterclaims raised numerous issues, leading to lengthy party and non-party discovery. Throughout, the parties engaged in seemingly constant disputes regarding discovery, deposition scheduling, motions to compel, and Claimant's motion for the appointment of an independent auditor seeking to have Respondent's electronic documents audited. All of this resulted in significant time spent by the parties and the Arbitrator, twenty-six separate orders issued by the Arbitrator before this one, and numerous telephonic hearings.

## 1. Preliminary Matters

The Claimant is Let's Go Aero, Inc., a Colorado corporation with its principal place of business in Colorado Springs, Colorado. (Stip., ¶1)[2]. Respondent Cequent Performance Products, Inc., now known as Horizon Global Americas, Inc., is a Delaware corporation with its principal place of business in Michigan. (*Id.* at ¶3).

Although this arbitration was filed by Claimant on September 6, 2016, the parties were involved in several lawsuits prior to institution of this case. The parties' business relationship started on January 2, 2008, when they executed a License Agreement. (C-974)[3]. That License Agreement was amended on March 16, 2009. (*Id.*).

On its face, the License Agreement addressed intellectual property represented to be owned by Claimant that is related to the design, manufacture, and sale of certain Products that were specified in Exhibit A to the License Agreement, and identified with respect to issued U.S. patents and pending U.S. patent applications. These Products fall into the cargo management area and include bicycle racks and cargo carriers that can be attached to motor vehicles via various hitches that are also attached to the vehicles; the Products also include hitch pins that connect the Products to the hitches. This intellectual property was described as including patents, patent applications, complete designs, and designs in process that relate to the Products specified in Exhibit A. The License Agreement defined this intellectual property as the "Licensed Technology." Additionally, the License Agreement defined the term "Licensed Products" as those Products to be made, used, distributed, offered for sale, imported, and sold by Respondent that utilize the Licensed Technology. (*See* License Agreement (C-974), numbered paragraphs 1 through 4 immediately following the first paragraph in the License Agreement). Certain provisions of the License Agreement are quoted below:

In Section 1.1 of the License Agreement, Claimant granted to Respondent a:

> worldwide limited exclusive license for the Licensed Technology and all improvements thereto developed, owned or controlled by LGA to make, manufacture, have made, use, import, offer for sale and sell the Licensed Products set forth on Exhibit A under Cequent trademarks or trade names or such other brands as Cequent may determine in its sole discretion, for a period beginning as of the Effective Date [*i.e.*, January 2, 2008] and

---

[2] On April 20, 2018, the parties submitted an agreed set of Stipulated Facts, which are cited as "Stip."

[3] Throughout this Award, references are made to exhibits that were admitted during the evidentiary hearing conducted from May 31, 2018, through June 7, 2018, and on August 1, 2018. Exhibits that were admitted and cited herein are noted as "C-xxx" for exhibits found on Claimant's Exhibit List and as "R-xxx" for exhibits found on Respondent's Final Exhibit List. Reference to an exhibit using the "C" or "R" designation does not necessarily connote the party who moved the admission of such exhibit.

ending December 31, 2009 (the "**Exclusive License**").  (Emphasis in original).

After expiration of the exclusive license period, the License Agreement converted to a non-exclusive agreement. (C-974, §1.2).

Further, the License Agreement provided that Claimant would retain ownership of the Licensed Technology and any improvements thereto that it made. (C-974, §7). However, "any improvements, modifications or enhancements made to the Licensed Products or Licensed Technology by [Respondent] shall be owned by [Respondent]. [Claimant] shall have the right to utilize the improvements, modifications or enhancements made by [Respondent] in the Licensed Products." (C-974, §7).

Effective March 16, 2009, the parties entered into the First Amendment ("Amendment") to the License Agreement (the First Amendment is found as part of exhibit C-974.) Among other things, that Amendment extended Respondent's exclusivity period for the Licensed Products identified in Exhibit A and set a date when the exclusive license to certain of the Licensed Products would become non-exclusive. The Amendment also required Respondent to make minimum annual royalty payments and to purchase certain of Claimant's inventory.

The parties also entered into another agreement that was signed by Mr. Marty L. Williams, who is the founder and president of Claimant, on November 9, 2007, and by Eric J. Nickerson, a representative of Respondent, on November 11, 2007. (*See* R-279). That document identifies Respondent as the "Company" and Mr. Williams signed the document as "Inventor. This agreement sets out a mechanism for Mr. Williams to submit his product idea, which is stated as "Towing related & Cargo related Products" to the Company. Section 5 addresses confidentiality and states:

> The Company is not required to hold your product idea in confidence, and no confidential relationship is established between you and the Company. Notwithstanding the foregoing, you agree that you will not disclose to any person or entity that the Company is evaluating your product idea or use the Company name without express written permission from the Company.

With respect to the License Agreement and the Amendment several sections are of importance in this proceeding. Section 8 of the License Agreement relates to Confidential Information and states (C-974, §8, emphasis added):

> **8. Confidential Information.** Either party may disclose confidential and/or proprietary information from time to time to the other party in order to further their business relationship. Each party agrees to maintain such disclosed information as confidential and not to use such information except to the benefit of the disclosing party and in furtherance of this Agreement. The parties agree that *the terms and conditions of the Nondisclosure*

*Agreement executed by the parties will apply to this Agreement in their entirety*, notwithstanding any expiration of the Nondisclosure Agreement.[4]

Section 13 of the License Agreement is a merger provision, stating in relevant part:

> **13. Entire Agreement.** This Agreement represents the entire understanding of the parties with respect to its subject matter and supersedes all previous representations, understandings or agreements, oral or written including any prior license agreements between the parties. Any amendment of this Agreement must be in writing.

Section D of the Amendment is also a merger provision stating, in relevant part:

> **D. Entire Agreement.** This Amendment and the License Agreement, as amended, represents the entire understanding of the parties with respect to its subject matter and supersedes all previous representations, understandings or agreements, oral or written including any prior license agreements between the parties. Any amendment of this Agreement must be in writing.

Nowhere in the License Agreement or the Amendment is there any specific identification of the Nondisclosure Agreement referred to in Section 8 of the License Agreement, such as the execution or effective date, the names of the parties who may have executed that agreement, or any other information that identifies that document.

On December 1, 2010, Respondent sued Claimant in the District of Colorado, case number 10-CV-02921, alleging breach of the License Agreement (this suit is referred to herein as the "**Colorado Action – I**"). Respondent alleged that Claimant breached the License Agreement because certain of the licensed patent applications and patents were allowed to expire or go abandoned prior to and during the term of the License Agreement. On May 12, 2011, Claimant filed an answer and its amended counterclaims. In its answer, Claimant acknowledged that certain application fees were not paid by Claimant's counsel and asserted that such counsel had misappropriated the fees. (Claimant's Answer and Amended Counterclaims, filed in Colorado Action – I on May 12, 2011, ¶30). In its counterclaims, Claimant asserted that Respondent was in

---

[4] In December 2016, the Arbitrator noted that the referenced nondisclosure agreement was mentioned in paragraph 43 of Claimant's Second Amended Complaint filed in **Colorado Action – II** (*infra* at 8) but was not included as part of the initial documents provided by the parties to the Arbitrator. Consequently, through the AAA Case Manager, the Arbitrator requested a copy of that document in an email sent on December 20, 2016. On December 21, 2016, counsel for Claimant, Martin Beier, forwarded the "referenced document" to the Case Manager. The forwarded document is identical to R-279, discussed above.

breach of the License Agreement and the Amendment for failure to pay royalties due, had infringed patents allegedly owned by Claimant intellectual property, and other related claims.[5]

The parties then resolved the **Colorado Action – I** litigation under a settlement agreement, effective January 28, 2012 (the "Settlement Agreement"). (See C-976). The Settlement Agreement provided the following, among other things:

1.      The parties agreed that the License Agreement and the Amendment terminated as of the Effective Date of the Settlement Agreement, *i.e.*, January 28, 2012. (C-976, §1).

2.      The parties provided cross releases that released any claims, demands, actions or causes of action of every kind and description, which any of them has, had, may have or may have had against the other, as well as any right of action which one party may have, whether known or unknown, arising from any act or omission by any of the released parties or arising from any fact or circumstance occurring prior to the Effective Date of the Settlement Agreement.  (C-976, §§4, 5).

3.      The Settlement Agreement also included a provision addressing payment of attorneys' fees and costs in the event of the need to enforce the Settlement Agreement. That provision states (C-976, §16):

> 16.  **Attorneys' Fees.**  In the event any Party commences legal proceeding to enforce any of the terms of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs incurred, as may be allowed by the Court.

In addition, Paragraph 20 of the Settlement Agreement contained a merger provision, stating in in its entirety (C-976, §20):

> 20.  **Entire Agreement.**  This Agreement is the entire agreement between the Parties with respect to its subject matter hereof, and all other prior agreements, covenants, promises and conditions, verbal or written, between these Parties are superseded and incorporated by this written Agreement.

4.      The Settlement Agreement also contains a dispute resolution provision in Section 23, which states (C-976, §23)

> 23.  **Dispute Resolution.**  In the event of any dispute, claim, question, or disagreement arising from or relating to the Agreement or the breach thereof, the Parties shall use their best efforts to settle the dispute, claim, question, or disagreement. To this effect, they shall consult and negotiate with each other in good

---

[5] Of the patents listed as infringed in Claimant's Amended Counterclaim, only the '725 and '550 are asserted in this proceeding.

faith and, recognizing their mutual interests, attempt to reach a just and equitable solution satisfactory to both parties. If they do not reach such solution within a period of 60 days, then, upon notice by either party to the other, all disputes, claims, questions, or differences shall be finally settled by arbitration administered by the American Arbitration Association in accordance with the provisions of its Commercial Arbitration Rules. Venue for the arbitration proceedings shall be in Chicago, Illinois, and the arbitration shall be conducted by a single neutral arbitrator.

In June 2014, Claimant initiated an action in the District of Colorado, Civil Action No. 1:14-cv-016000-MEH, against Respondent claiming that Respondent was violating certain intellectual property rights owned by Claimant; Claimant submitted its Second Amended Complaint in that action on July 31, 2014. That action is referred to herein as the "**Colorado Action – II**." That Second Amended Complaint alleged that Mr. Williams "is the sole assignee and beneficial owner" of inventions created by him; three of those identified the complaint were the '725 and '550 utility patents and the D917 design patent. The Second Amended Complaint contained twelve separate claims for relief and referred to a number of patents. In particular, paragraphs 69-76 asserted direct infringement of patents, without expressly identifying the patents, although earlier allegations identifying the '725 and '550 utility patents and the D917 design patent were incorporated by reference. In addition, paragraphs 77-81 of that Second Amended Complaint alleged inducement to infringe the '550 patent and another patent (US Patent 6,409,203) that is not part of this arbitration.

Thereafter, on September 17, 2014, Respondent filed with the court in **Colorado Action – II** a motion to compel arbitration based on the arbitration provision found in Section 23 of the Settlement Agreement, quoted above. Claimant argued that because any arbitration under the Settlement Agreement was to take place in Chicago, Illinois, the motion Respondent filed in Colorado should not be considered by that court under the authority of the Tenth Circuit's decision in *Ansari v. Quest Communications Corp.*, 414 F.3d 1214, 1219-20 (10th Cir. 2005).

On October 27, 2014, Respondent filed a petition to compel arbitration with the Northern District of Illinois, Civil Action No. 2014-C-8457 (the "**Illinois Action**"). Claimant moved to stay the **Illinois Action** pending a decision by the **Colorado Action – II** court on the issue of arbitrability and the Illinois court stayed the action before it. On January 28, 2015 (three years after the Settlement Agreement), the Colorado court in **Colorado Action – II** granted in part Respondent's motion to compel arbitration and concluded that six of the claims asserted by Claimant in its Second Amended Complaint were subject to arbitration. *See Let's Go Aero, Inc. v. Cequent Performance Products, Inc.*, 78 F. Supp. 3d 1363 (D. Colo. 2015). Respondent then appealed that ruling to the U.S. Court of Appeals for the Federal Circuit. On March 26, 2015, the Colorado court issued an Amended Order (document number 54) in which the court held, among other things, that Respondent's appeal to the Federal Circuit "is not-frivolous." (Colorado Action – II, March 26, 2015 Amended Order at 3). On March 3, 2016, the Federal Circuit dismissed the appeal on the basis that there was no appealable order for it to consider.

*Let's Go Aero, Inc. v. Cequent Performance Products, Inc.*, Case No. 2015-1308, ___ Fed. App'x ___. 2016 WL 827985 (Fed. Cir. 3/3/2016).

The Northern District of Illinois then lifted the stay it had imposed in the Illinois Action and proceeded to rule on Respondent's petition to compel arbitration. On July 28, 2016, that court ruled that the Settlement Agreement required the parties to arbitrate their dispute. Although the Illinois court noted that the rules of the AAA gave the arbitrator the authority to determine what claims are subject to arbitration, the court concluded that all twelve of Claimant's claims were arbitrable. *Cequent Performance Products, Inc. v. Let's Go Aero, Inc.*, Case No. 2014-C-8457, Slip Op. at 17 (N.D. IL. 7/28/2016).

During the November 28, 2016, Preliminary Hearing in this arbitration, the undersigned noted that the opinion of the Northern District of Illinois concluded that the Commercial Rules of the AAA require the arbitrator to decide the issues of arbitrability (*Cequent* 7/28/16 Slip Op. at 16, citing AAA Rules 7(a) and 7(b)). Nonetheless, the Illinois court went on to find that all of the twelve claims raised by Claimant in its Second Amended Complaint, filed in **Colorado Action – II** , were subject to arbitration. The undersigned advised the parties that, as the arbitrator, he was obligated to consider the arbitrability of the asserted claims de novo, irrespective of the decisions from the Colorado and Illinois courts. Counsel for both Claimant and Respondent concurred that the Arbitrator should revisit the arbitrability of the claims being asserted.

On January 5, 2017, the Arbitrator issued Order No. 2 – Order Regarding Arbitrability of Claims, in which the Arbitrator independently concluded that all of the claims asserted by Claimant in its Second Amended Complaint in **Colorado Action – II** were subject to arbitration. In Order No. 2, the Arbitrator requested that Claimant prepare an amendatory pleading in this matter to comport with the claims asserted by it in the Second Amended Complaint it had filed in **Colorado Action – II**. That amendatory pleading was filed in this proceeding on February 9, 2017, as Claimant's Complaint and has been the operative complaint in this matter since that time.

## 2.    Procedural Matters

After issuance of Order No. 2, the Arbitrator conducted a second preliminary hearing, on February 10, 2017, with counsel for the parties. The overall purpose of this hearing was to discuss the law to be applied to the disputed issues; the need for, type, and amount of discovery; the need for a protective order; submissions of the parties' initial and final contentions regarding their respective claims and defenses; initial disclosures under the AAA's Supplementary Rules for the Resolution of Patent Disputes; procedures for the filing of motions; establishing a hearing date and time; and other matters relating to preparing the case for evidentiary hearing. The matters discussed at the preliminary hearing formed the basis for Order No. 3, issued on February 16, 2017. That Order included a schedule of events, commencing with the submission by the parties of a proposed protective order to the Arbitrator on February 24, 2017, and commencement of the evidentiary hearing on October 23, 2017.

Unfortunately, the timing that was established by Order No. 3 was not followed for a number of reasons. For example, the parties and the Arbitrator spent considerable time in finalizing the Stipulated Protective Order and Electronically Stored Information Order (Order No. 7, dated June 7, 2017) and attending to a number of discovery disputes arising under that Order and related matters. As a result, the evidentiary hearing date was extended three separate times and the Arbitrator and the parties conducted thirteen separate telephonic conferences/hearings. All of this resulted in the Arbitrator, as of July 19, 2018, issuing twenty-six separate orders involving virtually all aspects of this proceeding.

Of importance to this Award, on September 27, 2017, the Arbitrator entered Order No. 12 – Order on the Construction of Patent Claim Terms in Patents Asserted in this Proceeding. That Order construed the disputed claim terms in the asserted utility patents and is attached hereto at Exhibit A.

### 3. The Evidentiary Hearing

Ultimately, the evidentiary hearing in this matter was conducted in two phases, with the first on May 31, June 1, and June 4-7, 2018, and the second phase on August 1, 2018. During the hearing, the parties submitted oral and deposition testimony from the following witnesses, with live, telephonic, video, deposition, or court testimony being noted:

### TABLE II - HEARING WITNESSES

| Witnesses by Claimant | Witnesses by Respondent |
|---|---|
| Marty Williams (live) | Paul Caruso (live; deposition) |
| Jerry Smith (live, by telephone) | Neil Weipert (live) |
| Scott Hampton (live) | Kevin Pierce (live) |
| Sara Williams (live; video conference) | |
| Garth Gridley (live) | |
| Mike Kutzscher (live) | |
| Tim Dexter (live, by telephone) | |
| Thomas Benson (deposition) | Thomas Benson (deposition) |
| Francis Bernart (deposition) | Francis Bernart (deposition) |
| David Cupar (in court testimony) | |

| Witnesses by Claimant | Witnesses by Respondent |
|---|---|
| Rick Doney (deposition) | Rick Doney (deposition) |
| Jason Dreger (deposition) | |
| Ruthanne Largent (deposition) | Ruthanne Largent (deposition) |
| Mark Walkowski (deposition) | Mark Walkowski (deposition) |
| Paul Caruso (deposition; in court testimony) | |

The second phase of the evidentiary hearing was conducted on August 1, 2018, via video conference with Claimant's witness and its counsel located in Colorado, Respondent's counsel located in Ohio, and the Arbitrator located in Illinois. During that phase, Ms. Sara Williams' direct testimony was resumed. (*See* Order No. 26, dated July 19, 2018). After conclusion of Ms. Williams' resumed direct examination, Respondent conducted cross-examination at that time. At the conclusion of the cross-examination, Claimant's counsel had no redirect examination.

Leading up to the first phase of the hearing, the parties submitted their respective final lists of exhibits. Claimant's list contained nearly 1,000 separately numbered exhibits; Respondent's list contained about 390 separately numbered exhibits. At the hearing, 41 of Claimant's numbered exhibits were admitted and 69 of Respondent's numbered exhibits were admitted. Reference to the testimony of the witnesses and the admitted exhibits will be detailed in the remainder of this Award.

Prior to the first hearing phase, both parties informed the Arbitrator that no court reporter would be used to transcribe the testimony. On May 30, 2018, Claimant's counsel advised that it was going to have a court reporter to transcribe the testimony for Claimant's use. When asked what caused Claimant to change its position on the reporter, Claimant's counsel stated that Claimant's investors were interested in the proceeding and wanted to have access to the transcripts to review. Respondent's counsel objected to this approach because the evidence would discuss confidential information (including information designated as attorneys' eyes only) subject to the Protective Order (*i.e.*, Order No. 7) issued in this matter on June 7, 2017, and Claimant's investors, and others, should not have access to such information and testimony. As a result of this objection, the Arbitrator requested that counsel for Claimant reconsider overnight the use of transcripts for the stated purpose and that such would be discussed on May 31. Prior to the start of the testimony on May 31, Claimant's counsel stated that Claimant would not have a court reporter transcribe the testimony. The Arbitrator advised the parties that the Arbitrator's notes would be used in connection with the preparation of this Award. During the hearing, the Arbitrator took 228 pages of hand-written notes.

### 4. Patent Ownership

During an April 10, 2017, status hearing, the Arbitrator noted that the files of the PTO for the patents at issue appeared not to identify correctly the owner of all of the asserted patents (at that time the PTO assignment files for these patents did not show the recordation of any assignments from the named inventor to Claimant; the named inventor has been and is Claimant's president, Marty Williams). Counsel for Claimant stated that it was his understanding all of the patents were owned by Claimant and that he would investigate this point. (*See* Order No. 5, dated April 11, 2017, p. 2). Again, during a June 15, 2017, status hearing, the Arbitrator informed the parties that the reexamination files in the PTO for the pending reexaminations of the '725 and '550 patents identified that the patents were owned by Mr. Williams. (Order No. 8, dated June 20, 2015, at 3).

The Arbitrator again raised the point of patent ownership with counsel for the parties during a conference held on May 30, 2018, prior to the start of the evidentiary hearing. At that time the parties and the Arbitrator discussed an approach that would allow the hearing to go forward while not giving rise to a possible argument that if the owner of the patents was not a party to the proceedings then any decision regarding the patents would be ineffective. The parties agreed to attempt to prepare a stipulation that would ensure that any Award regarding the patents would be binding on Claimant. During his opening statement on May 31, 2018, counsel for Claimant stated that Claimant would agree to be estopped from denying that the preceding are binding on Claimant and its affiliates.

On September 19, 2018, the Arbitrator sent an email to the parties, asking for an update on the status of the stipulation. Shortly after that, the Arbitrator visited the PTO's publically available on-line Patent Application Information Retrieval system ("PAIR") and did an assignment search using the patent numbers of the patents asserted in this matter. That search turned up some surprising information. A number of the patents had been assigned from Mr. Williams to Claimant in 2015 (and another assignment in 2007) but the 2015 assignment was not recorded in the PTO until 2018. The assignments that relate to the asserted patents, as shown in PAIR, are:

### TABLE III - PATENT ASSIGNMENTS

| Patent No. | Assignment Execution Date | Assignment Recordation Date |
|---|---|---|
| 6,609,725 | March 23, 2015 | September 20, 2018 |
| 6,945,550 | March 23, 2015 | September 20, 2018 |
| 8,858,141 | March 23, 2015 | September 20, 2018 |
| 8,899,456 | March 23, 2015<br><br>April 5, 2007 | September 20, 2018<br><br>Not recorded |

| Patent No. | Assignment Execution Date | Assignment Recordation Date |
|------------|---------------------------|-----------------------------|
| D684,917   | March 23, 2015            | May 10, 2018                |
| D717,716   | March 23, 2015            | May 10, 2018                |
| D717,717   | March 23, 2015            | May 10, 2018                |
| D722,289   | March 23, 2015            | May 10, 2018                |

The actual assignment document, signed by Mr. Williams on March 23, 2015, as obtained by the Arbitrator's staff from the PTO is attached to this Award as Attch. B. Curiously, the assignment was not included on Claimant's pre-hearing or final exhibit list. Moreover, on April 5, 2007, a facsimile was sent to the PTO that included both a patent declaration signed by Mr. Williams and an assignment also signed by him and dated April 5, 2007. The declaration and assignment accompanied the application that led to the '456 patent. (*See* C-10 at pp. C-10_00774-00776). During the hearing, the prosecution history of the '456 patent was admitted into evidence as exhibit C-10. There is nothing in that exhibit showing that the April 5, 2007, assignment was ever forward to the PTO for recordation.

Given that the patent ownership issue was raised over a year before the start of the hearing, and the assignments of the four utility patents and the four design patents at issue were executed in March 2015 and recorded over three years later and several weeks before the hearing commenced, it appears that Claimant's patent prosecution firm was not timely communicating with its hearing counsel.

Nonetheless, on October 4, 2018, the parties forwarded to the AAA Case Manager and the Arbitrator a Stipulation Re: Binding Effect of Award. This Stipulation is dated September 25, 2018, and was signed by Marty Williams, Claimant's President, and counsel for each party. In its entirety, the Stipulation states:

> It appears that the records of the Unites States Patent Office do not show that Let's Go Aero, Inc. ("LGA") is the assignee of the patents asserted by LGA in the arbitration proceedings ("Patents"). Marty L. Williams, President of Lets (sic) Go Aero, Inc. ("Williams"), acknowledges that he has assigned all of his rights in the Patents to LGA and to no one else. The parties to the arbitration proceeding and Williams, who joins herein, agree that the Award of the Arbitrator in these proceedings shall be binding upon them and that neither party nor Williams will make an argument in any forum that this Arbitration could not consider the Patents because the owner was not a party to the Arbitration.

Given the timing of the hearing and the recordation of the assignments, coupled with the fact that the March 23, 2015, assignment document was not included on

Claimant's exhibit list or presented during the hearing, the Arbitrator will incorporate the parties September 25, 2018, stipulation into this Award.

## II.     THE PATENTS AND ASSERTED PATENT CLAIMS

### A.     Introduction

This portion of the overall Award is limited to the patent infringement, invalidity, inequitable conduct, and damages matters that were presented during the May 31, 2018, to June 7, 2018, and August 1, 2018, evidentiary hearing and refrains from discussing the specifics of the parties' proprietary and confidential information. Although patent damages will be discussed, the amount of those damages and the bases for them as addressed by the parties and their damage experts are redacted in the redacted form of this Award because those items involve information that the parties have designated as confidential or attorneys eyes only ("AEO") under the Protective Order entered in this matter.

The United States patents at issue are set out in the following table:

**TABLE IV - ASSERTED PATENTS**

| Patent Number | Filing Date[6] | Issue Date |
|---|---|---|
| 6,609,725 (the '725 patent) | September 25, 2000 | August 26, 2003 |
| 6,945,550 (the '550 patent) | August 25, 2003 | September 20, 2005 |
| 8,858,141 (the '141 patent) | May 16, 2008 | October 14, 2014 |
| 8,899,456 (the '456 patent) | April 5, 2007 | December 2, 2014 |
| D 684,917 (the D917 patent) | December 14, 2012 | June 25, 2013 |
| D 717,716 (the D716 patent) | June 27, 2013 | November 18, 2014 |
| D 717,717 (the D717 patent) | June 27, 2013 | November 18, 2014 |
| D 722,289 (the D289 patent) | May 13, 2013 | February 10, 2015 |

During the hearing, there was some testimony concerning the relationship of these patents to each other. In the post-hearing briefing, Respondent contended that although the design patents claimed priority to the previously filed '456 utility patent application,

---

[6]  The filing dates set out in this table are the dates on which the applications for the respective patents were filed. The parties dispute the effective filings dates of the design patents, a matter discussed later in this Award in relation to each of those patents.

as either continuations or continuations-in-part, those design patents are not entitled to an earlier filing date. These points will be addressed in detail below.

The asserted claims of the utility patents, as found in Claimant's complaint and its infringement contentions are set out in the following table:

**TABLE V - ASSERTED UTILITY PATENT CLAIMS**

| US Patent Number | Asserted Independent Claims | Asserted Dependent Claims |
|---|---|---|
| '725 patent | Independent claim 1 | Dependent claims 2, 3, and 4, each of which depends from claim 1. |
| '550 patent | Independent claim 1 | Dependent claims 2, 3, and 6, each of which depends from claim 1. |
| '141 patent | Independent claim 1 | Dependent claims 2, 3, and 4, each of which depends from claim 1. |
| | Independent claim 5 | Dependent claims 6, 7, and 8, each of which depends from claim 5. |
| '456 patent | Independent claim 1 | Dependent claim 2, depending from claim 1. Dependent claim 3, depending from claim 2. Dependent claim 4, depending from claim 3. Dependent claim 5, depending from claim 4. Dependent claim 6, depending from claim 1. Dependent claim 9, depending from claim 1. Dependent claim 11, depending from claim 9. |

After this arbitration was instituted and before the evidentiary hearing, the '725 patent and the '550 patent were subject to *ex parte* reexamination proceedings in which several claims of these patents were amended and other claims added. The reexamination certificate for the '725 patent issued on December 22, 2017, (C-14) and that for the '550 patent issued on December 26, 2017 (C-19). Independent claim 1 of the '725 patent was slightly amended, by changing the word "a" to "the" in two places; as a result, that amendment is incorporated into claims 2 through 4. In addition, new claims 5 through 9 were added to the '725 patent in reexamination. As to the '550 patent, independent claim 1 was amended in the same way as claim 1 of the '725 patent. Claim 6 was amended in a significant manner and claims 7 through 10 were added.

During the March 12, 2018, status hearing in this matter, counsel for Claimant stated that the claims added to the '725 patent (*i.e.*, claims 5-9) and to the '550 patent (*i.e.*, claims 7-10) are not and will not be part of this arbitration. Also, during that hearing, the parties agreed that the amendments to the claims made during the reexaminations do not require that the claim constructions previously entered by the Arbitrator be revisited. (*See* Order No. 21, March 15, 2018, p. 4). The Arbitrator concurs and notes that the claim amendments would not change the previous construction or the claims. For the purpose of assessing the assertions of infringement of the four utility

patents, the constructions set out in the claim construction order will be used. (*See* Order No. 12, September 27, 2017, a copy of which is attached hereto as Attch. A)

On September 27, 2017, the undersigned construed the disputed claim terms of the asserted utility patents, as those terms were identified by the parties. In that construction, the undersigned considered each of the four asserted utility patents, their prosecution histories, the Joint Disputed Claim Terms charts submitted by the parties, the claim construction briefs submitted by the parties, and applicable claim construction case law. The Arbitrator's construction resulted in a 45 page Order on the Construction of the Patent Claim Terms in Patents Asserted in this Proceeding. (*See* Attch. A hereto).

As to the design patents, during the June 15, 2017, status hearing, the parties took the position that construction of the design patent claims was not needed. The Arbitrator then commented that "the ornamental design aspects of each design patent should be addressed during the evidential hearing." (*See* Order No. 8, June 20, 2017, p. 5).

## B.    Applicable Legal Standards Relating to Utility Patents[7]

### 1.    Infringement

In assessing the allegations relating to the patents at issue, this section will address the legal standards to be applied. In particular, the issues of claim construction, infringement, invalidity and inequitable conduct will be discussed.

As noted, prior to the evidentiary hearing, the Arbitrator construed the disputed elements of the asserted claims. (*See* Order No. 12, September 27, 2017, a copy of which is attached hereto as Attch. A). That Order describes the Arbitrator's approach to the constructions of the claims and the legal standards relating thereto and will not be repeated here. For the avoidance of doubt, that Order, as attached, is part of this Award.

In this case, Claimant contends that Respondent has infringed certain identified claims of Claimant's utility patents. To succeed on this contention, Claimant must prove the following two elements by a preponderance of the evidence:

1. Every requirement in the claim of Claimant's patent is found in Respondent's accused product. *See Riles v. Shell Exploration & Prod. Co.,* 298 F.3d 1302, 1308 (Fed. Cir. 2002); *Pfizer, Inc. v. Teva Pharms. USA, Inc*., 429 F.3d 1364, 1376 (Fed. Cir. 2005); *PSC Computer Prods., Inc. v. Foxconn Int'l,* 355 F.3d 1353, 1357 (Fed. Cir. 2004); *Cross Med. Prods. v. Medtronic,* 424 F.3d 1293, 1310 (Fed. Cir. 2005).

2. Respondent made, used, sold, offered for sale, or imported that product into the United States. 35 U.S.C. § 271(a).

---

[7] Much of the legal standards discussed in this section is taken from the Federal Civil Jury Instructions of the Seventh Circuit, Section 11, Patents, 2017 rev. and updates to those instructions that are currently being considered by the Seventh Circuit. The Arbitrator has been on the committee of pattern civil jury instructions for patent cases since 2012, drafting revisions and updates to the instructions.

To meet this requirement, Respondent's products must be compared to the applicable claim(s) being asserted, as the Arbitrator construed them. For the asserted dependent claims, the elements of the dependent claims and the claim, or claims, to which that dependent claim refers must be considered and applied to the Respondent's accused products.

There are two ways to address infringement: (i) literal infringement, or (ii) infringement under the doctrine of equivalents. Literal infringement exists if the elements of the claim are found in the accused product exactly as they are found in the claim. If an element in the accused product differs from the requirement of the claim, infringement may exist under the doctrine of equivalents. For example, a part of Respondent's product could be equivalent to a claim requirement if a person of ordinary skill in the field of the invention would regard any differences between them as insubstantial. *See, e.g.*, *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39-40 (1997); *Honeywell Int'l. Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004) (*en banc*); *Novartis Pharmaceuticals Corp. v. Eon Labs Mfg., Inc.*, 363 F.3d 1306, 1312 (Fed. Cir. 2004). One way to consider this point is to determine whether a part of Respondent's accused product performs substantially the same function, in substantially the same way, to obtain substantially the same result as required by the limitation in the claim under consideration. If it does then that part could be considered equivalent to the claim limitation. *Machine Co. v. Murphy,* 97 U.S. 120, 124 (1878); *Warner- Jenkinson Co., supra,* 520 U.S. at 39-40.

Finally, if an independent claim is not infringed, there can be no infringement of any dependent claim that refers directly or indirectly to that independent claim. *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1316, n.1 (Fed. Cir. 2006) (dependent claims not infringed when independent claim not infringed); *Oak Technology, Inc. v. ITC*, 248 F.3d 1316, 1323, n.4 (Fed. Cir. 2001) (same).

In this matter, Claimant asserts that Respondent has directly infringed the asserted independent and dependent claims of the '725, '141, and '456 patents. Claimant also contends that Respondent induced purchasers of some of its products to infringe the '550 patent. To succeed on this inducement contention, Claimant had to prove the following by a preponderance of the evidence:

1. Respondent knew of Plaintiff's patent.

2. Respondent acted, encouraged, instructed, induced, or caused its customers to use/make a product in a manner that directly infringed Claimant's '550 patent. *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990).

3. Claimant knew or should have known that its acts would cause its customers to infringe Claimant's '550 patent. *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321-22 (Fed. Cir. 2009) ("[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements.") (quoting *DSU Med. Corp. v. Paramount Systems, Inc.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).

4. That other person directly infringed the patent.

## 2. Infringement Damages

Finally, Claimant seeks damages for the asserted infringement of its utility patents. Typically, damages start with the date a defendant is aware of the patent and a plaintiff has given notice of its patent rights. This notice can take the form of correspondence to the defendant advising it of the patent and the claims plaintiff believes are infringed, together with an identification of the accused infringing products. The notice can also be given by placing the word "patent" or the abbreviation "PAT." with the number of the patent on substantially all the products it sold that included the patented invention. 35 U.S.C. § 287(a). This latter approach is referred to as "patent marking." The marking with a patent number is important because a patent owner's failure to mark with the number has an effect on damages. According to 35 U.S.C. § 287(a), "[i]n the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice." Further, if a plaintiff does not practice the patent, or when the patent involves only method claims, damages begin at the time the infringement starts and there is no requirement that the defendant receives actual or constructive notice of the patent. *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1220 (Fed. Cir. 2002).

In patent matters, there are three ways to calculate damages resulting from infringement: (i) determination of the patent owner's profits it lost due to the infringement, (ii) a reasonable royalty, and (iii) a combination of lost profits and reasonable royalty.

Lost profits consists of the additional profits that Claimant would have made if there had been no infringement by Respondent. To recover lost profits, Claimant had to prove the following by a preponderance of the evidence:

1. A reasonable probability that, but for Respondent's infringement, Claimant would have made additional profits through the sales of all or some of the patented product or process that Respondent made. *See Grain Processing Corp. v. American Maize-Prod. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999); *Siemens Med. Solutions, USA Inc. v. Saint-Gobain Ceramics*, 637 F.3d 1269, 1289 (Fed. Cir. 2011), citing *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (*en banc*).

2. The amount of profit Claimant would have made on those additional sales. Claimant does not need to prove this amount with precision, and if there are uncertainties regarding the specific amount of lost profits, those uncertainties may be resolved in favor of Claimant and against Respondent. *See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006). Once a patentee shows causation, "the trial court may resolve doubts underlying the precise measurement of damages against the infringer." *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996).

3. Respondent reasonably should have foreseen that Claimant would have lost profits. *See Rite-Hite Corp.*, 56 F.3d at 1545-46. This element becomes an issue if the Respondent offered evidence of lack of foreseeability.

Moreover, lost profits damages are a measure of the profits lost by Claimant due to the infringement by Respondent and not the profits made by Respondent.

There are several ways in which a patent owner can attempt to establish its lost profits damages. One way that Claimant could establish, by a preponderance of the evidence, that it is reasonably probable, that it would have made additional sales of the patented product or process is by proving three things:

1. There was a demand for the patented product or process;

2. There was no acceptable, non-infringing substitute for the patented product or process and

3. Claimant was capable of satisfying the demand.

*See Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (*en banc*). If Claimant proves these matters, the burden of proof shifts to the Respondent to disprove lost sales. *Rite-Hite*, 56 F.3d at 1545.

Another way that Claimant may prove its entitlement to lost profits is to establish that it is reasonably probable that it would have made additional sales of the patented product or process is by proving two things:

1. Claimant and Defendant are the only suppliers for the product or process in the market; and

2. Claimant was capable of making all of the sales made by Defendant.

This approach is oftentimes referred to as the lost profits analysis in a two supplier market. If Claimant proves these things, it is entitled to recover its lost profits on all of the sales made by Respondent unless Respondent proves that Claimant would not have made some or all of the sales. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 428 F.3d 1354, 1370 (Fed. Cir. 2006); *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1141 (Fed. Cir. 1991); *Lam, Inc. v. Johns- Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983).

A further alternative lost profits assessment is where Claimant establishes that it is reasonably probable that it would have made additional sales of the patented product or process is by proving two things:

1. Claimant would have made some portion of Respondent's infringing sales if Respondent's infringing product or process had not been available; and

2. Claimant was capable of making those additional sales.

This approach is referred to as the lost profits market share analysis. If Claimant proves these things, it is entitled to recover its lost profits on the percentage of Respondent's sales that reflects what Claimant proves was its share of the market. In this regard, use of this method requires evidence of the share of the market held by Claimant and, ideally, also held by Respondent. Moreover, under this approach, Claimant may recover lost profits even though acceptable non-infringing substitutes are available from others. *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989). In such cases, Claimant would be entitled to recover lost profits on a percentage of Respondent's sales equal to the Respondent's (plus Claimant's) market share, and a reasonable royalty on the balance of Respondent's infringing sales. *State Indus.*, 883 F.2d at 1577-78; *Crystal Semiconductor Corp. v. Tritech Microelectronics, Int'l.*, 246 F.3d 1336, 1354-56 (Fed. Cir. 2001).

In this proceeding, Claimant also seeks reasonable royalty damages. The evidence needed for a determination of such damages very typically addresses the factors that are found in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). These factors are:

1. Royalties that others paid to Plaintiff to be allowed to make, use, sell, offer for sale, or import the patented invention;

2. Royalties that Defendant paid to others for comparable patents;

3. Whether Plaintiff had a policy of licensing or not licensing the patents;

4. Whether Plaintiff and Defendant are competitors;

5. Whether use of the patented invention helps to make sales of other products or services;

6. Whether the patented invention is commercially successful, as well as its profitability;

7. The advantages of using the patented invention over products not covered by the patent;

8. The extent of Defendant's use of the patented invention and the value of that use to Defendant;

9. Any royalty amounts that are customary for similar or comparable patented inventions;

10. The portion of the profit on sales that is due to the patented invention, as opposed to other factors, such as unpatented elements or processes, features, or improvements developed by Defendant; and

11. Expert opinions regarding what would be a reasonable royalty.

Of course, other factors may be considered, depending on the evidence.

### 3. Claimant's Willful Infringement Assertion

Claimant also alleges that Respondent's infringement of each of the utility and design patents was willful. (Complaint, ¶63). In its post-hearing briefing on attorneys' fees, Claimant seeks a determination that this case is exceptional and it should be awarded attorneys' fees under 35 U.S.C. § 285. Infringement is willful if Claimant has proven by a preponderance of the evidence that Respondent knew that it was infringing the patent or acted in reckless disregard of Claimant's rights. In making this determination, evidence including any evidence regarding whether Respondent acted maliciously, deliberately, or in bad faith, is to be considered. In its recent decision in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1934 (2016), the Supreme Court overturned *In re Seagate Technology, LLC.*, 497 F.3d 1360 (Fed. Cir. 2007) (*en banc*), explaining that the decision to award enhanced damages is a matter for the district court's discretion without explicit limits or conditions. The Supreme Court indicated in *Halo* that enhanced damages "are not to be meted out in a typical infringement case" but are reserved for behavior that is willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate. *Halo*, 136 S. Ct. at 1932.

### 4. Respondent's Defenses of Non-infringement and Invalidity Regarding the Utility Patents

Respondent contented in its Answer and Counterclaims that the asserted utility patents were not infringed. *See* Answer and Counterclaim, submitted March 3, 2017, pp. 8-9 at ¶¶60-69 (denial of direct infringement and infringement by inducement). In addition, Respondent's affirmative defenses asserted that Respondent had not infringed any claim of the patents. (*id.* p. 13 at ¶16-17). and that one or more of the asserted patents are unenforceable as a result of inequitable conduct. (*Id.* p. 13-14 at ¶ 19)). As to this allegation, Respondent did not specifically identify, in its affirmative defenses, the patents it contends are unenforceable. However, Respondent alleged in its Counterclaims that each of the design patents is unenforceable due to inequitable conduct (*Id.* at pp.21-28 at ¶¶25-51 of Respondent's counterclaims). Finally, Respondent asserts that each of Claimant's patents is invalid under at least 35 U.C.S §§101, 102, 103, and 112. (*Id.* p. 28, ¶53-54).

To prevail on the non-infringement defense, Respondent had to show by a preponderance of the evidence that the accused product did not contain at least one limitation of the claim at issue (*i.e.*, no literal infringement) or that one or more of the claim limitations not literally present do not meet the requirements for application of the doctrine of equivalents (*i.e.*, no infringement under the doctrine of equivalents).

In connection with the issues of patent validity, each of the asserted patent claims is presumed to be valid. 35 U.S.C. § 282; *Avia Group Int'l, Inc. v. L.A. Gear Cal.*, 853 F.2d 1557, 1562 (Fed. Cir. 1988); *DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 427 (Fed. Cir.

1986); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983). For this reason, Respondent had the burden of proving invalidity by clear and convincing evidence. The validity of each claim is determined separately.

Regarding Respondent's assertions that the claims are invalid under §101 of the patent statute, this provision relates to whether the subject matter of the claim is eligible for patent protection. At the hearing and in its post-hearing briefing, Respondent did not provide any evidence or argument directed to patent eligibility of the utility patents and has thus (i) not presented clear and convincing evidence that any one or more of the patent claims is/are invalid under 35 U.S.C. §101, and (ii) waived that argument.

As to §§102 (anticipation) and 103 (obviousness) defenses, the statute and law to apply is based on whether the patent at issue is to be considered under the respective statute as that statute existed prior to the effective date of the claim under consideration. This is due to the enactment of the America Invents Act (AIA) which changed the nature of what can be considered to be prior art. In sum, if the patent at issue never included a claim having a priority date *after March 15, 2013* and never contained a priority claim to any patent or application that contains or ever contained a claim with an effective filing date *after March 15, 2013*, then the applicable statute is the one that existed prior to the effective date of the AIA. On the other hand, if the patent at issue contains *or ever contained* a claim with an effective filing date after March 15, 2013, then the AIA amendments apply to *all claims* instead of just the claim(s) that had such an effective filing date. Given the differences between the nature of items to be considered as prior art under the statues as existing pre- and post- the effective date of the AIA, any discussion of which to apply will be addressed when the invalidity of the individual patents is detailed.

The law requires that the "specification" section of the patent contain enough information to enable a person of ordinary skill in the field of the invention to make and use the invention, without an unreasonable amount of experimentation. A patent does not have to state information that persons of ordinary skill in the field would be likely to know or could obtain without undue effort. To be enabling, the specification must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation. *See* 35 U.S.C. §112; *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1306 (2001); *Union Pac. Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 690-92 (Fed. Cir. 2001); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986) (a patent does not have to teach what is well known in the art). Lack of enablement must be proven by clear and convincing evidence. *Ralston Purina Co. v. Far-Mar Co.*, 772 F.2d 1570, 1573-74 (Fed. Cir. 1985); *White Consolidated Indus., Inc. v. Vega Servo Control, Inc.*, 713 F.2d 788, 791 (Fed. Cir. 1983). The AIA did not affect the legal analysis under § 112 as related to the issues in this proceeding.

Regarding Respondent's assertions that the claims are invalid under §112 of the patent statute, this provision relates to whether the patent's specification contains a "written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to

which it pertains, or with which it is most nearly connected, to make and use the same…" While the AIA made several amendments to §112, none of those amendments affect the issues in this proceeding.

At the hearing and in its post-hearing briefing, Respondent did not provide any evidence or argument directed to patent invalidity of the utility patents under §112 of the pre-AIA statute or §112(a) of the post-AIA statute, and thus has: (i) not met its clear and convincing evidence that any one or more of the patent claims is/are invalid under 35 U.S.C.§ 112, and (ii) waived that argument. The issues involving §102 will be addressed below in relation to each patent.

### 5. Respondent's Defense of Inequitable Conduct Regarding the Design Patents

Respondent contends that the design patents are unenforceable because Claimant committed inequitable conduct during the prosecution of them. According to Respondent, Claimant did not disclose to the PTO that Respondent had been selling the products accused of design patent infringement before the effective filing date of the patents' applications and also did not disclose that the drawings in the applications were based on Respondent's commercially sold products.

In its decision in *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276 (Fed. Cir. 2011)(*en banc*), the Federal Circuit clarified the elements of inequitable conduct and the burden and proofs necessary to establish inequitable conduct. The court confirmed that inequitable conduct is an equitable defense to patent infringement and, if proven, renders the patent unenforceable. *Therasense*, 649 F.3d at 1285. In addition, a finding of inequitable conduct of a single patent can spread to other related patents in the same technology family and render them unenforceable also. *Id.* at 1288-89, citing *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 808-12 (Fed. Cir. 1990).

For it to prevail on a claim of inequitable conduct, Respondent had to prove that Claimant acted with the specific intent to deceive the PTO. *Therasense*, 649 F.3d at 1290. To meet this requirement, Respondent had to show by clear and convincing evidence that Claimant know of a reference, knew that it was material, and made a deliberate decision to withhold that reference from the PTO. *Id.* The court also held that the issues of intent and materiality are separate requirements and each must be separately weighed. *Id.*

As to intent, the court cautioned that a finding of specific intent to deceive the PTO must be the single most reasonable inference able to be drawn for the evidence. *Id.*, quoting *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008). A threshold level of intent to deceive must be shown by clear and convincing evidence before a patentee needs to provide evidence of good faith. *Therasense*, 649 F.3d at 1291, quoting *Star Scientific*, 537 F.3d as 1368

Finally, the court confirmed that the materiality element is based on the but-for standard, *i.e.*, but-for the withholding of the reference at issue, the patent would not have issued. *Therasense*, 649 F.3d at 1291.

## C. The Utility Patents at Issue

In this section, the asserted utility patents will be separately addressed, which involves the issues of infringement, validity, inequitable conduct, and damages.

### 1. The '725 Patent

As noted, the application for the '725 patent was filed on September 25, 2000, as an original application and did not assert a claim of priority to an earlier filed application. The '725 patent issued on August 26, 2003. The patent describes a device that can securely clamp a shank tube to a receiver tube in a manner that minimizes the rattling and relative movement of the shank tube and the receiver tube. ('725 patent, C-3, at 1:60-65)[8]. In this proceeding, the device shown and claimed in the '725 patent has been referred to by the parties as the Silent Hitch Pin ("SHP") and that reference will be used in this Award. Claimant asserts independent claim 1 and dependent claims 2-4 of the '725 patent were directly infringed by Respondent.

The terms in the asserted claims of the '725 patent were construed by the Arbitrator. (*See* Order No. 12, Attch. A hereto, pp. 21-24). During the hearing, Claimant contended that Respondent's products sold under Respondent's Stock Keeping Unit ("SKU") numbers 13413, 63232, 63232-25, and 70255, identified by Ms. Williams during her testimony, infringed the asserted claims of this patent. (Claimant's Liability Brief, at 34). However, Claimant also appears to contend that other products Respondent sold, SKUs 63145 and 63146, also infringed the '725 patent. (*Id.*, 31).

### 2. The '550 Patent

The application for the '550 patent was filed of August 25, 2003, as a continuation of the '725 patent, and was published on June 3, 2004. It issued as a parent on September 20, 2005. The filing date of the '550 patent application was the day before its parent, the '725 patent, was issued. In essence, the '550 patent claims a method of using the pin disclosed in the '725 patent. The terms in the asserted claims of the '550 patent were construed by the Arbitrator. (*See* Order No. 12, Attch. A hereto, p. 24). During the hearing, Claimant contended that Respondent's products sold under Respondent's SKUs 13413, 62145, 63232, 63232-25, and 70255, among others, infringed the asserted claims of this patent. (Claimant's Liability Brief, at 31). Claimant also seeks damages for Respondent's products that are claimed to infringe the '550 patent. (*Id.* at 33).

---

[8] Reference to text of the patents will refer to the patent number, the corresponding exhibit number and the column and line number(s) where that text is found. For example, column 1, lines 60 through 65 of the '725 patent, will be cited as '725 patent, C-3, 1:60-65.

### a. Products Accused of Infringing the '725 and '550 Patents

After the hearing, Claimant contended that the following products, identified by Respondent's SKU numbers, infringe the '725 and '550 patents: 13143, 63232, 63232-025, 63147, 7023500, 7023533. (Claimant's Submission of Booklet Requested by Order # 25, Exhibit thereto, at p. 2, submitted June 28, 2018). On July 30, 2018, pursuant to Order No. 26, ¶13, dated July 19, 2018, Claimant submitted a revision to its listing of products accused of infringing the '725 patent. In that revision, Claimant identified that Respondent's SKUs 63232, 63232-025, 63145, 63145-025, and 63145 are accused products, but did not specify which patent each is alleged to be infringed.

The apparent confusion over exactly what is alleged to infringe the '725 and '550 patents is also seen in the expert reports of Claimant's damages expert Scott Hampton, and Respondent's damages expert Kevin Pierce. Mr. Hampton based his damage analyses for the '725 and '550 patents on Respondent's following SKU numbers, as taken from Mr. Hampton's Expert Report submitted February 2, 2018 (at Table 5, p. 14). Mr. Hamilton's entire export report and its exhibits was admitted as Exhibits C-970a and C-970 at the hearing. For comparison, the following table also presents Mr. Pierce's conclusion as to the SKUs that should be considered in relation to these patents, as taken from Exhibits C-2 and C-3 of Mr. Pierce's Expert Report submitted April 12, 2018 (the entire report and exhibits thereto was admitted as Exhibit R-384 during the hearing).

**TABLE VI - SKUS ACCUSED OF INFRINGING THE '725 AND '550 PATENTS**

| Respondent's SKU Number | Hampton '725 Patent Analysis | Pierce '725 Patent Analysis | Hampton '550 Patent Analysis | Pierce '550 Patent Analysis |
|---|---|---|---|---|
| 13143 | X | X | | X |
| 59105 | X | X | | X |
| 59106 | X | X | | X |
| 63140 | X | | | |
| 63144 | | | X | |
| 63145 | | | X | |
| 63146 | | X | X | X |
| 63147 | X | | | |
| 63232 | | X | X | X |
| 70235 | | | X | |

| Respondent's SKU Number | Hampton '725 Patent Analysis | Pierce '725 Patent Analysis | Hampton '550 Patent Analysis | Pierce '550 Patent Analysis |
|---|---|---|---|---|
| 7023500 | X | X | | X |
| 7023533 | X | | | |
| 63145-025 | | X | X | X |
| 63232 (2 inch) | X | | | |
| 63232-025 | X | X | | X |
| 5802400 | X | X | | X |
| 5800200 | | X | | X |
| 5801600 | | X | | X |
| 1370400 | | X | | X |
| 1370500 | | X | | X |

In addition to differences in the products accused of infringing the '725 and '550 patents, the respective experts disagree on the number of such products that should be considered for damages purposes. For example, in his expert report, C-970a, Mr. Hampton concluded that Respondent obtained revenue of **XXXXXX** from January 28, 2012, to January 16, 2018, related to the '550 patent that resulted from the sale of 2,640 units. (C-970a at p. 5 and supporting exhibits F, F.1, and F.1.1 at C-970_0025, C-970_0026, and C970_0712 respectively) and **XXXXXX** during that same time period relating to the '725 patent that resulted from the sale of 15,259 units. (C-970 at p. 5 and supporting exhibits F, F.2, and F.2.1 at C-970_0025, C-970_0027, C970_0730, and C970_0731 respectively).[9]

In his supplemental expert report submitted April 5, 2018, Mr. Hampton amended the revenue numbers to be **XXXXXX** related to the '550 patent and at least **XXXXXX** related to the '725 patent. (*See* C-970b at pp. 4-5, ¶14, Hampton Supplemental Expert Report). In addition, Mr. Hampton revised the number of sold units in respect of the patents to 4,091 relating to the '550 patent (C-970_2264, supporting exhibit F.1, which is dated April 5, 2018) and 13,137 relating to the '725 patent (C-970_2265, supporting exhibit F.2, dated April 5, 2018).

---

[9] These exhibits are all dated February 2, 2018. Mr. Hampton submitted three expert reports and supporting exhibits: C-970 contains the supporting exhibits referenced in his original report (C-970a). He submitted a supplemental report (C-970b) and exhibits supporting it. (C-971). Finally, he submitted a rebuttal report (C-971a) replying on supporting exhibits (C-971).

It is unclear to the Arbitrator whether for certain of his unit sales data Mr. Hampton identified the products as separate units or as one package containing a number of units. For example, the testimony at the hearing was that the SKUs 63232-025 and 63145-025 sold by Respondent each contained a total of 25 separate pins. Mr. Hampton's report does not say whether he counted each pin in as a separate unit or simply counted the entire package as one unit. In his supporting exhibit F.1, Mr. Hampton includes 298 units of SKU 63145-025 that Respondent sold and received **XXXX** in revenue. If each package is counted as one unit, then the average revenue received was **XXXX**. However, if each pin in the packages is considered as a separate unit, then the 298 packages equate to 7,450 individual units, and the average revenue for each would be **XXXX**.

In addition, in his report, Mr. Hampton does not explain why he categorized some of the pins to be considered in relation to the '725 patent and others in relation to the '550 patent. Given that the '550 patent claims a method of using the pin that is claimed in the '725 patent, it seems artificial to identify some SKUs implicating the '725 patent and others implicating the '550 patent. However, as noted below, the Arbitrator does not deem this to be important in analyzing any potential damages.

Respondent's expert Pierce determined that Mr. Hampton's assessments were questionable. Mr. Pierce's analysis concluded that Mr. Hampton had undercounted the number of pins sold by Respondent and that Respondent sold **XXXX** separate units. Under the Settlement Agreement, Respondent was permitted to sell-off 25,792 units of the pin. (C-976 at §2). Thus, Mr. Pierce concluded that Respondent had sold **XXXX** units more than permitted and received **XXXX** in revenue from such sales. (*See* R-384, Pierce Expert Report, at p. 96 and supporting exhibit E-1.1).

In his report and his hearing testimony, Mr. Pierce proposed that a royalty rate of 7% would be appropriate to apply to this revenue amount on the theory that the parties had agreed to a 7% royalty in the License Agreement. (C-974 at §3; Pierce testimony, 6/**7**/18). Thus, Mr. Pierce concluded that if there are any damages to be levied in connection with the excess sales, it should be **XXXXXX**, calculated as 0.07 x **XXXXXX** = **XXXXXX**, before rounding up. (Pierce testimony, 6/7/18; R-384, supporting exhibits E-1, E-1.1).

### b. Infringement Analysis Relating to the '725 and '550 Patents

The parties agree that Section 2 of the January 28, 2012, Settlement Agreement provided Respondent with the right to sell off its inventory of the SHP product in return for an up-front payment of $17,500. (C-974 at §2). In that Agreement, Respondent represented that its inventory or on order amount of that product was 25,792 units. During the hearing, Respondent's counsel admitted in his opening statement that Respondent had sold **XXXX** units in excess of the allowed number. Indeed, Respondent's expert witness Mr. Pierce testified that, from his analysis of Respondent's product sales, he concluded that after January 28, 2012, Respondent sold **XXXX** more of the SHP products than permitted by the Settlement Agreement.

In Respondent's Post-Hearing Brief on Liability and Damages, submitted September 7, 2018 ("Respondent's Liability Brief"), Respondent stated that it "does not dispute that any silent hitch pins that it sold over the 25,792 sell-off allowance would infringe one or both [of the '725 or '550] patents." (Respondent's Liability Brief at 22). Respondent echoed that point in Respondent's Opposition to Claimant's Post-Hearing Brief on Liability and Damages, submitted September 21, 2018, ("Respondent's Opposition Liability Brief") at 16.

In both Respondent's Liability Brief and its Opposition Liability Brief, Respondent did not argue that either the '725 Patent or the '550 Patent was invalid or unenforceable.

Consequently, in light of Respondent's explicit statement that it "does not dispute that any silent hitch pins that it sold over the 25,792 sell-off allowance would infringe one or both [of the '725 or '550] patents," this Award concludes that the **XXXX** units sold by Respondent that were in excess of the 25,792 sell-off allowance found in the Settlement Agreement infringe the '725 patent and the use of such units infringes the '550 patent.

### c.    Damages Assessment Involving the '725 and '550 Patents

Having concluded that Respondent admitted that infringement of the '725 and '550 patents has occurred, it is necessary to determine infringement damages. In this context, both parties submitted reports from their damages experts.

From Claimant's perspective, its expert Mr. Hampton identified that he was retained "to develop and provide a damage theory, as well as, to the extent possible, provide an opinion on monetary damages arising from … direct infringement of patents …" (C-970a at p. 1). Mr. Hampton then listed the patents upon which he was retained to render a damage theory. Those listed patents were the '725 and '550 utility patents and all four of the design patents. Mr. Hampton's original expert report did not address the '141 and '456 utility patents and he did not refer to them in his supplemental and rebuttal reports. Mr. Hampton correctly noted that patent damages are governed by 35 U.S.C. § 284. He stated that under this statute, the following remedies are available (C-970a at p. 17):

a.    Claimant's lost profits attributable to the infringement,

b.    A reasonable royalty, or

c.    A combination of both.

When Mr. Hampton addressed the '725 and '550 patents, he did not attempt to provide any opinion on whether Claimant should receive a lost profits damages amount or even what would be a reasonable royalty rate. Rather, he only calculated the revenue related to what he assumed were infringing sales. Indeed, in paragraph 95 of his report, Mr. Hampton stated (C-970a at p. 29, ¶95, emphasis added):

> In my opinion, the damage award that compensates [Claimant] for
> [Respondent's] infringing use of the '550 Patent and the '725
> Patent includes at least a royalty on the infringing sales. *While I
> have not be asked to calculate a reasonable royalty, I have
> calculated the revenue related to infringing sales.*[10]

Mr. Hampton said essentially the same thing in his April 5, 2018, supplemental expert report. (C-970b at 4, ¶12). Mr. Hampton confirmed in his testimony that although he calculated a revenue so a royalty rate could be applied, he did not determine an appropriate royalty rate. (Hampton testimony, 6/4/18 on cross-examination).

Perhaps Claimant recognized that Mr. Hampton damages approach was deficient, because in its post-hearing response liability brief, it argues that Respondent should not be entitled to the benefit of the 25,792 unit sell-off allowance found in the Settlement Agreement "given its admitted overage and breach of contract." (Claimant's Response Liability Brief at 35). Rather, Claimant posits that all of the pins sold by Claimant after the termination of the License agreement (*i.e.*, 28,391, determined by adding the sell-off allowance to the **XXXX** excess units) should be used as the damages base. (*Id.*). Claimant also contends that as a result of Respondent's admission of infringement, the "damages should be the disgorgement of [Respondent's] profits, which according to Mr. Hampton are no less than **XXXXXX** of infringing revenue related to the '550 Patent and **XXXXXX** of infringing revenue related to the '726 Patent." (*Id.* at 36). In this, Claimant seems to equate Hampton's discussion of revenue derived from the sale of the excess units to Respondent's profits from such sales. That is an incorrect assessment.

Claimant's breach of contract theory in its Response Liability Brief is new. There is nothing in its Amended Complaint that alleges Respondent's sales of any overage amount was in breach of the Settlement Agreement and Claimant did not seek to add that theory as a claim in this proceeding after receiving Respondent's expert report on April 12, 2108. Indeed, during a status hearing conducted on November 6, 2017, counsel for Respondent advised that Respondent had sold about 1,600 of the accused pins over the sell-off allowance, but after that, Claimant did not seek to assert a breach of the Settlement Agreement as a separate allegation in its complaint. (*See* Order No. 14 at 2-3). Moreover, Claimant has explicitly stated that "[C]laimant is not suing for substantive damages under the Settlement Agreement." (Claimant's Reply Liability brief at 13).

It is the Arbitrator's conclusion that the patent damages statute, 35 U.S.C. §284, provides no basis for disgorgement of profits or revenues. The statute has been construed and applied consistently as authorizing an award of the patent owner's lost profits, assuming all elements of a lost profits analysis are proven, or not less than a reasonable royalty. In an appropriate case, a combination of lost profits and a reasonable royalty might be used. Here, Mr. Hampton did not provide testimony on the factors to be addressed in a lost profits analysis, including testimony directed to market share and related factors found in *Panduit*, *Rite-Hite*, or *State Indus., Inc.* as those cases are noted

---

[10] Mr. Hampton repeats the emphasized sentence in his supplemental expert report, C-970b at 4.

above. He also did not provide any royalty rate be applied to a royalty base and did not address any of the factors set out in *Georgia-Pacific*.

While the Arbitrator recognizes that Mr. Pierce's approach of using the 7% royalty rate found in the License Agreement has some appeal, the Arbitrator believes that rate would not take into account the disputes between the parties starting in 2010 with the **Colorado – I Action**. With those disputes in mind, it is uncertain whether the parties would have later agreed to a 7% royalty under the *Georgia Pacific* factors, particularly in view of the on-going animosity between the parties that the Arbitrator has noted throughout this proceeding.

However, the Arbitrator believes the Settlement Agreement provides guidance that can be used to develop a damages approach that is consistent with the patent damages statute. As noted above, the 25,792 units of sell-off allowance available to Respondent came at a cost of $17,500. Thus, Respondent essentially paid $0.68 for each unit it could sell ($17,500 divided by 25,892 units, rounded up). The Arbitrator believes that a damage approach using the $0.68 amount as a per unit royalty is true to the Settlement Agreement and does not require application of the royalty rate that was terminated when the Settlement Agreement was executed. Consequently, the Arbitrator has concluded that for the **XXXX** excess units sold by Respondent, Claimant is entitled to **XXXXXX** as full and complete damages for the infringement of the '725 and '550 patents. This amount will make Claimant whole for those units and Claimant would not be able to recover on them in the future, either from Respondent or any third party.

In addition, pursuant to 28 U.S.C. §1961(a), prejudgment interest on this amount has been calculated by the Arbitrator to be **XXXX**, measured from the Board of Governors of the Federal Reserve System's 1-year constant maturity Treasury yield as of January 1, 2014, compounded annually through December 31, 2018. The 1-year constant maturity Treasury yield as of January 1, 2014 was 0.13. Thus, the total award to Respondent is **XXXXXX**.

        **d.**      **Willful Infringement Relating to the '725 and '550 Patents**

As noted, Claimant alleges that Respondent's infringement of each of the utility and design patents was willful and seeks attorneys' fees under 35 U.S.C. § 285. The issue of willful infringement of the '725 and '550 patents will now be addressed. Infringement is willful if Claimant has proven by a preponderance of the evidence that Respondent knew that it was infringing the patent or acted in reckless disregard of Claimant's rights. Evidence including any evidence regarding whether Respondent acted maliciously, deliberately, or in bad faith, is to be considered.

In its recent decision in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1934 (2016), the Supreme Court overturned *In re Seagate Technology, LLC.*, 497 F.3d 1360 (Fed. Cir. 2007) (*en banc*), explaining that the decision to award enhanced damages is a matter for the district court's discretion without explicit limits or conditions. The Supreme Court indicated in *Halo* that enhanced damages "are not to be meted out in a

typical infringement case" but are reserved for behavior that is willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate. *Halo*, 136 S. Ct. at 1932.

Surprisingly, in its post-hearing briefs on the liability and damages issues, Claimant did not argue that the evidence showed Respondent's actions in relation to the '725 or '550 patents rose to the level of willful infringement. Similarly, in its post-haring briefing on attorneys' fees, Claimant did not discuss evidence relating to alleged willful infringement of these patents to be considered in an exceptional case determination. Instead, Claimant's argument involving Respondent's conduct addressed the misappropriation allegations under the Colorado Uniform Trade Secret Act. (*See* Claimant LGA's Motion for Award of Attorneys' Fees and Costs, submitted October 25, 2018, at 2, making a passing citation to the Supreme Court's decision in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct., 1749 (2014), without any application of that case to the facts adduced during the evidentiary hearing.).

The Arbitrator appreciates that there may be questions as to how Respondent could have sold more of the hitch pins than allowed in the Settlement Agreement if it was not a deliberate decision to infringe the '725 or '550 patents. That, however, was not fully explored during the hearing or in the depositions designated for the hearing.

In any event, in November 2017, slightly more than five months before Respondent's damages expert submitted his opening expert report, Respondent's counsel advised Claimant's counsel and the Arbitrator that Respondent had determined it had sold more of the hitch pins than permitted under the Settlement Agreement. From that time on, Respondent did not contest non-infringement or invalidity of the '725 and '550 patents. In his opening statement during the evidentiary hearing, counsel for Respondent conceded that it had sold at least 2,500 more of the hitch pins that allowed by the Settlement Agreement and stated that Respondent would pay a reasonable royalty on such sales.

In sum, the Arbitrator finds and concludes that willful infringement of either the '725 patent or the '550 patent has not been proven and further finds and concludes that this case is not an exceptional case under 35 U.S.C. §285.

### 3. The '141 Patent

The application for the '141 patent was filed as an original application on May 16, 2008, was published on November 19, 2009, and was issued on October 14, 2014. The '141 patent claims a fastener assembly for securing two components to one another. The assembly includes a pin having a reduced diametrical portion on one end of it that forms a shoulder. The pin is for insertion into a hole formed in a first component. When inserted into the hole, the shoulder engages an outer wall of the first component and the other end of the pin engages another outer wall of that first component. The pin also has a radially extending threaded hole formed in it. The assembly further includes an elongated fastener with a head portion and a threaded portion. This fastener is inserted into at least one hole in the second component , with the threaded portion being threadedly received in the

radially extending threaded hole of the pin. ('141 patent, at 4:35-56).[11] The terms in the asserted claims of the '141 patent were construed by the Arbitrator. (*See* Order No. 12, Attch. A hereto, pp. 25-30).

Throughout this matter, the parties have referred to the '141 patent as the "GearCage" patent. However, the patent and its claims are limited to a fastener pin and not the GearCage product. Although the '141 patent was at issue from the beginning of this proceeding with the parties exchanging infringement and validity contentions, claim construction positions, and taking discovery relating to this patent, on April 20, 2018, the parties submitted a set of Stipulated Facts. Stipulated Fact 35 stated (emphasis added):

> [Respondent] does not sell bikes, and did not sell bikes at any relevant time. *[Respondent] does not sell the type of barrel nut covered by the asserted claims of the '141 patent and did not do so at any relevant time*.

During a conference with counsel for the parties on May 30, 2018, the Arbitrator inquired as to whether the '141 patent was still at issue. Counsel for Claimant said that this patent was withdrawn and would not be part of the hearing.

Given the parties' stipulation, the Arbitrator concludes that Claimant's stipulation means that it could not establish by a preponderance of the evidence that Respondent made, used, sold, offered for sale, or imported a barrel nut covered by the asserted claims of the '141 patent at any relevant time.

### 4.    The '456 Patent

As noted above, the asserted claims of the '456 patent are independent claim 1 and dependent claims 2, 3, 4, 5, 6, 9, and 11. Claims 4, 5, and 11 are multiply dependent claims. (*See* Table V above).

On November 15, 2017, Claimant stipulated to the withdrawal of claim 6 of the '456 patent, stating:

> The parties stipulate to Claimant Let's Go Aero, In. ("LGA") withdrawing its claim of infringement of Claim 6 of the 8,899,456 patent. LGA requested this withdrawal because it acknowledged that the accused Cequent products do not have the "telescoping arms" recited in claim 6 as that term has been construed by the Arbitrator. This withdrawal includes an agreement by Let's Go Aero, Inc. to not assert this claim against existing products or any future products that are substantially similar to products imported or sold by Cequent Performance Products, In. (n/k/a Horizon Global Americas Inc.) or its affiliates, predecessors, successors, or

---

[11] Because is was withdrawn from this case, the '141 patent was not admitted as an exhibit during the hearing. It is referenced in this Award in light of the parties' stipulation.

subsidiaries. With this understanding Cequent Performance Products, Inc., stipulates to allow the withdrawal of Claim 6 of the '456 patent.

(Claimant's Stipulated Withdrawal of Claim 6 of the 8,899,456 Patent, submitted November 15, 2017, p. 1). This stipulation will be part of this Award.

The application for the '456 patent was filed as an original application on April 5, 2007, and published on October 6, 2011. The patent issued on December 2, 2014. The patent describes and claims a bicycle carrier in combination with at least one bicycle by attachment to the wheels of the bicycle. ('456 patent, C-11, 7:44-8:5). The drawings of the '456 patent show the profile of the carrier to be generally V-shaped, with the arms of the V to be either of circular cross-section or square or slightly rectangular. ('456 patent, C-11, compare Figures 4 to 21, 22, 23, and 24)).

The terms in the asserted claims of the '456 patent were construed by the Arbitrator. (*See* Order No. 12, Attch. A hereto, pp. 30-41). In particular, the Arbitrator concluded that each of the asserted claims included a bicycle as a claim element. In reaching this conclusion, the Arbitrator described in detail that the prosecution history of the '456 patent that showed the inclusion of "bicycle" in the preamble of the claims was a positive recitation that was made by the Claimant to overcome rejections of the patent examiner. (*Id*. at 30-38). The Arbitrator also concluded that the term "clamping mechanism" found in claim 1 is properly construed as "an apparatus that holds other components together through a clamping action." (*See* Order No. 12, Attch. A hereto, pp. 38, 44). In this regard, the Arbitrator noted Claimant's construction argument that the "clamping mechanism" may include suction cups or elastic connectors, but also noted that such argument goes to the doctrine of equivalents in an infringement analysis. (*Id*. at 38).

### a.  Products Accused of Infringing the '456 Patent

In its opening liability and damages brief, Claimant argues that photographs found in Respondent's catalogs showing the SportWing V bike rack with bikes attached meet every limitation of claim 1, as construed by the Arbitrator. Claimant then points to certain pages of Respondent's catalogs to support its argument.

As noted above, on April 20, 2018, the parties submitted a set of Stipulated Facts. Stipulated Fact 35 stated (emphasis added):

> *[Respondent] does not sell bikes, and did not sell bikes at any relevant time.* [Respondent] does not sell the type of barrel nut covered by the asserted claims of the '141 patent and did not do so at any relevant time.

While the stipulation specifically identifies the '141 patent, it also makes clear that the parties stipulated that Respondent does not and has not sold bicycles at any relevant time. In light of this, in its post-hearing opening brief, Claimant noted that during the hearing, Mr. Williams identified the elements of Respondent's SportWing

product that corresponded to the limitations in the asserted claims of the '456 patent. (Claimant's Liability Brief at 34). Claimant then argued that "[e]ach limitation of the '456 patent, claim 1 exists in the SportWing V bike rack when a bike is mounted (*id.*) and refers to specific photographs found in Respondent's catalogs for the years 2012 through 2016 (found in R-293 through R-298). (*Id.* at 34-35 and n. 16). After reviewing those photographs identified in footnote 16, the Arbitrator has prepared the following table listing the SKU numbers for each of the accused products shown in the photographs:

**TABLE VII - SKUS ACCUSED OF INFRINGING THE '456 PATENT**

| Product SKU | Description | Citation to Product |
|---|---|---|
| 59608 | NV2 | R-293 at I-9; R-294 at I-3; R-296 at I-4; R-297 at I-7; R-298 at I-3 |
| 5801200 | SportWing, 2-bike, | R-293 at I-11; R-294 at I-9; R-296 at I-9; R-298 at I-4 |
| 1370400 | SportWing, 4- bike | R-293 at I-11; R-294 at I-9; R-296 at I-9; R-297 at I-10; R-298 at I-4 |
| 1370100 | SportWing, 2-bike, Highland brand | R-293 at I-11; R-294 at I-9 |
| 1370500 | SportWing, 4-bike, Highland brand | R-293 at I-11; R-294 at I-9 |
| 13751 | SportWing, 2-bike, Highland brand | R-295 at 38 |
| 13755 | SportWing, 4-bike, Highland brand | R-295 at 38 |
| 13765 | SportWing, 2-bike, Highland brand | R-295 at 38 |
| 1390000 | SportWing, 2-bike, Reese brand | R-295 at 38 (shown at SKU 13751) |
| 1390500 | SportWing, 4-bike, Reese brand | R-293 at I-11; R-294 at I-9 |

In its opposition to Claimant's arguments concerning the '456 patent, Respondent advanced a number of points. (Respondent's Opposition Liability Brief at 17-20). First,

Respondent notes that during his testimony at the hearing, Mr. Williams admitted that Respondent's SKUs 1390000 and 1390500 do not infringe the '456 patent. (*Id.* at 17). Indeed, at the hearing, Mr. Williams also confirmed that these SKUs were not being charged with infringement. During his testimony, Mr. Williams described that Respondent's SportWing product had a bracket welded to the top of the shank; the bottom of the "u-tube" that forms the base for the V-rack arms has another bracket welded to it. Each of the brackets have holes that allow bolts to be used to bolt the brackets together. (M. Williams' testimony 6/4/18). Mr. Williams also testified that this approach used by Respondent provides no compression fit. (*Id.*).

Respondent's second point was that the catalogs cited by Claimant were not admitted during the testimony of Mr. Williams on May 31 or June 1, 2018. (Respondent's Opposition Liability Brief at 17). When Mr. Williams was testifying on June 1 in relation to the '456 patent, Claimant made reference to R-296, Respondent's 2014 catalog, but withdrew that as a proposed exhibit. In addition, during Mr. Williams' June 1 testimony, Claimant moved the admission of R-297, Respondent's 2015 catalog but Respondent objected on the basis that this catalog was published before the '456 patent issued.[12] The objection was sustained due to lack of foundation. Although R-296 was admitted during the testimony of Respondent's Neal Weipert on June 6, 2018, he was not questioned about the '456 patent.

Respondent also noted that during the resumed testimony of Ms. Williams on August 1, exhibits R-293, R-295, R-295, R-297, and R-298 were admitted. However, the Arbitrator's Order No. 26 at ¶1 limited her resumed testimony to the accused pins and the four asserted design patents. (Respondent's Opposition Liability Brief at 17). The Arbitrator's notes taken during Ms. Williams August 1 resumed testimony show that her testimony regarding these exhibits was limited to the areas identified in Order No. 26 and did not address the '456 patent.

Respondent also contended that Claimant's witnesses had no personal knowledge of any of the images shown in Respondent's catalogs or how or when they were made or when the bicycles shown in the image were mounted on the racks. In addition, Respondent pointed out that images in Respondent's 2016 catalog first appeared in catalogs that predate the issuance of the '456 patent. (*Id.* at 18-19).

Finally, Respondent argued that Claimant did not prove that any of Respondent's bike racks had the clamping mechanism limitation found in the asserted claims of the '456 patent. The accused SportWing V racks were shown to have a plate on the bottom of the V-shape and a separate plate on the top of the shank, such that the two plates were bolted together. Respondent also argued that Claimant presented no evidence that the hub on the NV-2 rack was a clamping mechanism as that claim limitation was construed. (*Id.* at 19).

---

[12] The catalog for 2015 bears a 2014 copyright notice and indicates that it was created on or before November 14, 2014, for use in 2015. (*See* R-297 at the bottom of p. I-7 and p. I-10).

### b.    Infringement Analysis Relating to the '456 Patent

The Arbitrator first concludes that Claimant's infringement assertions involving the '456 patent are limited to direct infringement and do not encompass contributory infringement or inducement infringement. This conclusion is consistent with Order No. 6 – Order Resulting from November 6, 2017, Status Hearing, at 6-8, in which the Arbitrator ruled on Claimant's Motion to Amend its Infringement Contentions, submitted on October 18, 2107. In that motion Claimant primarily sought to assert contributory infringement and infringement by inducement in relation to the '456 patent. On November 1, 2017, Respondent opposed the motion to amend, noting that Claimant did not assert contributory or inducement infringement in its complaint in this matter. (*Id*. at 6). Respondent also pointed out that Order No. 3 provided a ten day period after issuance of the claim construction order for a party to submit its final infringement contentions. (*Id*.). After considering the parties' arguments on Claimant's motion to amend, the Arbitrator ruled in relevant part (*id*. at 8):

> [T]he Arbitrator denies Claimant's request to add contributory and/or inducement infringement assertions to its infringement contentions in relation to claim 1 of the '456 patent as being untimely. Apart from the foregoing, the Arbitrator would have also denied the request on the basis that such amendment would delay this proceeding and could prejudice Respondent in connection with, among other things, whether to rely on advice of counsel

> The Denial of Claimant's request as noted herein does not affect Claimant's pleaded direct infringement allegations of claim 1 and that allegation remains in this case.

The Arbitrator now addresses the clamping mechanism claim limitation, as construed. The construction requires that the mechanism hold the parts together by a clamping action. The brackets found on Respondent's SportWing accused products SKSs 1390000 and 1390500 do not use a clamping action. In the clamping mechanism of the '456 patent, the shank is surrounded by what Mr. Williams called a "hat bracket" that forms a compression fit around the shank. (M. Williams' testimony, 6/4/18). This can be seen in an abbreviated part of Figure 2 of the '456 patent:



**Figure 2**

where item 22 is the shank and item 20 is the clamping mechanism (according to Mr. Williams, the hat bracket). *See also* C-11 at 3:55-58.

In contrast, the accused SportWing products are seen as:



(Taken from Respondent's Liability Brief at 25, with the left-hand reference to Brackets in the rectangle and the lead-line arrows from it added by the Arbitrator).

The Arbitrator has reviewed the photographs shown in the catalogs identified in Table VII above and plainly sees that all of the products, other than the NV-2 products, have the same bracket/bolt components as shown in the drawing immediately above. Given that Mr. Williams admitted that this physical construction is not accused of infringement and is not the compression fitting clamping mechanism found in the claims of the '456 patent, there is literal no infringement of the asserted claims of the '456 patent by any of the accused structures.

In addition, Claimant presented no evidence that the hub arrangement found in the NV-2 products literally meets the "clamping mechanism" limitation of the asserted claims. The hub arrangement of the NV-2 product is shown as:



**Figure 2**

(A portion of Figure 2 of U. S. Patent 9,254,790, assigned to Respondent.

As a result of the absence of the "clamping mechanism" claim limitation in the accused SportWing products and the accused NV-2 products, Claimant did not prove literal infringement of any of the asserted claims.

Finally, Claimant did not present evidence on the application of the doctrine of equivalents to the structure found in either Respondent's SportWing accused products or Respondent's accused NV-2 products. Consequently, Claimant has not shown that any of those products infringe any of the asserted claims of the '456 patent under the doctrine of equivalents.

In sum, the Arbitrator concludes that the referenced SKUs do not have a "clamping mechanism" of the '456 patent as that claim limitation has been construed and do not infringe any of the asserted claims of the '456 patent for at least this reason.

In addition, Respondent argues that because it does not sell bicycles it cannot infringe the '456 patent for this additional reason. (Respondent's Liability Brief at 24; Respondent's Opposition Liability Brief at 17). Claimant contends that Respondent's catalogs show that Respondent has infringed the '456 patent because photographs in those catalogs show a bicycle or bicycles attached to Respondent's bike racks. (Claimant's Liability Brief at 35, n. 16). Respondent counters by asserting that the photographs were taken prior to the December 2, 2104, issuance of the '456 patent and consequently its use of bicycles at the time the photographs were taken could not be an infringement. (Respondent's Opposition Liability Brief at 18-19). In addition, Respondent points out that many of the catalogs were created prior to the issuance of the '456 patent. During the hearing, it was explained that the catalogs show a copyright date, the revision date and the year for which the catalog is intended. For example each page of the 2012 catalog shows a copyright date of 2011, a part or revision number, a revision date (noted as "Rev." of 11/11 (*i.e.*, November 2011)) and the year of intended use "for

2012." The wording on each page thus takes the form of "© [year][Claimant's name] [part or reference number] [revision date] [intended year of use ]."

Using this information, the following table shows the copyright year, the revision date and the year of intended use for the catalogs referenced by Claimant.

**TABLE VIII - CATALOGS RELIED ON BY CLAIMANT IN RELATOIN TO ITS ASSERTION OF INFRINGEMENT OF THE '456 PATENT**

| Exhibit No. | Copyright Year | Part Number | Revision Date | Year of Intended Use |
|---|---|---|---|---|
| R-293 | 2011 | 98929-2012 | 11/11 | 2012 |
| R-294 | 2012 | 98929-2013 | 11/12 | 2013 |
| R-295[13] | | | | 2013 |
| R-296 | 2013 | 98929-2014 | 11/13 | 2014 |
| R-297 | 2014 | 98929-2015 | 11/14 | 2015 |
| R-298 | 2015 | 98929-2016 | 11/15 | 2016 |

As noted above, Respondent asserts that the photographs shown in the catalogs were taken prior to the December 2, 2104, issuance of the '456 patent and consequently its use of bicycles at the time the photographs were taken could not be an infringement. (Respondent's Opposition Liability Brief at 18-19). The Arbitrator has reviewed each of the exhibits and photographs upon which Claimant relies. The following table comments on those photographs.

**TABLE IX - PHOTOGRAPHS RELIED ON BY CLAIMANT**

| Exhibit No. | Page(s) Cited by Claimant | Arbitrator's Comments |
|---|---|---|
| R-293 | I-9; I-11 | I-9 shows a Rola brand NV-2 bike rack with a mounted bike. I-11 shows a SportWing rack with a mounted bike. |

---

[13] There is no copyright date, part number or revision date shown in R-295; however, that exhibit does not include the entire catalog and the information may be on pages not part of the exhibit. Nonetheless, the cover page clearly shows it is the 2013 catalog.

| Exhibit No. | Page(s) Cited by Claimant | Arbitrator's Comments |
|---|---|---|
| R-294 | I-3; I-9 | I-3 shows an NV-2 rack with a bike attached.<br><br>I-9 shows a SportWing rack with a mounted bike. |
| R-295 | 38; 79 | Page 38 shows a SportWing rack with a mounted bike.<br><br>There is no page 79 in the R-295 exhibit admitted at the hearing. However, an NV-2 rack with a mounted bike is shown on page 49 of that exhibit.[14] |
| R-296 | I-4; I-9 | I-4 shows a Rola brand NV-2 rack with a mounted bike.<br><br>I-9 shows a SportWing rack with a mounted bike. |
| R-297 | I-7; I-10 | I-7 shows an NV-2 rack with a mounted bike.<br><br>I-10 shows a SportWing rack with a mounted bike. |
| R-298 | I-3; I-4 | I-3 shows a photograph of an NV-2 rack and appears as the same photograph shown at I-7 of R-297, including the same license plate on the vehicle, the last four letters of which are "ROLA." A bike is mounted to the rack seen on I-3.<br><br>Similarly, the photograph on page I-4 of R-298 appears to be the same photograph found at page I-10 of R-297. A bike is mounted to the rack seen on I-4. |

---

[14] Although footnote 16 on page 35 of Claimant's Liability Brief refers to page 79 of R-295, on November 1, 2018, the Arbitrator informed counsel for the parties that exhibit R-295 did not contain a page 79 and asked if Claimant had intended to refer to page 49. Later that day, counsel for Claimant advised that the reference to page 79 was in error and the correct reference is page 49. The Arbitrator therefore has considered the bike rack shown on page 49.

This review confirmed that the photographs appearing in exhibits R-293, R-294, R-295, R-296, and R-297 were all included in the respective catalogs before the '456 patent issued. Thus, Respondent's combination of a bicycle and the rack for purposes of having the photographs taken cannot be an infringement of the yet-to-be issued patent. In relation to the photographs appearing in R-298, although that catalog was published after the '456 patent issued, the photographs are the same as appearing in R-297. Thus, the use of the combination shown in R-298 also occurred prior to the issuance of the '456 patent.

In its response brief, submitted September 21, 2018, and its reply brief, submitted, October 8, 2018, Claimant did not address Respondent's argument regarding the dates of the photographs in the catalogs vis-a-vis the issue date of the '456 patent. In addition, Claimant was denied leave to add inducement of infringement contentions in relation to the '456 patent. During the hearing, the only evidence regarding the asserted infringement of the '456 patent involved Mr. Williams' testimony and the catalogs discussed above. Because these catalogs and their photographs do not establish that Respondent used the bicycle/rack combination after the issuance of the patent, Claimant has not proven infringement of this patent for this additional reason.

### c.     Invalidity Analysis Relating to the '456 Patent

As noted, Respondent alleged that the asserted claims of the '456 patent are invalid under 35 U.S.C. §§101, 112, 102, and 103. During the hearing, Respondent presented no evidence going to invalidity under any of these statutes and did not argue invalidity in its post-hearing briefs. The Arbitrator concludes that Respondent has not proven by clear and convincing evidence that any the asserted claims of the '456 patent is invalid.

### d.     Damages Relating to the '456 Patent

While the Arbitrator has concluded that Claimant failed to prove infringement of the '456 patent, it should also be noted that Claimant's expert Mr. Hampton did not provide any damages opinion in connection with that patent.

### D.     Priority Assessments of The Design Patents at Issue

Claimant asserts that Respondent has infringed four design patents: D917, D716, D717, and D289. Before addressing specific aspects of these patents, the following will set out the law to be followed when considering design patents.

The patent statutes provide protection for designs (35 U.S.C. §171):

> (a) In general – Whoever invents and new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the requirements of this title.

> (b) Applicability of this title. – The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided.

(c) Filing date. – The filing date of an application for patent for design shall be the date on which the specification as prescribed by section 112 and any required drawings are filed.

Design patents may be infringed as stated in 35 U.S.C. § 289:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.
>
> Nothing in this section shall prevent, lessen, or impeach any other remedy which an owner of an infringed patent has under the provisions of this title, but he shall not twice recover the profit made from the infringement.

The point of a design patent is that it protects the "new, original and ornamental design for an article of manufacture" and does not cover aspects of a product that are purely functional. In order for an inventor to show the ornamental design he/she has created, the PTO has the practice of permitting design patent applicants to show the design using solid lines and those aspects of the product or the environment that are not part of the design sought to be patented are shown using broken lines. For example, the PTO has given guidance to applicants in relation to the use of solid and broken lines in the design patent drawings submitted with the application:

> The two most common uses of broken lines are to disclose the environment related to the claimed design and to define the bounds of the claim. Structure that is not part of the claimed design, but is considered necessary to show the environment in which the design is associated, may be represented in the drawing by broken lines. This includes any portion of an article in which the design is embodied, or applied to, that is not considered part of the claimed design. See *In re Zahn*, 617 F.2d 261, 204 USPQ 988 (CCPA 1980). Unclaimed subject matter may be shown in broken lines for the purpose of illustrating the environment in which the article embodying the design is used. Unclaimed subject matter must be described as forming no part of the claimed design or of a specified embodiment thereof.

(Manual of Patent Examining Procedures ("MPEP"), Chapter 1500, ¶15.48, Item III, August 2017 version. This guidance is also phrased the same way in Chapter 1500, ¶15.49, Item III, of the November 2013 version of the MPEP).

According to the Federal Circuit, the determination of which aspects of a claimed design are ornamental is a matter of claim construction, which is a legal issue for the Court. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679-80 (Fed. Cir. 2008) (*en banc*). The Circuit has provided guidance on an approach to such claim construction, by identifying the non-functional aspects of the design that is shown in the patent. *OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1405 (Fed.Cir.1997) ("Where a design contains both functional and nonfunctional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."). This is important , because it is only the ornamental design of the article that is protected. *Richardson v. Stanley Works, Inc.* 697 F.3d 1288, 1293 (Fed. Cir. 2010). *See also*, *OddzOn*, 122 F.3d at 1405 ("only ornamental features are protected.").

Relying on the Supreme Court's century-plus observation that a design is better represented by an illustration "than it could be by any description and a description would probably not be intelligible without the illustration" the Federal Circuit has cautioned that claim construction of a design patent should eschew providing a detailed verbal or written description of the claimed design. (*Egyptian Goddess*, 543 F.3d at 179, quoting *Dobson v. Dornan*, 118 U.S. 10, 14, 6 S. Ct. 946, 30 L.Ed. 63 (1886)).

In this proceeding, the parties were of the view that claim construction of the each design patent was not needed. The Arbitrator will, however, provide a brief description of the ornamental aspects of the design shown in each patent and then use that as the basis for comparison to the accused products. This will focus on the visual appearance of the ornamental design. "Unlike an invention in a utility patent, a patented ornamental design has no use other than its visual appearance," and therefore "its scope is 'limited to what is shown in the application drawings.'" *In re Harvey*, 12 F. 3d 1061, 1064 (Fed. Cir. 1993), citing appearance, *In re Glavas, 230 F.2d 447, 450 (CCPA 1956),* and its scope is "limited to what is shown in the application drawings," *In re Mann*, 861 F.2d 1581, 1582 (Fed.Cir.1988).

For infringement purposes, the design patent owner must prove infringement of a design patent by a "preponderance of the evidence." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 Fed 1312, 1334 (Fed. Cir. 2015)). The test for design infringement has been clearly stated by the Federal Circuit in *Egyptian Goddess* as "[a] design patent is infringed '[if], in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two design are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other.'" *Egyptian Goddess*, 543 F.3d at 670 (quoting *Gorham Co. v. White*, 81 U.S. 511, 528 (1871).

Just like any other patent, an issued design patent is presumed valid and the party asserting invalidity has the burden of proving invalidity by clear and convincing evidence. In this case, Respondent asserts that each of the design patents is invalid under 35 U.S.C. §102 because Respondent sold the accused bicycle racks well before the applications for the design patents were filed. Respondent also asserts that Claimant committed inequitable conduct in the filing and prosecution of the design patents because

Claimant did not disclose to the PTO Respondent's prior sales of the accused racks, even though Claimant knew of those sales.

As to Claimant's sales of the accused racks, the parties have stipulated as follows:

> 32. Cequent publicly sold one or more of the bike racks accused of infringing D722,289 prior to May 13, 2012.

> 33. Cequent publicly sold one or more of the bike racks accused of infringing D717,717 prior to June 27, 2012.

> 34. Cequent publicly sold one or more of the bike racks accused of infringing D717,716 prior to June 27, 2013.

(Stipulated Facts, ¶¶32-34, submitted April 20, 2018). It is noted that these stipulations did not address design patent D917. As to that patent, as well as the others, Respondent points to the testimony of Mr. Williams in which he admitted during the hearing that: (i) Respondent's SportWing, 2-bike rack accused of infringing the D917 patent was sold more than one year before December14, 2012 (M. Williams testimony, 6/1/18); (ii) Respondent's SportWing, 4-bike rack accused of infringing the D289 patent was sold more than one year before May 13, 2012 (*id.*); (iii) Respondent's SportWing, trunk-mount bike rack accused of infringing the D716 patent was thought by Mr. Williams to have been sold by Respondent before June 27, 2013 (*id.*); and (iv) Respondent's NV-2 bike rack accused of infringing the D717 patent was, according to Mr. Williams, sold by Respondent as early as 2010. (*Id.*).

Based on this testimony, Respondent argues that because the accused products were "all on sale publicly before *the effective filing date* of the claimed invention, all four [design] patents are invalid." (*See* Respondent's Liability Brief at 8-9, emphasis added). Respondent's conclusion is premised on the effective filing date of each design patent. That topic involves assessment of the effective filing date of each design patent and will be addressed below.

### a.    The Design Patents' Drawings

In order to consider the issues surrounding the design patents, it is useful to have the invention, as depicted in the patent's drawings, included in the text of this Award. Representative figures from the patents' drawings are shown below, followed by the Arbitrator's comments:

**D917, Figure 1**                              **D917, Figure 3**



FIG. 1



FIG. 3

The D917 patent's claim is typical of design patent claims. It states: "The ornamental design for a V-shaped bicycle carrier, as shown and described." (R-210, also found as C-5). The descriptions of the drawings include a statement as to what is not included within the patent claim: "The broken lines illustrate unclaimed environmental structure." (*Id.*). Thus, in Figure 1, all of the structure shown is claimed as part of the design, whereas in Figure 3, the depicted bicycle is shown in broken lines and does not form a part of the claimed design.

**D716, Figure 1**                              **D716, Figure 3**



FIG. 1                                    FIG. 3

The D716 patent's claim is also typical of design patent claims. It states: "The ornamental design for a V trunk mount bicycle carrier, as shown and described." (R-211, also found as C-6). The descriptions of the drawings include a statement as to what is not included within the patent claim: "The broken lines shown in the drawings environmental structure and portions of the V trunk mount bicycle carrier that forms (sic) no part of the

claimed design." (*Id.*). Thus, in Figure 1, the trunk mount structure in shown broken lines and is not claimed as part of the design. In Figure 3, the trunk mount structure, the portion connecting the rack to the trunk mount, and the depicted bicycle are shown in broken lines and do not form a part of the claimed design.

**D717, Figure 1**            **D717, Figure 3**





The D717 patent's claim states: "The ornamental design for a V folding wings bicycle carrier, as shown and described." (R-212, also found as C-7). The descriptions of the drawings include a statement as to what is not included within the patent claim: "The broken lines shown in the drawings illustrate environmental structure and portions of the V folding wings bicycle carrier that forms (sic) no part of the claimed design." (*Id.*). Thus, in Figure 1, the shank portion going from the rear of the lower cylindrical shaped component that is shown is not claimed as part of the design. This is different from what is shown in Figure 1 of the D917 patent which shows the shank to be part of claimed design. In Figure 3 of the D717 patent, the depicted bicycle is shown in broken lines and does not form a part of the claimed design.

**D289, Figure 1**            **D289, Figure 3**





The D289 patent's claim states: "The ornamental design for a V-shaped four bicycle carrier, as shown and described." (R-213, also found as C-12). The descriptions of the drawings include a statement as to what is not included within the patent claim: "The broken lines illustrate unclaimed environmental structure." (*Id.*). Thus, in Figure 1, all of the structure shown is claimed as part of the design. In Figure 3, the depicted bicycle is shown in broken lines and does not form a part of the claimed design.

These aspects of the design patents are important because Respondent alleges the patents are invalid in light of Mr. Williams' testimony and the parties' stipulations. In particular, Respondent asserts that the patents are not entitled to a priority date that is earlier than its sales of the accused products and those sales are therefore invalidating prior art. Claimant asserts that the design patents are entitled to the priority date because the designs claimed in the design patents are found in the application upon which the priority claim is based.

In order to put this into perspective, the following table identifies each design patent, its filing date, the claimed priority date, and the basis for the priority claim, as a continuation application or as a continuation-in-part application ("CIP").

## TABLE X - DESIGN PATENTS

| Patent Number | Filing Date | Asserted Priority Date | Type of Priority Claim as Stated on the First Page of the Patent |
|---|---|---|---|
| D917 patent | December 14, 2012 | April 5, 2007 | CIP of App. No. 11/697,294 |
| D716 patent | June 27, 2013 | April 5, 2007 | Continuation of App. No. 11/697,294 |
| D717 patent | June 27, 2013 | April 5, 2007 | Continuation of App, No. 11/697,294 |
| D289 patent | May 13, 2013 | April 5, 2007 | None listed on the issued patent.<br><br>The PTO has indicated D289 will reissue as a CIP of App. No. 11/697,294 |

Each design patent bases its priority continuity claim on Application No. 11/697,294, which is the application that issued as the '456 patent. Thus, in order to assess Respondent's lack of priority assertion it is necessary to compare the design

claimed in each of the design patents to the bicycle racks shown and described in the '456 patent to determine separately if the claimed design found in each later design patent is supported by the '456 patent. The drawings in the '456 patent depict a number of embodiments of the described bicycle carrier. These are shown in Figures 2, 6, 10, 12, 14, 15, 20, 21, and 24. For completeness, each of this drawing is reproduced below, followed by the Arbitrator's comments.

### '456 Patent, Figure 2



*Figure 2*

This Figure shows the V-shape and also includes two sculpted bumpers 70 and 72, two locking mechanisms 50 and 52 with each having a textured surface, and two bicycle clamping mechanisms 60 and 62. The adjustable arms 40 and 42 are shown in Figure 4 of the patent as having a circular cross-section. The locking mechanisms depict textured surface, apparently to provide a surface friction because the locking mechanisms are rotated in one direction to apply pressure against the arm members 40 and 42 to secure those members from movement. (R-205, '456 patent at 4:15-21). The clamping mechanisms 60 and 62 are shown in more detail in figure 3 as a U-shaped trough that receives the bicycle wheel and a strap that goes over the top of the wheel and attached to the trough to hold the wheel in place.

**'456 Patent, Figure 6**



*Figure 6*

Figure 6 shows the bicycle rack of figure 2 with an attached bicycle.

**'456 Patent, Figure 10**



*Figure 10*

The bike rack show in figure 10 is similar to that shown in figure 2, except the clamping mechanisms are replaced with pegs 64 on each side of the arms 40 and 42. (R-205, '456 patent at 5:21-25).

**'456 Patent, Figure 12**



*Figure 12*

Figure 12 shows a rack that has a bracket 230 with a cross member 132 and a plate member 134. The arms 140 and 142 are attached to the plate member 134 by bolts; the arms may be pivoted with respect to the bracket 130 to change the angel between them. In addition, bicycle supports 150 and 152 are mounted to the upper ends of the arm and can be moved along the arms by sliding. The supports are formed as U-shaped hooks. (*See* R-205, '456 patent at 5:31-48 describing the foregoing). There are no sculptured bumpers or textural surfaces on the arms 140 and 142.

**'456 Patent, Figure 14**



*Figure* 14

Figure 14 shows the rack of figure 12 with an attached bicycle.



*Figure* 15

The rack of figure 15 uses the clamp 20 and the shank 22, also as depicted in figure 2. The bracket 220 includes wing portions 222 and 224 that extend from each side of the bracket 220. Visible notches are provided in the bracket 220. The arms 240 and 242 may be repositioned in the direction of the arrows. This repositioning is a functional item and is not part of the design patent. While the bracket 220 is used in connection with the repositioning it has an ornamental structure and is part of the claimed design. Bicycle clamping mechanisms 260 and 262 are provided. (*See* R-205, '456 patent at 5:57 to 6:35 describing the foregoing).

**'456 Patent, Figure 18**



*Figure* 18

Figure 18 is similar to figure 17 (not shown above), but includes a diamond shaped collar 402 that slides over the shank 322, with elastic cord 404 (not numbered in the figure) having a hook 406. The hook 406 may engage the pedal of a bicycle to secure

the lower part of the bike. In addition, wheel securing mechanisms 410 and 420 are shown; these can secure the bicycle wheels. (*See* R-205, '456 patent at 6:30-57 describing the foregoing). Pegs 362 and 364 shown in figure 17 and shown but not numbered in figure 18 are found at the fee ends of the arms 304 and 342.

### '456 Patent, Figure 20



*Figure* 20

Figure 20 depicts the rack of figure 18 with a bicycle attached.

### '456 Patent, Figure 21



*Figure* 21

Figure 21 shows a 2-bike rack that is similar to that seen in figure 18, with the cross section of the arms 342 and 346 square or rectangular. The pegs 362 of the upper arms have a stretched U-shape. Each arm has one sculptured bumper. The arms 332, 342,

334, and 336 have a square or rectangular cross-section. (*See* R-205, '456 patent at 6:30-57 describing the foregoing). The collar 402 is included.

**'456 Patent, Figure 24**



Figure 24 is the 4-bike version of the rack seen in figure 21 and has the same individual attributes.

### b.   Priority Assessment Concerning the D917 Patent

As noted, the application for the D917 patent was filed on December 14, 2012. The Application Data Sheet submitted with the application claimed the application was a continuation of application number 11/697294, filed on April 5, 2007. (C-4 at C-0004_0061). In the application's specification as filed, Claimant stated that "This application claims priority to Co-Pending Utility Patent Application 11/697,294, filed on 2007.04.05." (*Id.* at C-0004_0051).

On February 15, 2013, the Patent Examiner issued an office action which objected to the continuity claim submitted with the application. The Examiner stated:

> Objection – Continuity claim to Application Number 11/697284
>
> This application contains matter not present in application number 11/697294 and is therefore not entitled to be a 'continuation' of said application (identified as such in the Application Data Sheet. (sic) Specifically, the arms and features wrapped around them have different appearances and configuration. To overcome this objection, applicant should either change the continuity type to 'continuation-in-part' (in both the specification and Application Data Sheet), or cancel the continuity claim entirely. A supplemental Application Data Sheet should be submitted to include the corrected information.

(*Id.* at C-0004_0039). In addition, the Examiner objected to the drawings because, among other things, "[a]ll unclaimed structure in the figures must be reduced to broken lines." (*Id.*).

In response to the office action, on April 12, 2013, Claimant submitted a supplemental Application Data Sheet in which the continuity of the application for the D917 patent was changed to a continuation-in-part of the 11/697,294 application. (*Id.* at C-0004_0033). In its accompanying amendment, Claimant told the Examiner that, in response to the Examiner's objection to the continuity, Claimant submitted a supplemental Application Data Sheet and amended the specification to state that the application is a continuation-in-part of co-pending Utility application number 11/697,294. (*Id.* at C-0004_0020-0021).

In its Reply Liability Brief, submitted on October 8, 2018, Claimant referred to the continuation-in-part stating "[t]he examiner made [the application] into a CIP application." (Claimant's Reply Liability Brief at 20). This statement does not accurately reflect what occurred. During prosecution, the Examiner described that Claimant had the option of either changing the continuity type to a continuation-in-part or cancelling the continuity claim entirely. Claimant decided on the former approach to change the continuity to continuation-in-part; the Examiner did not make the change on his own.

Claimant also submitted revisions to the drawings in order to address the Examiner's objections. One such revision was to figure 3 in which the bicycle, shown in the filed application in unbroken lines, was revised to show the bicycle in broken lines. This is the figure set out above. By showing the bicycle in broken lines it does not become a part of the claimed design. While the other figures were revised to show some shading, there were no other substantive changes made to the drawings and nothing originally contained in them, apart from the bicycle, was revised to use broken lines.

The fact that Claimant changed the continuity of the application for the D917 patent from a continuation to a continuation-in-part is an admission that the D917 design is not found entirely in the application leading to the '456 patent and new matter was included in the drawings for the D917 patent. The addition of new matter means that the priority of the D917 patent claim is the date on which that new matter was added. Thus, the filing date of the D917 patent is the date to be accorded that patent for priority purposes, *i.e.*, December 14, 2012.

This conclusion is supported by a comparison of the following figures found in the D917 patent to those in the '465 patent and highlights that the D917 patent claims features that are different from and/or not found in the application leading to the '456 patent.

# TABLE XI - COMPARISON OF 'D917 PATENT DRAWINGS TO THE '456 PATENT DRAWINGS

| D917 Patent Drawings | '456 Patent Drawings |
|---|---|
| Fig. 1shows that each arm has two smooth surface components separated from each other and surrounding each arm. The upper end of each arm is smooth with no holes. The arms have a square or rectangular cross-section. There is a base plate below the bottom of the V-shape and above the shank. Each arm has two bicycle holding clamps located near the free ends of the arms and positioned on opposite sides of each arm. None these components is shown in broken lines. | Fig. 2 shows that each arm has components with sculpted surfaces and separated from each other. Each component surrounds its arm. The upper end of each arm has a series of holes. The arms have a circular cross-section. There is no base plate below the bottom of the V-shape; rather there is a bracket surrounding the shank. Each arm has one bicycle holding clamp that may clamp around the bicycle tire. ('456 patent, C-11 at 4:29- 32), or any other device. (*Id.* at 4:32-33). |
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position. The components are not shown in broken lines. | Fig.6 of the '456 patent has the same components as described above with respect to Fig. 2. |
| | Fig. 10 shows the same structure as described with respect to Fig. 2, except the arms do not have holes and the bicycle clamps are short pegs. ('456 patent, C-11 at 4:22-25). |
| Fig. 1shows that each arm has two smooth surface components separated from each other and surrounding each arm. The upper end of each arm is smooth with no holes. The arms have a square or rectangular cross-section. There is a base plate below the bottom of the V-shape and above the shank. Each arm has two bicycle holding clamps located near the free ends of the arms and positioned on opposite sides of each arm. None these | Fig. 12 shows two arms that do not have the surface components surrounding the arms that are shown in the D917 patent. Each arm has one peg located at the upper portion of the arm that hold the bicycle and have a different structure than the components shown in the D917 patent that hold the bicycle. The base of the V-shape has a trapezoidal shaped component with an arc cut-out on the bottom thereof, with this |

| D917 Patent Drawings | '456 Patent Drawings |
|---|---|
| components is shown in broken lines.<br><br>Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position. The components are not shown in broken lines. | component sitting on a rectangular surface.<br><br>Fig.14 of the '456 patent has the same components as described above with respect to Fig. 12. |
| Fig. 1shows that each arm has two smooth surface components separated from each other and surrounding each arm. The upper end of each arm is smooth with no holes. The arms have a square or rectangular cross-section. There is a base plate below the bottom of the V-shape and above the shank. Each arm has two bicycle holding clamps located near the free ends of the arms and positioned on opposite sides of each arm. None these components is shown in broken lines. | Fig. 15 shows that the two arms do not have the surface components surrounding the arms that are shown in the D917 patent. Each arm has one bicycle holding clamp. The bottom portion of each arm includes a bracket having curved wing portions that extend from each side of the bracket. Notches are provided in the bracket. These features are not found in the D917 patent. |
| Fig. 1shows that each arm has two smooth surface components separated from each other and surrounding each arm. The upper end of each arm is smooth with no holes. The arms have a square or rectangular cross-section. There is a base plate below the bottom of the V-shape and above the shank. Each arm has two bicycle holding clamps located near the free ends of the arms and positioned on opposite sides of each arm. None these components is shown in broken lines.<br><br>Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position. The components are not shown in | Fig. 18 includes a diamond shaped collar that slides over the shank, with an elastic cord having a hook. In addition, wheel securing mechanisms are shown toward the lower portion of each arm. Pegs are shown near the upper end of each arm.<br><br><br><br><br><br><br><br>Fig.20 of the '456 patent has the same components as described above with respect to Fig. 18. |

| D917 Patent Drawings | '456 Patent Drawings |
|---|---|
| broken lines. | |
| Fig. 1 shows that each arm has two smooth surface components separated from each other and surrounding each arm. The upper end of each arm is smooth with no holes. The arms have a square or rectangular cross-section. There is a base plate below the bottom of the V-shape and above the shank. Each arm has two bicycle holding clamps located near the free ends of the arms and positioned on opposite sides of each arm. None these components is shown in broken lines. | Fig. 21 shows a 2-bike rack that is similar to that seen in figure 18, with the cross section of the arms square or rectangular. The pegs on the upper arms have a stretched U-shape. Each arm has one sculptured bumper. The collar is included. |
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position. The components are not shown in broken lines. | Fig. 24 is the 4-bike version of the rack seen in figure 21 and has the same individual features. |

Based upon the drawings of the claimed invention found in the D917 patent and Claimant's use of solid lines in each of the drawings, except for Figure 3 in which the bicycle is shown in broken lines and constitutes unclaimed structure, the Arbitrator concludes that the drawings in the D917 patent depict components in shape and ornamental appearance that are not found in the '456 patent. During the hearing Mr. Williams testified that the only thing claimed in the design patents was the V-shape of the arms. (M. Williams' testimony, 5/31/18). On this point, Mr. Williams was incorrect. The claim of the D917 patent says "[t]he ornamental design for a V-shaped bicycle carrier as shown and described." While it is correct than part of the design addresses the V-shape, that is only one of the portions shown and claimed in the drawings of the D917 patent that form the claim of that patent.

In its post-hearing briefing, Claimant continues to focus on the V-shape of the rack and essentially ignores the other elements of the ornamental design. Claimant argues that "[t]he relative importance of elements is much less when the difference in the overall impression between the prior art and the patented design is great." (Claimant's Reply Liability Brief at 19). That may be an appropriate approach when considering the scope of a design patent claim, but it does not fit into the analysis of the priority a design patent claim may enjoy. For priority purposes, the focus is on the comparison of the design patent to the application from which priority is sought, as was done in Table XI above. If

the design patent claims items not found in or supported by the earlier utility patent, the claimed design contains new matter and that claim necessarily has an effective filing date as of the date the claim with that new matter was filed with the PTO.

In essence, Claimant argues that if a component is found in one drawing of the '456 patent, and another different component is found in another drawing, but both components are not found in the same embodiment, they can be selected from the several drawings and arranged into a new structure. However, doing so after the fact does not prove that Mr. Williams had possession of the new design and arrangement when '456 patent application was filed.

Moreover when considering the prior art, the various components shown in the design drawings are what distinguish the D917 patent from the prior art. During the hearing, a prior art patent and a prior art published patent application were admitted, each of which depicted a V-shaped bicycle rack. For example, such a V-shaped rack is found in R-195, British patent 2,235,909, published August 12, 1993. Figure 2 of that patent is:



FIG. 2

Another V-shaped bicycle rack was shown in R-196, British published patent application 2,363,772, published September 1, 2002. Figure 2 in that application is:



These prior art references show that a V-shaped bicycle rack was known well before the filing dates of the '456 patent and the D917 patent. The ornamental elements shown in

the D017 patented design are what distinguishes that design over the prior art V-shaped racks.

Because the drawings in the D917 patent differ from those in the '456 patent in relation to the ornamental features and shapes of the components, the Arbitrator finds and concludes that the D917 patent is at most a continuation-in-part of the application leading to the '456 patent. As such, the effective filing date of the claim in the D917 patent is its filing date of December 14, 2012. Because this date is before March 16, 2013, the AIA does not apply to the D917 patent for prior art assessment.

### c.     Priority Assessment Concerning the D716 Patent

The application for the D716 patent was filed on June 27, 20013. The Application Data Sheet submitted with the application claimed the application was a continuation of application number 11/697294, filed on April 5, 2007. (C-6 at C-0006_0196). In the application's specification as filed, Claimant provided a "Cross-Reference to Related Applications" section which stated that "This application is a *Continuation-In-Part* and claims priority to Co-Pending Utility Patent Application 11/697,294, filed on 2007.04.05." (*Id.* at C-0006_0208, emphasis added). Thus, there is an explicit inconsistency between the Application Data Sheet and the application's specification. The filing receipt identified the application as a continuation of the '294 application. (C-6 at C-0006_0151; *see also* C-6 at C-0006_0141). On April 29, 2014, the Examiner issued an office action which rejected the patent claim under 35 U.S.C. §112. (C-6 at C-0006_0036). In that office action, the Examiner referred to the clam of priority as set out in the specification, stating:

> Reference to the design application as a continuation-in-part to United States Utility Application No. 11/697.294 under 35 U.S.C. §120 is acknowledged. Applicant is advised that the design disclosed in the parent application is not the same design as the design disclosed in this application. Therefore, this application does not satisfy the written description requirement of 35 U.S.C. §112(a) or pre-AIA 35 U.S.C. §112, first paragraph, under 35 U.S.C. §120 and is not entitled to the benefit of the earlier filing date. However, unless the filing date of the earlier application is actually needed, such as to avoid intervening prior art, the entitlement to priority in this SIP (sic: CIP) application will not be considered.
>
> ***
>
> Consequently, continuity is denied because the design in this instant application is not limited to a change in scope and reflects a change in the configuration from the earlier filed United States Utility Application No. 11/697.294. Applicant **must** delete the reference to the utility application and claim to benefit in the application papers.

(C-6 at C-0006_0037, ¶¶3, 5, bolding in original). Later in the office action, the Examiner reiterated his objection to the specification and denial of priority to the '456 patent application, stating, in part:

> The specification is objected to for the following reasons:
>
> As previously discussed, continuity and benefit of the earlier filing date to United States Utility Application No. 11/697.294 is denied. Therefore, the section pertaining to the cross-reference to relation applications (i.e., *foreign priority and incorporation by reference*) must be omitted from the specification as it is not applicable.

(C-6 at C-0006_0040, ¶15, also found in R-284, page 22 at ¶ 15; emphasis in original).

On July 29, 2014, Claimant submitted an amendment in response to the office action. In that amendment, Claimant revised the descriptions of the drawings in light of the Examiner's comments concerning how those descriptions had been phrased. (C-6 at C-0006_0018-0019). The wording in the claim was also altered in a non-substantive manner as follows: "The ornamental design for a ~~V Trunk Mount Bicycle Carrier~~ V TRUNK MOUNT BICYCLE CARRIER as shown and described." (where the strike through shows deleted words and the underlining shows inserted words). (*Id.* at C-0006_0019, capitalization in original).

In that amendment, Claimant <u>did</u> <u>not</u> delete from the specification the priority claim cross-reference to the '456 patent application as the Examiner had instructed. (*Id.* at C-0006_0018). Also, Claimant <u>did</u> <u>not</u> address whether or not the filing date of the '456 patent was needed to avoid intervening prior art.

The amendment also argued that the Examiner was incorrect in concluding that the design application was not entitled to the priority date of the '456 patent application. In doing so, Claimant focused on certain drawings found in the '456 application and compared them to drawings found in the design application. As Claimant argued:

> As can be seen from the two images [Fig. 2 in the '456 application and Fig. 5 in the D716 application; these being the same figures found in the '456 patent and in the D716 patent], the main structure is almost identical. There are minor changes in the base configuration but the main crux of the inventions are identical. Both teach a V-shaped bicycle rack with adjustable arms, i.e., arms that are adjustable in the y direction with hangering systems that are adjustable in the X direction. [Claimant] respectfully argues that this "continuation-in-part" does not change the shape or configuration of the design disclosed in the earlier application and as such this application should in fact be entitled to the benefit of the filing date of the earlier application." (sic).

(*Id.* at C-0006_0020-0021). While Claimant addressed the overall V-shape of the racks, Claimant did not describe why it believed the other components found in the respective

racks had any similarity and how the surface features shown on the arms of Figure 2 of the '456 application and the base of the rack shown there are, from a design and ornamental standpoint, the same as or even similar to those shown in the D716 patent.

On September 22, 2014, the Examiner issued a notice of allowance for what became the D917 patent. In that notice, the Examiner withdrew his objection and rejection under 35 U.S.C. §§112(a) and (b) in light of Claimant's amendment. On this point, Claimant argued that:

> In the case of the trunk mounted bike rack, '716 on R 284, page 31 of the prosecution history … the examiner accepted [Claimant's] arguments for priority as persuasive such as to overcome the examiner's rejection in paragraph 112, (a). As a result the examiner withdrew his rejection and allowed the claim of priority. Subsequently the D 716 … [patent] as continuation patent[ ].

(R-284 at 31, also found at C-0006_0012).

Here, Claimant overstates what the Examiner actually did. In the very next paragraph of the notice of allowance, the Examiner addressed the priority claim, stating:

> Reference to this design application as a continuation-in-part to United States Utility Application No. 11/697,294 under 35 U.S.C. §120 is acknowledged. However, unless the filing date of the earlier application is actually needed, such as to avoid intervening prior art, *the entitlement to priority in this CIP application will not be considered*. See In re Corba, 212 USPQ 825 (Comm'r Pat. 1981).

(R-284 at 31, ¶3, also found in C-6 at C-0006_0012, ¶3; emphasis added). Thus, the Examiner did not allow the request for priority. This is consistent with what the Examiner did in his earlier office action. (C-6 at C-0006_0040, ¶15). After issuance of the notice of allowance, Claimant did not request that the Examiner reconsider his decision not to consider priority entitlement. Instead, Claimant's counsel submitted payment of the base issue fee on October 13, 2014. (C-6 at C-0006_0002).

Even though the Examiner concluded that "the design disclosed in the parent application [*i.e.*, the application for the '456 patent] is not the same design as the design disclosed in this application [*i.e.*, the application for the '716 patent], the D716 patent issued with the following found on the front page of the patent at item (63): "Continuation of application No. 11/697,294, filed on Apr. 5, 2007." (C-8 at C-0008_0001). The issuance of the D716 patent as a "continuation" cannot be squared with the Examiner's conclusion just noted above concerning the different drawings in the parent application and cannot be squared with the Claimant's amendment that did not delete reference to the design application as a continuation-in-part. It thus appears that the PTO mistakenly included the "continuation" wording on the front page of the patent, perhaps because Claimant included that wording on the Application Data Sheet it

submitted when the application was filed, which as noted above was inconsistent with the continuation-in-part priority claim found in the application's specification as filed.

To address this point, it is appropriate to compare the drawings found in the D716 patent to those to the '456 patent. This comparison is set out in the following table.

### TABLE XII - COMPARISON OF 'D716 PATENT DRAWINGS TO THE '456 PATENT DRAWINGS

| D716 Patent Drawings | '456 Patent Drawings |
|---|---|
| Fig. 1 shows that each arm has one smooth surface component surrounding each arm. The arms have a square or rectangular cross-section. There is a trapezoidal plate having linear upper and lower edges to which the lower part of the arms of the V-shape connect; that trapezoidal shape receives the shank. Each arm has two bicycle holders attached on opposite sides of the arm. at the upper ends that are shown as inverted squared off U-shapes with a the top perpendicular to each side. None these components is shown in broken lines. | Fig. 2 shows that each arm has two components with sculpted surfaces and separated from each other. Each component surrounds its arm. The arms have a circular cross-section. Fig. 2 does not depict the trapezoidal plate. |
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position. The components are not shown in broken lines. | Fig.6 of the '456 patent has the same components as described above with respect to Fig. 2.<br><br>Fig. 10 shows the same structure as described with respect to Fig. 2, except the arms do not have holes and the bicycle clamps are short pegs. ('456 patent, C-11 at 4:22-25). |
| Fig. 1 shows that each arm has one smooth surface component surrounding each arm. The arms have a square or rectangular cross-section. There is a trapezoidal plate having linear upper and lower | Fig. 12 shows two arms that do not have any sculptured surface components surrounding the arms that are shown in the D716 patent. The pegs located at the upper portion of the arm that hold the |

| D716 Patent Drawings | '456 Patent Drawings |
|---|---|
| edges to which the lower part of the arms of the V-shape connect; that trapezoidal shape receives the shank. Each arm has two bicycle holders attached on opposite sides of the arm. at the upper ends that are shown as inverted squared off U-shapes with a the top perpendicular to each side. None these components is shown in broken lines.<br><br>Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position. The components are not shown in broken lines. | bicycle have a different appearance than the components shown in the D716 patent that hold the bicycle. The base of the V-shape has a partial trapezoidal shaped component with linear top edge and an arc cut-out on the bottom thereof, with this component positioned on a rectangular surface.<br><br>Fig.14 of the '456 patent has the same components as described above with respect to Fig. 12. |
| Fig. 1 shows that each arm has one smooth surface component surrounding each arm. The arms have a square or rectangular cross-section. There is a trapezoidal plate having linear upper and lower edges to which the lower part of the arms of the V-shape connect; that trapezoidal shape receives the shank. Each arm has two bicycle holders attached on opposite sides of the arm. at the upper ends that are shown as inverted squared off U-shapes with a the top perpendicular to each side. None these components is shown in broken lines. | Fig. 15 shows that the two arms do not have the surface component surrounding the arms that are shown in the D716 patent. The upper end of each arm has holes in it. The bottom portion of the rack includes a bracket having curved wing portions that extend from each side of the bracket. Notches are provided in the bracket. These features are not found in the D716 patent. |
| Fig. 1 shows that each arm has one smooth surface component surrounding each arm. The arms have a square or rectangular cross-section. There is a trapezoidal plate having linear upper and lower edges to which the lower part of the arms of the V-shape connect; that trapezoidal shape receives the | Fig. 18 includes a diamond shaped collar that slides over the shank, with an elastic cord having a hook. In addition, wheel securing mechanisms are shown toward the lower portion of each arm. Pegs are shown near the upper end of each arm. It appears that the cross- |

| D716 Patent Drawings | '456 Patent Drawings |
|---|---|
| shank. Each arm has two bicycle holders attached on opposite sides of the arm. at the upper ends that are shown as inverted squared off U-shapes with a the top perpendicular to each side. None these components is shown in broken lines. | section of the arms is circular. |
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position. The components are not shown in broken lines. | Fig.20 of the '456 patent has the same components as described above with respect to Fig. 18. |
| Fig. 1 shows that each arm has one smooth surface component surrounding each arm. The arms have a square or rectangular cross-section. There is a trapezoidal plate having linear upper and lower edges to which the lower part of the arms of the V-shape connect; that trapezoidal shape receives the shank. Each arm has two bicycle holders attached on opposite sides of the arm. at the upper ends that are shown as inverted squared off U-shapes with a the top perpendicular to each side. None these components is shown in broken lines. | Fig. 21 shows a 2-bike rack that is somewhat similar to that seen in figure 18, with the cross section of the arms square or rectangular. The pegs on the upper arms have a stretched U-shape. Each arm has one sculptured bumper. The collar is included. |
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position. The components are not shown in broken lines. | Fig. 24 is the 4-bike version of the rack seen in figure 21 and has the same individual features. |

This comparison and a visual comparison of the drawings in the D716 patent against those shown in the '456 patent show that there is no single drawing that is the same that is found in both patents. Moreover, all of the individual components that make up the claimed design in the D716 patent are not individually found in the '456 patent.

Based on this, the Arbitrator concludes that the D716 patent is at most a continuation-in-part of the '456 patent and the drawings found in the D716 patent contain new matter not found in the '456 patent. As a result, the effective date of the claim in the D716 patent is no earlier than the filing date for that patent, *i.e.*, June 27, 2013. Because this date is after March 15, 2013, the AIA applies to the D716 patent for prior art assessment.

### d.      Priority Assessment Concerning the D717 Patent

The prosecution history of the D717 patent contains many of the same issues discussed above in relation to the D716 patent. Indeed, the examiners who handled the D716 prosecution were Assistant Examiner Darlington Ly and Primary Examiner Philip S. Hyder. These were the same examiners who handled the prosecution of the D717 patent. (*Compare* C-6 at C-0006_0042 to C-7 at C-0007_42 for the same names/initials to the first page of the D716 patent (C-0008) and the first page of the D717 patent (C-0009) showing those names). In addition, the office actions issued by the Examiners in these prosecutions were issued on the same day, April 29, 2014.

Turning to the prosecution of the D717 patent, that application was filed on June 27, 2013. The Application Data Sheet submitted with the application claimed the application was a continuation of application number 11/697294, filed on April 5, 2007. (C-7 at C-0007_0196). In the application's specification as filed, Claimant provided a "Cross-Reference to Related Applications" section which stated that "This application is a *Continuation-In-Part* and claims priority to Co-Pending Utility Patent Application 11/697,294, filed on 2007.04.05." (*Id.* at C-0007_0208, emphasis added). Thus, there again is an explicit inconsistency between the Application Data Sheet and the application's specification. The filing receipt identified the application as a continuation of the '294 application. (C-7 at C-0007_0151; *see also* C-7 at C-0007_0141). On April 29, 2014, the Examiner issued an office action which rejected the patent claim under 35 U.S.C. §112 (a) and (b). (C-7 at C-0007_0038). In that office action, the Examiner referred to the clam of priority as set out in the specification, stating:

> Reference to this design application as a continuation-in-part to United States Utility Application No. 11/697.294 under 35 U.S.C. §120 is acknowledged. Applicant is advised that the design disclosed in the parent application is not the same design as the design disclosed in this application. Therefore, this application does not satisfy the written description requirement of 35 U.S.C. §112(a) or pre-AIA 35 U.S.C. §112, first paragraph, under 35 U.S.C. §120 and is not entitled to the benefit of the earlier filing date. However, unless the filing date of the earlier application is actually needed, such as to avoid intervening prior art, the entitlement to priority in this CIP application will not be considered.

***

Consequently, continuity is denied because the design in this instant application is limited to a change in scope and reflects a change in scope and reflects a change in configuration from the earlier filed United States Utility Application No. 11/697.294. Applicant **must** delete the reference to the utility application and claim to benefit in the application papers.

(C-7 at C-0007_0037, ¶¶3, 5, bolding in original). Later in the office action, the Examiner reiterated his objection to the specification and denial of priority to the '456 patent application, stating, in part:

The specification is objected to for the following reasons:

As previously discussed, continuity and benefit of the earlier filing date to United States Utility Application No. 11/697.294 is denied. Therefore, the section pertaining to the cross-reference to relation applications (i.e., *foreign priority and incorporation by reference*) must be omitted from the specification as it is not applicable.

(C-7 at C-0006_0040, ¶13, emphasis in original).

On July 29, 2014, Claimant submitted an amendment in response to the office action. In that amendment, Claimant revised the descriptions of the drawings in light of the Examiner's comments concerning how those descriptions had been phrased. (C-7 at C-0007_0018-0019). The wording in the claim as originally filed was not amended. That claim stated: "The ornamental design for a V Folding Wings Bicycle Carrier as shown and described." (*Id.* at C-0007_0019).

In that amendment, Claimant <u>did</u> <u>not</u> delete from the specification the priority claim cross-reference to the '456 patent application as the Examiner had instructed. (*Id.* at C-0007_0018). And, again, Claimant <u>did</u> <u>not</u> address whether the filing date of the '456 patent application was needed to avoid intervening prior art.

The amendment also argued that the Examiner was incorrect in concluding that the design application was not entitled to the priority date of the '456 patent application. In doing so, Claimant focused on certain drawings found in the '456 application and compared them to drawings found in the design application. As Claimant argued:

As can be seen from the two images [Figs. 17 and 2 in the '456 application and Fig. 1 in the D717 application; these being the same figures found in the '456 patent and in the D717 patent], the main structure is almost identical. There are minor changes in the base configuration but the main crux of the inventions are identical. Both teach a V-shaped bicycle rack with adjustable arms, i.e., arms that are adjustable in the y direction with hangering systems that are adjustable in the X direction. [Claimant] respectfully argues that this "continuation-in-part" does not change the shape or configuration of the design disclosed in the earlier

application and as such this application should in fact be entitled to
the benefit of the filing date of the earlier application." (sic).

(*Id.* at C-0007_0020-0021). While Claimant addressed the overall V-shape of the racks,
Claimant did not describe why it believed the other components found in the respective
racks had any similarity and how the surface features shown on the arms of Figure 2 of
the '456 application and the base of the rack shown there are, from a design and
ornamental standpoint, the same as or even similar to those shown in the D717 patent.
The D717 patent shows a hub at the base of the arms that is circular in cross-section and
mostly cylindrical in length. In addition, the lower portions of the arms display a slight S-
shape at the point where each connects to the hub. (C-9 at Figs. 1 and 3, C-9 at C-
0009_0003 and C-0009_0005 respectively). None of these features is found in the '456
patent.

During the hearing, Mr. Williams testified it was his understanding that the D717
patent claimed the V-shaped wing and nothing about the shape surrounding the shank.
(M. Williams' testimony, 5/31/18). Again, Mr. Williams understanding is incorrect. The
D717 patent claim is directed to all features of the bike rack that are shown in the
drawings, none which depict components of the rack in broken lines.

On September 19, 2014, the Examiner issued a notice of allowance for what
became the D717 patent. In that notice, the Examiner withdrew his objection and
rejection under 35 U.S.C. §§112(a) and (b) in light of Claimant's amendment. On this
point, Claimant argued that (Claimant's Reply Liability Brief at 19-20):

> In the case … for the '717 patent, R 285, page 32 of the
> prosecution history … the examiner accepted [Claimant's]
> arguments for priority as persuasive such as to overcome the
> examiner's rejection in paragraph 112, (a). As a result the
> examiner withdrew his rejection and allowed the claim of priority.
> Subsequently the D 717 … [patent] as continuation patent[ ].

(Citing R-285 at 32, also found at C-0007_0012).

Here, Claimant again overstates what the Examiner actually did. In the very next
paragraph of the notice of allowance, the Examiner addressed the priority claim, stating:

> Reference to this design application as a continuation-in-part to
> United States Utility Application No. 11/697,294 under 35 U.S.C.
> §120 is acknowledged. However, unless the filing date of the
> earlier application is actually needed, such as to avoid intervening
> prior art, *the entitlement to priority in this CIP application will not
> be considered*. See In re Corba, 212 USPQ 825 (Comm'r Pat.
> 1981).

(R-285 at 31, ¶3, also found in C-7 at C-0007_0012, ¶3; emphasis added). Thus, the
Examiner did not allow the request for priority. This is consistent with what the Examiner
did earlier in his office action. (C-7 at C-0007_0040, ¶13). After issuance of the notice of

allowance, Claimant did not request that the Examiner reconsider his decision not to consider priority entitlement. Instead, Claimant's counsel submitted payment of the base issue fee on October 13, 2014. (C-7 at C-0007_0002).

Even though the Examiner concluded that "the design disclosed in the parent application [*i.e.*, the application for the '456 patent] is not the same design as the design disclosed in this application [*i.e.*, the application for the '717 patent], the D717 patent issued with the following found on the front page of the patent at item (63): "Continuation of application No. 11/697,294, filed on Apr. 5, 2007." (C-9 at C-0009_0001). The issuance of the D717 patent as a "continuation" cannot be squared with the Examiner's conclusion just noted above concerning the different drawings in the parent application and cannot be squared with the Claimant's amendment that did not delete reference to the design application as a continuation-in-part. It thus appears that the PTO mistakenly included the "continuation" wording on the front page of the patent, perhaps because Claimant included that wording on the Application Data Sheet it submitted when the application was filed, which as noted above was inconsistent with the continuation-in-part priority claim found in the application's specification as filed.

To address this point, it is appropriate to compare the drawings found in the D717 patent to those to the '456 patent. This comparison is set out in the following table.

### TABLE XIII - COMPARISON OF 'D717 PATENT DRAWINGS TO THE '456 PATENT DRAWINGS

| D717 Patent Drawings | '456 Patent Drawings |
|---|---|
| Fig 1 shows that each arm has two smooth surface components surrounding each arm. The arms have a square or rectangular cross-section. There is circular and mostly cylindrical hub to which the lower part of the arms of the V-shape connect; that hub receives the shank (which is shown in broken lines). Each arm has two bicycle holders, attached at the free end and near the mid-point of the length of the arm. that are shown as inverted angled U-shapes with a the top ends angled outwardly from the top surface. The lower end of each are, near where the arm is connected to the hub, each arm as a slight S-shape. None these components is shown in broken lines. | Fig. 2 shows that each arm has two components with sculpted surfaces and separated from each other. Each component surrounds its arm. The arms have a circular cross-section. Fig. 2 does not depict the circular hub or that the lower portion of the arms have a slight S-shape. |
|  | Fig.6 of the '456 patent has the |

| D717 Patent Drawings | '456 Patent Drawings |
|---|---|
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position and attached to a bicycle. The bicycle is shown in broken lines. The ends of the arms that connect to the hub have a slight S-shape. | same components as described above with respect to Fig. 2. The rack is shown attached to a bicycle. |
| Fig 1 shows that each arm has two smooth surface components surrounding each arm. The arms have a square or rectangular cross-section. There is circular and mostly cylindrical hub to which the lower part of the arms of the V-shape connect; that hub receives the shank (which is shown in broken lines). Each arm has two bicycle holders, attached at the free end and near the mid-point of the length of the arm. that are shown as inverted angled U-shapes with a the top ends angled outwardly from the top surface. The lower end of each are, near where the arm is connected to the hub, each arm as a slight S-shape. None these components is shown in broken lines. | Fig. 12 shows two arms that do not have any sculptured surface components surrounding the arms that are shown in the D717 patent. The pegs located at the upper portion of the arm that hold the bicycle have a different appearance than the components shown in the D717 patent that hold the bicycle. The base of the V-shape has a partial trapezoidal shaped component with linear top edge and an arc cut-out on the bottom thereof, which is positioned on a rectangular surface. |
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position and attached to a bicycle. The bicycle is shown in broken lines. The ends of the arms that connect to the hub have a slight S-shape. | Fig. 14 of the '456 patent has the same components as described above with respect to Fig. 12, with the rack shown attached to a bicycle. |
| Fig 1 shows that each arm has two smooth surface components surrounding each arm. The arms have a square or rectangular cross-section. There is circular and mostly cylindrical hub to which the | Fig. 15 shows that the two arms do not have the surface component surrounding the arms that are shown in the D717 patent. The bottom portion of the rack includes a bracket having curved wing |

| D717 Patent Drawings | '456 Patent Drawings |
|---|---|
| lower part of the arms of the V-shape connect; that hub receives the shank (which is shown in broken lines). Each arm has two  bicycle holders, attached at the free end and near the mid-point of the length of the arm. that are shown as inverted angled U-shapes with a the top ends angled outwardly from the top surface. The lower end of each are, near where the arm is connected to the hub, each arm as a slight S-shape. None these components is shown in broken lines. | portions that extend from each side of the bracket. Notches are provided in the bracket. These features are not found in the D717 patent. Fig. 15 does not depict the circular hub found in the D717 patent. |
| Fig 1 shows that each arm has two smooth surface components surrounding each arm. The arms have a square or rectangular cross-section. There is circular and mostly cylindrical hub to which the lower part of the arms of the V-shape connect; that hub receives the shank (which is shown in broken lines). Each arm has two  bicycle holders, attached at the free end and near the mid-point of the length of the arm. that are shown as inverted angled U-shapes with a the top ends angled outwardly from the top surface. The lower end of each are, near where the arm is connected to the hub, each arm as a slight S-shape. None these components is shown in broken lines. | Fig. 18 includes a diamond shaped collar that slides over the shank, with an elastic cord having a hook. In addition, wheel securing mechanisms are shown toward the lower portion of each arm. Pegs are shown near the upper end of each arm. It appears that the cross-section of the arms is circular. The arms do not have holes in them. Each arm has a sculptured bumper component that encircles the arm. |
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position and attached to a bicycle. The bicycle is shown in broken lines. The ends of the arms that connect to the hub | Fig. 20 of the '456 patent has the same components as described above with respect to Fig. 18, with the rack attached to a bicycle. |

| D717 Patent Drawings | '456 Patent Drawings |
|---|---|
| have a slight S-shape. | |
| Fig 1 shows that each arm has two smooth surface components surrounding each arm. The arms have a square or rectangular cross-section. There is circular and mostly cylindrical hub to which the lower part of the arms of the V-shape connect; that hub receives the shank (which is shown in broken lines). Each arm has two bicycle holders, attached at the free end and near the mid-point of the length of the arm. that are shown as inverted angled U-shapes with a the top ends angled outwardly from the top surface. The lower end of each are, near where the arm is connected to the hub, each arm as a slight S-shape. None these components is shown in broken lines. | Fig. 21 shows a 2-bike rack that is somewhat similar to that seen in figure 18, with the cross section of the arms square or rectangular. The pegs on the upper arms have a stretched U-shape. Each arm has one sculptured bumper. The collar is included. |
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position and attached to a bicycle. The bicycle is shown in broken lines. The ends of the arms that connect to the hub have a slight S-shape. | Figure 24 is the 4-bike version of the rack seen in figure 21 and has the same individual features. |

This comparison and a visual comparison of the drawings in the D717 patent against those found in the '456 patent show that there is no single drawing that is the same found in both patents. Moreover, all of the individual components that make up the claimed design in the D717 patent are not individually found in the '456 patent.

Based on this, the Arbitrator finds and concludes that the D717 patent is at most a continuation-in-part of the '456 patent and the drawings found in the D717 patent contain new matter not found in the '456 patent. As a result, the effective date of the claim in the D717 patent is no earlier than the filing date for that patent, *i.e.*, June 27, 2013. Because this is after March 15, 2013, the AIA applies for prior art assessment purposes.

### e. Priority Assessment Concerning the D289 Patent

The application for the D289 patent was filed on May 13, 2013. The Application Data Sheet submitted with the application did not claim priority to any earlier application. (C-12 at C-0012_0063). In the application's specification as filed, Claimant provided a "Cross-Reference to Related Applications" section which stated that "This application is a *Continuation-In-Part* and claims priority to Co-Pending Utility Patent Application 11/697,294, filed on 2007.04.05." (*Id.* at C-0012_0049, emphasis added). Thus, there again is an inconsistency between the Application Data Sheet and the application's specification. The filing receipt did not identify any priority claim and stated that "*[a] proper domestic benefit claim must be provided in an Application Data Sheet in order to constitute a claim for domestic benefit. See 37 C.F.R. 1.76 and 1.78.*" (C-12 at C-0012_0044, emphasis in original).

On August 13, 2104, the Examiner issued a notice of allowability in which he objected to the drawings because the line weight in all drawings was poor. (C-12 at C-0012_0016). In addition the Examiner objected to the wording of the claim and made an Examiner's amendment to the claim. As originally filed, the claim stated (C-12 at C-0012_0049):

> The ornamental design for a V-shaped bicycle carrier as shown and described.

The Examiner's amendment added the word "four" to the claim, which changed the claim to read (C-12 at C-0012_0018):

> The ornamental design for a V-shaped four bicycle carrier as shown and described.

The effect of this amendment was to limit the scope of the claim so that the claimed design was directed to a carrier for four bicycles.

The Examiner provided Claimant the opportunity to contest this claim amendment when he advised that "[s]hould the [Claimant] find the changes or additions to be unacceptable, the [Claimant] may file an amendment as provided by 37 CFR §1.312." (C-12 at C-00012_0016). In the remainder of the prosecution, Claimant did not file such an amendment and, consequently, agreed with the Examiner's change in the wording of the claim.

On October 13, 2014, Claimant paid the issue fee and on December 29, 2014, the Examiner issued a corrected notice of allowability in which the prior objection to the drawings was withdrawn. However, the Examiner continued his objection to the claim wording and he again amended the claim in the manner described above. (C-12 at C-00012_0003).

Thereafter, the D289 patent issued. There is no claim of priority printed on the face of that issued patent. (C-19 at C-0013_0001). In the briefing on the liability and damages issues in this proceeding, Claimant noted that a reissue application had been

filed in relation to the D289 patent to seek continuity with the earlier '456 patent. (Claimant's Liability Brief at 2, 35; Claimant's Reply Liability Brief at 22).

Because the reissue application of the D289 patent and its prosecution are publically available documents, the Arbitrator has reviewed them using the PTO's PAIR web site and takes judicial notice of those documents. That review has noted that the reissue application was filed on May 30, 2018, which was the day before the first testimony in the evidentiary hearing in this arbitration. Before the record in this matter was closed, the parties submitted a copy of the prosecution history of the reissue application as it existed as of December 13, 2018, and stipulated to the completeness of that submission. The Arbitrator then advised the parties that the reissue prosecution history would be given the exhibit number C-3000 and included in the admitted exhibits.

At the time the reissue application was filed, Claimant also filed an Application Data Sheet in which Claimant indicated that the reissue application was a continuation-in-part of the application that led to the '456 patent. (C-3000 at LGA0026066). A reissue declaration, signed by Mr. Williams on May 29, 2018, stated that the "reissue application is filed to assert a priority claim as a continuation-in-part" of the application leading to the '456 patent. (C-3000 at LGA0026043). A filing receipt issued by the PTO on June 8, 2018, confirmed that Claimant is claiming that the reissue application as a continuation-in-part of the '456 patent. (C-3000 at LGA 0026032).

On September 6, 2018, Claimant filed a Preliminary Statement in support of the reissue application that had been filed on May 30. In that Preliminary Statement, Claimant confirmed that "[t]he present Reissue Application therefore hereby claims priority as a *Continuation-in-Part* of previously file Patent App. Serial No. 11/697,294.[15] (C-3000 at LGA0026028, emphasis added).

On September 27, 2018, the Examiner issued an office action in which he rejected the claim in the reissue application as being based on a defective reissue declaration and that the reissue oath/declaration is defective because it fails to identify at least one error which is relied upon to support the reissue application. (C-3000 at LGA0026020-022). The Examiner noted that "[t]he error is not simply that the information was not printed on the face of the file. The error is that the [Claimant] failed to file a proper claim to priority under 35 U.S.C. 120 because they failed to make specific reference [to] the prior application in their ADC [sic: ADS as the acronym for Application Data Sheet]." (C-3000 at LGA0026021).

On October 1, 2018, Claimant's response to the office action was filed (the response was dated September 28, 2018). In its remarks, Claimant stated that the reissue was being sought because "[Claimant] failed to file a proper claim to priority … because they (sic) failed to make specific reference the (sic) prior application serial no. 11/697,294 filed on 04/05/2017 on the ADS." (*See* C-3000 at LGA0026018). Claimant

---

[15] The Preliminary Statement bears a date of January 8, 2018, yet the first sentence refers to the reissue application that was filed on May 30, 2018. It appears that the Preliminary Statement was misdated.

also submitted a substitute reissue declaration, signed by Mr. Williams on October 1, 2018. (C-3000 at LGA0026015-016).

On December 10, 2018, the Examiner issued a notice of allowance and Claimant paid the base issue fee on December 12, 2018. (*See* C-3000 at LGA0026005-006 and LGA0026000). That concluded the prosecution of the reissue application.

Thus, from the filing of the original application through the filing and prosecution of the reissue application, Claimant consistently told the PTO that the D289 patent should be a continuation-in-part of the '456 patent. The file history of the D289 patent shows it will reissue as a continuation-in-part of the '456 patent.

### TABLE XIV - COMPARISON OF 'D289 PATENT DRAWINGS TO THE '456 PATENT DRAWINGS

| D289 Patent Drawings | '456 Patent Drawings |
|---|---|
| Fig 1 shows a bicycle rack capable of holding four bicycles. The rack has two identical V-shapes displaced from each other. Each arm (there are a total of four) has two smooth surface components surrounding that arm. The arms have a square or rectangular cross-section. There is a base plate below the bottom of each V-shape and above the shank. The shank connecting the two V-shapes is shown in solid lines. The arms have bicycle holders attached at the upper ends that are shown as inverted U-shapes with a the top ends perpendicular to the top portion of the shape. None these components is shown in broken lines. | Fig. 2 shows that each arm has two components with sculpted surfaces and separated from each other. Each component surrounds its arm. The arms have a circular cross-section. There is no base plate below the bottom of the V-shape. |
| Fig. 3has the same components described above in relation to Fig. 1 shown in the same position and attached to a bicycle. The bicycle is shown in broken lines. | Fig.6 of the '456 patent has the same components as described above with respect to Fig. 2. The rack is shown attached to a bicycle. |
| Fig 1 shows a bicycle rack capable of holding four bicycles. The rack | Fig. 12 shows two arms that do not have any sculptured surface |

| D289 Patent Drawings | '456 Patent Drawings |
|---|---|
| has two identical V-shapes displaced from each other. Each arm (there are a total of four) has two smooth surface components surrounding that arm. The arms have a square or rectangular cross-section. There is a base plate below the bottom of each V-shape and above the shank. The shank connecting the two V-shapes is shown in solid lines. The arms have bicycle holders attached at the upper ends that are shown as inverted U-shapes with a the top ends perpendicular to the top portion of the shape. None these components is shown in broken lines. | components surrounding the arms that are shown in the D717 patent. The pegs located at the upper portion of the arm that hold the bicycle have a different appearance than the components shown in the D289 patent that hold the bicycle. The base of the V-shape has a partial trapezoidal shaped component with linear top edge and an arc cut-out on the bottom thereof, which is position on a rectangular surface. |
| Fig. 3has the same components described above in relation to Fig. 1 shown in the same position and attached to a bicycle. The bicycle is shown in broken lines. | Fig.14 of the '456 patent has the same components as described above with respect to Fig. 12, with the rack shown attached to a bicycle. |
| Fig 1 shows a bicycle rack capable of holding four bicycles. The rack has two identical V-shapes displaced from each other. Each arm (there are a total of four) has two smooth surface components surrounding that arm. The arms have a square or rectangular cross-section. There is a base plate below the bottom of each V-shape and above the shank. The shank connecting the two V-shapes is shown in solid lines. The arms have bicycle holders attached at the upper ends that are shown as inverted U-shapes with a the top ends roughly perpendicular to the top portion of the shape. None these components is shown in broken | Fig. 15 shows that the two arms do not have the surface component surrounding the arms that are shown in the D289 patent. The upper end of each arm has holes in it. The bottom portion of the rack includes a bracket having curved wing portions that extend from each side of the bracket. Notches are provided in the bracket. These features are not found in the D289 patent. |

| D289 Patent Drawings | '456 Patent Drawings |
|---|---|
| lines. | |
| Fig 1 shows a bicycle rack capable of holding four bicycles. The rack has two identical V-shapes displaced from each other. Each arm (there are a total of four) has two smooth surface components surrounding that arm. The arms have a square or rectangular cross-section. There is a base plate below the bottom of each V-shape and above the shank. The shank connecting the two V-shapes is shown in solid lines. The arms have bicycle holders attached at the upper ends that are shown as inverted U-shapes with a the top ends roughly perpendicular to the top portion of the shape. None these components is shown in broken lines. | Fig. 18 include a diamond shaped collar that slides over the shank, with an elastic cord having a hook. In addition, wheel securing mechanisms are shown toward the lower portion of each arm. Pegs are shown near the upper end of each arm. It appears that the cross-section of the arms is circular. |
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position and attached to a bicycle. The bicycle is shown in broken lines. The components are not shown in broken lines. | Fig.20 of the '456 patent has the same components as described above with respect to Fig. 18, with the rack attached to a bicycle. |
| Fig 1 shows a bicycle rack capable of holding four bicycles. The rack has two identical V-shapes displaced from each other. Each arm (there are a total of four) has two smooth surface components surrounding that arm. The arms have a square or rectangular cross-section. There is a base plate below the bottom of each V-shape and above the shank. The shank connecting the two V-shapes is shown in solid lines. The arms have | Fig. 21 shows a 2-bike rack that is somewhat similar to that seen in figure 18, with the cross section of the arms square or rectangular. The pegs on the upper arms have a stretched U-shape. Each arm has one sculptured bumper. The diamond shaped collar is included. |

| D289 Patent Drawings | '456 Patent Drawings |
|---|---|
| bicycle holders attached at the upper ends that are shown as inverted U-shapes with a the top ends roughly perpendicular to the top portion of the shape. None these components is shown in broken lines. | |
| Fig. 3 has the same components described above in relation to Fig. 1 shown in the same position and attached to a bicycle. The bicycle is shown in broken lines. The components are not shown in broken lines. | Fig. 24 is the 4-bike version of the rack seen in figure 21 and has the same individual features. |

Because the drawings in the D289 patent differ from those in the '456 patent in relation to the ornamental features and shapes of the components, the Arbitrator finds and concludes that the D289 patent is at most a continuation-in-part of the application leading to the '456 patent. As such, the effective filing date of the claim in the D289 patent is its filing date of May 13, 2013. Because this date is after March 15,2013, the AIA applies to the D289 patent for prior art assessment.

### E.   Infringement Assessment of the Design Patents

This section addresses Claimant's assertions the certain of Respondent's products infringe the respective design patents. The following table identifies Respondent's products by SKU number, the allegedly infringed patent, and Claimant's evidence in support.[16]

---

[16] References to Claimant's supporting documents are taken from Claimant's Submission of Booklet Requested By Order #25, submitted on June 28, 2018; Claimant's List of Accused SKUs And Book Of Accused Products that was submitted on July 30, 2018; and Claimant's further submission of comparable material on November 21, 2018. In Claimant's June 28 submission, Claimant included copies of Figure 1 of each of the design patents and identified Respondent's SKU numbers accused of infringing each such patent.

| Respondent's SKU Number | Product Description | Design Patent Alleged to be Infringed | Claimant's Support |
|---|---|---|---|
| 5801200 | SportWing, 2-bike, Highland brand | D917 | R-298 at p. I-4<br>R-294 at p. I-9 |
| 1370400 | SportWing, 4-bike, Highland brand | D917 | R-297 at p. I-1<br>R-298 at p. I-4<br>R-294 at p. I-9 |
| 1370100 | SportWing, 2-bike, Highland brand | D917, D289 | R-294 at p. I-9 |
| 1370500 | SportWing, 4-bike, Highland brand | D917 | R-294 at p. I-9 |
| 13751<br>1375100 | SportWing, 2-bike, Highland brand | D917 | R-295 at p. 38 |
| 13755<br>1370550 | SportWing, 4-bike, Highland brand | D917, D716, D717 | R-295 at p. 38 |
| 1390000 | SportWing, 2-bike, Reese brand | D917 | R-299 at p. 13 |
| 1390500 | SportWing, 4-bike, Reese brand | D716 | R-299 at p. 13 |
| 1376500<br>1378000<br>1390400 | SportWing Trunk Mount | D716 | R-295 at p. 38 |
| 59508 | NV2 | D717 | R-295 at p. 49 |

A comparison of the drawings of each design patent to the respective accused product(s) accuse of infringing that patent shows that the accused products are virtually identical to the asserted patent.

For example, below is a comparison of the D717 drawing to NV2, SKU 59508, an example of which is found in R-295 at p. 49; *see also* R-293 at p. I-9).

**D717, Figure 1**                    **Respondent's NV2**



FIG. 1

This type of comparison across all of the accused products against the design patents shows that appearance of the accused products closely mirrors the drawings from the design patents. In his testimony, Mr. Williams explained how that occurred. He stated that the drawings in the design patents were based on the products Respondent was selling, physical products sold by Respondent were reviewed, and the drawings for the D716 and D717 patents were created by James Prichard using Respondent's product he purchased or pictures of those products he had. (M. Williams' testimony, 5/31/18, 6/1/18). In essence, Claimant used Respondent's commercially available products to prepare the drawings that were submitted for and form the basis of the design patents. As such, it is not surprising that Respondent's products look like the claimed designs.

All of this leads to the conclusion that if one or more of the design patents are not invalid, then infringement exists. The issue of validity will now be addressed.

### F.    Validity Assessment of the Design Patents

Respondent contends that each design patent is invalid under 35 U.S.C. §102. The validity assessment needs to consider the effective filing date of each design patent. Because the Arbitrator has concluded that the effective filing date of the D917 patent is December 14, 2012, §102 of the pre-AIA statute applies to that patent. As to the remaining three design patents, §102 of the post-AIA statute is the applicable statute.

Section 102 of the pre-AIA statute in relevant part states:

> A person shall be entitled to a patent unless–
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this

country, more than one year prior to the date of the application for patent in the United States …

Section 102(a) of the post-AIA statute in relevant part states:

(a) **Novelty; prior art.** – A person shall be entitle to an patent unless–

(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention …

For purposes of this proceeding, the relevant difference between these two provisions involve the date against which a printed publication, public use or on sale is measured. In the pre-AIA statute, the applicable date for determining whether a patent, printed publication, a public use or on sale in the US is prior art is "more than one year prior to the date of the application for patent in the United States." 35 U.S.C §102(b), pre-AIA.

However, under the post-AIA provision, the date for determining whether the claimed invention was patented or described in a printed publication, or in public use, on sale, or otherwise available to the public is "before the effective filing date of the claimed invention." 35 U.S.C §102(a)(1), post-AIA. Consequently, the focus in the post-AIA statute is on the effective filing date of the claimed invention and not more than one year prior to the filing date of the application for the patent under consideration.

As noted above, the parties have stipulated to Respondent's sales of accused bike racks in relation to the D289, D716 and D717 patents. However, there was no stipulation as to the D917 patent. That patent and the others will now be addressed.

### 1.      Validity of D917 Patent

Respondent contends that the D917 patent is invalid under 35 U.S.C §§102(a), (b), pre-AIA. (Respondent's Liability Brief at 8-9). During his testimony, Mr. Williams stated that Respondent had been selling the SportWing bike rack accused of infringing more than one year before the filing date of the application leading to the D917 patent. (M. Williams' testimony, 6/1/18). As seen in the above figures taken from the D917 patent, the bike rack claimed in it can hold up to two bicycles. While Claimant's November 21, 2018, booklet of accused products points to SKU 5801200 shown in R-298 at page I-4, which is Respondent's November 2015 catalog revision for use in 2016, Claimant does not address that Respondent's earlier catalog showed the same SKU 5801200 product. For example, that SKU is seen in R-290 at p. 308, which is Respondent's 2010 catalog.

Because the claim in the D917 patent is entitled at best to a filing date of December 14, 2012, the publication of a photograph of accused product SKU 5801200 in 2010 was well before the one year grace period found in the pre-AIA statute. As the Federal Circuit has instructed: "[I]t it is axiomatic that that which would literally infringe

if later anticipates if earlier." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F. 3d 1368, 1378 (Fed. Cir. 2001), quoting *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987). Here, Claimant accuses the SKU 5801200 of literally infringing the D917 patent. However, that SKU was at least publically available, in public use, and on sale greater than one year before the filing date of the invention claimed in the D917 patent.

Consequently, based on the foregoing analysis and the clear and convincing evidence presented at the hearing, the Arbitrator finds and concludes that the D917 patent is invalid under each of 35 U.S.C. §102(a) and 35 U.S.C. §102 (b).

## 2.      Validity of D716 Patent

The Arbitrator has concluded that the effective filing date of the D716 patent is June 27, 2013, is not entitled to the assertion as a continuation of the '456 patent, as printed on the first page of the D716 patent, and is governed by the AIA. As to this patent, the parties stipulated as follows:

> 34. Cequent publicly sold one or more of the bike racks accused of infringing D717,716 prior to June 27, 2013. (Stipulated Facts, ¶34, submitted April 20, 2018).

Although Mr. Williams testified that he did not know when Respondent started selling the trunk mounted bike rack accused of infringing the D716 patent, he thought it was before the June 27, 2013, filing date. (Mr. Williams' testimony, 6/1/18).

Notwithstanding this, Claimant's stipulation is clear. The stipulation results in the conclusion that for the D716 patent "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. 35 U.S.C. §102(a)(1), post-AIA.

Based on the parties' stipulation and the clear and convincing evidence presented at that the hearing, the Arbitrator finds and concludes that the D716 patent is invalid under 35 U.S.C. §102(a)(1), post-AIA.

## 3.      Validity of D717 Patent

As noted above, the Arbitrator has concluded that the effective filing date of the D717 patent is also June 27, 2013, is not entitled to the assertion as a continuation of the '456 patent, as printed on the first page of the D717 patent, and is governed by the AIA. As to this patent, the parties stipulated as follows:

> 33. Cequent publicly sold one or more of the bike racks accused of infringing D717,717 prior to June 27, 2013. (Stipulated Facts, ¶34, submitted April 20, 2018).

Claimant's stipulation results in the conclusion that for the D717 patent "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. 35 U.S.C. §102(a)(1), post-AIA.

Based on the parties' stipulation and the clear and convincing evidence presented at the hearing, the Arbitrator finds and concludes that the D717 patent is invalid under 35 U.S.C. §102(a)(1), post-AIA.

### 4. Validity of D289 Patent

As noted above, because the Arbitrator has concluded that the effective filing date of the D289 patent is May 13, 2013 is a continuation-in-part of the '456 patent and the D289 patent is to be reissued as a continuation –in-part of the '456 patent, the D289 patent is not entitled to an effective filing date that is the filing date of the '456 patent, and is governed by the AIA. As to this patent, the parties stipulated as follows:

> 32. Cequent publicly sold one or more of the bike racks accused of infringing D722,289 prior to May 13, 2012. (Stipulated Facts, ¶32, submitted April 20, 2018).

Claimant's stipulation results in the conclusion that for the D289 patent "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. 35 U.S.C. §102(a)(1), post-AIA.

Based on the parties' stipulation and the clear and convincing evidence presented at the hearing, the Arbitrator finds and concludes that the D289 patent is invalid under 35 U.S.C. §102(a)(1), post-AIA.

### G. Damages in Relation to the Design Patents

Because the Arbitrator has concluded that each of the asserted design patents is invalid as anticipated, it is unnecessary to address Claimant's damages analysis and Claimant's requests for damages under the design patents are moot.

### H. Assessment of Respondent's Inequitable Conduct Assertions Involving the Design Patents

In essence, Respondent contends that Claimant did not disclose to the PTO Respondent's prior sales of the products accused of infringing each of the design patents even though Claimant was well aware of those sales during the time they were made, which was before the patent applications were filed. Respondent also notes that the drawings submitted when the design applications were filed were drawings of Respondent's actual commercial products and this was not disclosed to the PTO.

Claimant argues that during the prosecution of the '456 patent, it advised the PTO of sales and public displays of the subject matter of the application that led to the '456

patent. For support, Claimant points to a February 22, 2013, declaration signed by Mr. Williams and submitted to the PTO in response to the Examiner's rejection of pending claims in that application and in support of an argument of commercial success. (*See* C-10 at C-0010_0427-04). In his declaration, Mr. Williams noted that the rack depicted in the '456 patent application was shown by Claimant in the November 2007 SEMA show and was the subject of the exclusive license to Respondent in January 2008. (*Id*. at C-0010_0427, ¶¶6, 7).[17] Mr. Williams further advised that sales of this product began in 2009 and "will approach **XXXXXX** for 2013". (*Id*. at C-0010_0428, ¶10). He attached to his declaration a number of photographs of Respondent's products, including those accused in this proceeding.

In his declaration, Mr. Williams also advised the PTO that on December 21, 2010, Respondent filed an action against Claimant in federal court (*i.e.*, **Colorado Action – I**) and in January 2011, Claimant counterclaimed "for infringement." (*Id*. at C-0010_0427, ¶9). Mr. Williams did not refer to the Amended Counterclaim filed by Claimant in that action on May 12, 2011. In that Amended Counterclaim, Claimant asserted a number of patents, including the '725 and '550 patents. While that Amended Counterclaim does refer broadly to infringement of "LGA's Technology" as of May 2011 there were no issued patents listed in the Amended Counterclaim that covered bike racks.

The Arbitrator appreciates that Mr. Williams did provide information to the PTO during the prosecution of the '456 patent that could be understood to disclose Respondent's sales of bike racks as early as 2009 and continuing up to the date of the declaration. On this point, Claimant argues that if a disclosure is made in an earlier patent prosecution, that disclosure is deemed to be available to the Examiner during the examination of child applications. While that may be consistent with patent practice, one has to assume the Examiner actually looked at that earlier information during the examination of child applications.

In light of Mr. Williams' declaration and the attached photographs, the Arbitrator finds and concludes that this information did disclose to the PTO Respondent's sales of bike racks and these sales were not withheld from the PTO as of February 22, 2013. Although prudence would suggest that reference to this information should have been made in each subsequent design patent prosecution so that the information was immediately before the Examiner, that does not outweigh the fact that the information was submitted to the PTO.

Likewise, Respondent's argument that Claimant should have disclosed that the drawings in the design patent applications were made using Respondent's products as the source is undercut by the photographs attached to Mr. Williams' declaration. Those photos identify Respondent and display products that are depicted in the patent's drawings. That should have been readily obvious to the Examiner if he had looked and the photos and compared them to the drawings.

---

[17]    SEMA is the acronym for the Specialty Equipment Market Association. The association conducts an annual trade show held in November.

Based on the foregoing, the Arbitrator finds and concludes that Respondent has not shown by clear and convincing evidence that Claimant had the intent to deceive the PTO in relation to Respondent's prior sales of the accused products. However, the Arbitrator finds and concludes that those products would have been material to the examination of each of the design patents had they not been disclosed to the PTO.

## I.        Exceptional Case Analysis

In this matter, both parties have asserted that the patent portion of the proceeding is exceptional under 35 U.S.C. §285 and an award of attorneys' fees to the prevailing party is appropriate. The Supreme Court addressed the exceptional case consideration in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, ___ U.S. ___, 134 S. Ct. 1749 (2014). There, the Court clarified the application of §285. It held that an "exceptional" case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both governing law and the facts of the case or the unreasonable manner in which the case was litigated." (*Id.* at 1756). Consideration of whether a case is exceptional is left to the discretion of the decider, considering the totality of the circumstances. (Id.). Finally, the Court held that proof of an exceptional case is under the preponderance of the evidence standard. (*Id.* at 1758). As the Court stated: "Section 285 demands a simple discretionary inquiry …" (*Id.*).

Over the years, before and after *Octane Fitness*, courts have considered a number of touch points to inform the exceptional issue under §285. These include a level of bad faith, litigation misconduct, and inequitable conduct. However, these are simply part of the totality of the circumstances surrounding the suit.

After having acted as the Arbitrator in this matter for over two years, participated in numerous telephone status hearings with counsel for both parties, reviewed many briefs and motions directed to the legal issues in the case, and observed counsel and the parties during the evidentiary hearing, the Arbitrator concludes that this proceeding  does not stand out from others within the meaning of §285. This case has been litigated hard by all counsel and each party appeared to have a degree of animosity as to the other, but that is to be expected. There were, however, a few hiccups along the way, such as Respondent finding archived emails late in the day. Claimant wavered on what patents were at issue and did not address the patent ownership issue sooner. There are other items the Arbitrator could cite, but that in not necessary. The Arbitrator concludes that this case was litigated no differently than many other patent infringement matters and does not believe this is a patent case warranting the label of exceptional under §285.

## III.   CLAIMANT'S COPYRIGHT ALLEGATIONS

In this proceeding, Claimant alleges that Respondent has infringed Claimant's copyright registration by using manuals that are covered by the registration. In addition, Claimant asserts that Respondent has violated the Digital Millennium Copyright Act, 17 U.S.C §§1202(a) and (b) by removing Claimant's copyright management information from the manuals used by Respondent. Each of these claims will be addressed separately below.

## A. Claimant's Copyright Registration Infringement Claim

Claimant received copyright registration TXu 1-847-969 on January 18, 2013. (*See* C-21 at C-0021_0001 to 0002). A certified copy of the of the specimens submitted in support of the registration application is also found as R-145. The registration identifies the title of the work as "LGA Cargo Rack Operating Manuals" having the following "Contents Titles":

> GearCage Ramp Accessory
>
> Moover Transporter System
>
> GearCage SP Cargo Rack
>
> GearCage TT Cargo Rack
>
> TwinTube U-Build-IT

In addition, the registration indicates that the author of the work was as Let's Go Aero (*i.e.*, Claimant), stating that the author created "text, photographs(s), compilation, editing, artwork." (*Id.* at C-0021_0001). The registration also notes that the work was a work made for hire and was completed in 2006. (*Id.*).

During the hearing, Ms. Williams testified that the five operating manuals noted above were filed as the subject matter of the registration because they were a group, had been prepared about the same time, and she felt it was easier to submit them all at once. (S. Williams' testimony, 6/5/18). She also identified the manuals and the parts of them. For ease of reference, admitted exhibit C-24 contains each of the manuals in the order they are identified in the copyright registration. Those manuals and the number of pages in each are identified in the following table:

### TABLE XVI - MANUALS FOUND AS PART OF CLAIMANT'S COPYRIGHT REGISTRATION

| Manual Name | Exhibit Number and Page Numbers in the Exhibit | Number of Pages |
|---|---|---|
| GearCage Ramp Accessory | Exhibit C-24 Page C0024_0001 to _0005 | 5 |
| Moover Transporter System | Exhibit C-24 Page C0024_0006 to _00013 | 8 |
| GearCage SP Cargo Rack | Exhibit C-24 Page C0024_0014 to _00018 | 5 |
| GearCage TT Cargo Rack | Exhibit C-24 | 10 |

| Manual Name | Exhibit Number and Page Numbers in the Exhibit | Number of Pages |
|---|---|---|
| | Page C0024_0019 to _00028 | |
| TwinTube U-Build-IT | Exhibit C-24<br>Page C0024_0029 to _00036 | 7 |

Each manual starts with a photograph of the product attached to a vehicle. Each manual is divided into different sections. For example, one section describes the use and operation of the product; another section identifies the parts of the product that are included in the packaging; and a third section describes the assembly and installation steps. The manuals also include exploded drawings of the product showing the way the various parts are to fit together.

Each manual has a legend in the lower right margin of the first page stating: "© *Copyright 2006 Let's Go Aero, Inc.*" (*See, e.g.*, C-24 at C-0024_0001). Claimant's name appears on each page of each manual and a toll free telephone number is provided in a warranty provision which could be used to contact Claimant.

During her testimony, Ms. Williams described that she took the photographs that are found in the manuals, some of which show the car she and Mr. Williams owned. She also testified that she wrote all of the copy in the text of the manuals and prepared the bill of materials (*i.e.*, the parts listings) included in the manuals. She described that the line art (*i.e.*, the exploded and other drawings) were done by Rich Litman, with the reference information included in and the formatting of the drawings was done by Out Side Services, located in Nebraska. (S. Williams' testimony, 6/5/18). She indicated that Patrice Vorsek of Jewel Design photo-shopped the photographs. (*Id.*).

Ms. Williams also testified that the TwinTube U-Build-IT product won the 2002 GMC design award at the 2002 SEMA shown. (S. Williams' testimony, 6/5/18).

As to the distribution of the manuals, Ms. Williams testified that the manuals were not and are not distributed or sold as a group. Rather, each product has its own manual packed with the product. (*Id.*). She also testified that the manuals have been and are available to download from Claimant's web site at no charge. (S. Williams' testimony, 6/5/18). Claimant did not offer any testimony that it obtained any revenues from any distribution of the manuals.

After the License Agreement was signed with Respondent, Ms. Williams testified that electronic files of the manuals were provided to Respondent so Respondent could use them. She said these files included all of the text, line drawings and formatting. (*Id.*).

Claimant asserts that manuals used by Respondent infringe the copyright registration. During the hearing, Claimant did not provide clear correspondence between the operating manuals found in its copyright registration and Respondent's manuals it accused of infringement. The Arbitrator has reviewed the admitted exhibits and has

prepared the following table that identifies Respondent's manuals that appear to correspond to Claimant's identified manuals:

**TABLE XVII - RESPONDENT'S ACCUSED MANUALS AND CLAIMANT'S CORRESPONDING MANUALS**

| Respondent's Manual Name, Date | Exhibit Number of Respondent's Accused Manual | Claimant's Apparent Corresponding Exhibit Number and Page Numbers in the Exhibit | Number of Pages in Claimant's Manuals |
|---|---|---|---|
| Ramp SKU 5800300 9/24/12 Rev. E | R-32 | Exhibit C-24 Page C0024_0001 to _0005 | 5 |
| GearCage SP Cargo Rack SKU 5800200 5/31/12 Rev. D | R-26 | Exhibit C-24 Page C0024_0006 to _00013 | 8 |
| Ramp SKU 5800300 9/24/12 Rev. E | R-32 | Also Exhibit C-24 Page C0024_0014-0018 | |
| GearCage SP SKU 5800200 4/1/08 Rev. A | R-99 | Exhibit C-24 Page C0024_0014 to _00018 [for all of Respondent's identified products] | 5 |
| GearCage SP Cargo Rack SKU 5800200 5/31/12 Rev. D | R-100 (also found as R-26) | | |
| Cargo Carrier SKU 5800200 7/1/14 Rev. E | R-102 | | |
| Cargo Rack SKU 5802100 9/24/12 Rev. D | R-72 | Exhibit C-24 Page C0024_0019 to _00028 | 10 |
| | No comparable | Exhibit C-24 Page C0024_0029 to _00036 | 7 |

| Respondent's Manual Name, Date | Exhibit Number of Respondent's Accused Manual | Claimant's Apparent Corresponding Exhibit Number and Page Numbers in the Exhibit | Number of Pages in Claimant's Manuals |
|---|---|---|---|
| | manual | (the Twin Tube U-Build-IT manual) | |

A comparison of Claimant's manuals to Respondent's accused manuals show that Respondents are virtually identical to Claimant's. That alone, might justify a finding of infringement, but would not put the copyright matter to rest because Claimant had been aware of Respondent's manuals during the life of the License Agreement and knew they were prepared using materials Claimant provided to Respondent for the purpose of making the manuals.

Respondent has argued that the copyright registration is invalid because, as a compilation, it does not meet the minimum level of creativity needed to support a copyright registration. (Respondent's Liability Brief at 39-40). In particular, Respondent notes that the copyright statute provides a definition of "compilation" as (17 U.S.C. §101):

> [A] work formed by the collection and assembling of preexisting materials of or data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. …

In support of this position, Respondent points to the testimony of Mr. Williams that she did not describe any selection process she used to organize the manuals in the way they are found in the copyright registration. In addition, Respondent notes that Ms. Williams testified that third parties provided information that was included in the manuals (*e.g.*, line art, exploded drawings, references, formatting, and photo-shopping) but Claimant did not own that information. Although Ms. Williams testified that the work submitted for the copyright registration was a work for hire and that the application she completed had the reference to a work for hire as a Yes/No question, Respondent did not present evidence as to whether or not the activities of the third parties were subject to a written agreement, the effect of which was to assign to Claimant any copyrightable works of such parties. (*See* 17 U.S.C. §101, at the definition of "work made for hire" and 17 U.S.C. §103(a), (b)).

In this regard, Claimant seems to have pulled back a bit on its copyright claim. In its Liability Reply Brief, Claimant argued that the registration is not invalid even if the manuals contain information not authored by Claimant. According to Claimant, the items created by Ms. Williams, such as the text and the photographs, are indisputably owned by Claimant. As to those "constituent parts authored by [Claimant] the registration is valid and [Respondent's] infringement is actionable." (Claimant's Liability Reply Brief at 25).

In Claimant's Liability Brief, Claimant noted that it was seeking copyright infringement damages based on Respondent's revenue of **XXXXXX** derived from the alleged infringement. (Claimant's Liability Brief at 42). This amount was based on the supplemental damages report of Mr. Hampton (C-970(b) at p. 6, ¶20):

> According to the documents I have seen, [Respondent] generated at least **XXXXXX** of infringing revenue relating to its alleged copyright infringement during the period January 28, 2012 through January 16, 2018.

For support of this statement, Mr. Hampton pointed to Exhibit I of his exhibits. (C-0970_2274). That exhibit notes that he calculated **XXXXXX** in asserted damages involving copyright infringement as to the silent hitch pin product and **XXXXXX** in asserted damages involving the GearCage product. However, at the hearing, Claimant's request to admit its exhibit C-25 was overruled. That exhibit included a copyright registration for a silent hitch pin product card, with the registration issued on February 29, 2016 (registration number VA 2-015-521). The Arbitrator ruled the exhibit was not admitted because Claimant had not alleged infringement of the noted registration.

Consequently, for Claimant's assertions of copyright infringement, the purported revenues derived from Respondent's sales of the silent hitch pin product, as calculated by Mr. Hampton, will not be considered.

As to the revenues reported in Mr. Hampton's Exhibit I, he provides a cross-reference to his Exhibit I.1 (found at C-0970_2275-76). In Exhibit I.1, he identifies his Exhibits I.2 through I.5 as providing support for his calculations. (*See* Exhibits I.2-I.5 at C-0970_4132-4228). However, he includes some SKU numbers in these latter exhibits that are not part of his Exhibit I.1.

The overarching issue relating to Mr. Hampton's calculation of copyright infringement revenues is that he determined Respondent's revenues derived from the sales of products rather than revenues flowing from the manuals themselves. The evidence at the hearing showed that the manuals were included in product packaging and not sold separately. Moreover, Claimant did not present any evidence that would entitle it to an indirect profits damage award, assuming copyright infringement exists. During his testimony, Mr. Hampton acknowledged that there must be a causal link between the copyright infringement and the damages being sought, which would include a link between the infringement and Respondent's profits. (Mr. Hampton testimony, 6/4/18). He also stated that he did not see evidence linking the alleged infringement to any indirect revenue or indirect profit made by Respondent. (*Id.*). In sum, Mr. Hampton testified that he calculated a revenue so a royalty rate could be applied to it. (*Id.*). He concluded by stating that he could calculate a royalty rate if the Arbitrator asks him to do that. Respectfully, Claimant is responsible for presenting its case.

Claimant's copyright damages requests have vacillated during this proceeding. In its post-hearing briefing, it argued that it is entitled to actual damages or statutory damages for publication of the accused manuals after January 2013. (Claimant's Liability

Brief at 43, 53). Then, Claimant argued that it is entitled to statutory damages for all publications done after the January 2012 effective date of the Settlement Agreement. (Claimant's Response Liability Brief at 44).

From Respondent's viewpoint, its expert Mr. Pierce concluded that because Respondent did not sell any of the accused manuals, it had no profits attributable to the alleged infringement. (R-384 at 38, ¶109). This would appear to be consistent with Mr. Hampton's own view when, in a publication he co-authored, he stated that "[a] defendant accused of copyright infringement is entitled to retain profits attributable to factors other than the copyrighted work." (*Id.* at 37, ¶108.c., quoting Scott Hampton, Karen Romrell and Aaron Burgoyne, *Apportionment for Copyright Infringement Damages*, October 9, 2015, appearing on the website of Hampton IP & Economic Consultants). Mr. Pierce further concluded that if copyright infringement damages are appropriate they should be measured by the costs to recreate independently the manuals. He estimated this cost to be approximately **XXXX**. (*Id.* at 37, ¶108.e., also noting that Mr. Williams testified at his deposition that the cost of having the drawings done for the manuals was "surprisingly little."). Neil Weipert, Respondent's senior designer in the aftermarket trailer and towage group, testified that it would have taken him about 40 hours to draft the text and create the line art appearing in each operating manual without relying on any example. He said this would equate to **XXXX** at his hourly income rate. (Weipert testimony 6/6/18).

Damages under the copyright statute may be two-fold. The copyright owner can recover the actual damages it suffered as a result of the infringement and any profit of the infringer that are attributable to the infringement and not taken into account in computing the actual damages. To prove the infringers profits, the copyright owner needs to prove the infringer's gross revenues. The alleged infringer then needs to prove its deductible expenses and elements of the profit that are attributable to factors other than the copyrighted work. This measure of damages is known and actual damages and profits. (17 U.S.C §504(b)). The statute notes that the actual damages must be the "result of the infringement" and any recoverable profits are those that are "attributable to the infringement." (*Id.*).

Here, neither Claimant nor Respondent sell the manuals and consequently there is no revenue or profit in relation to them. Respondent points to *Polar Bear Productions, Inc. v. Timex*, 384 F.3d 700, 710 (9th Cir. 2004), in support of its argument that Claimant therefore cannot obtain Respondent's direct profits, and is left with proving entitlement to indirect profits. (Respondent's Liability Brief at 38). In that case, the Ninth Circuit reiterated the need to connect the infringement to the damages, quoting its earlier decision in *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002). In *Mackie*, the court held that to show entitlement to indirect profits the copyright owner "must proffer sufficient non-speculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such infringement." (*Id.* at 915-16). The Ninth Circuit is not alone with this view. *Mackie* cites cases from the Federal Circuit, the Second Circuit, the Fifth Circuit, and the Seventh Circuit that have the same view. (*Id.* at 915, collecting cases).

During the hearing, Claimant did not provide evidence connecting Respondent's use of any of the accused manuals to any revenues, whether direct or indirect, received by Respondent as a result of such use. This is not surprising because the evidence showed that the manuals were in the packages containing the various products and consumers would not see a manual until the sale was completed, the packaging arrived at the consumers' homes, and then opened. In this situation, there was no evidence showing that the manuals were at least one of the drivers of any of the sales. Indeed, the parties stipulated to how Respondent used the manuals in their April 20, 2018, Stipulated Facts. Stipulated Fact 30 states:

> 30.     [Respondent] never separately charged anyone money for the assembly instructions that [Claimant] accuses of copyright infringement. Those instructions were provided inside closed boxes for customers to use to assemble the product, and they would not have been seen on the packaging by any customers until after their purchase when they open the box.

Given the foregoing, the Arbitrator finds and concludes that Claimant did not prove it was entitled to: (i) actual damages, (ii) Respondent's direct profits, or (iii) Respondent's indirect profits in relation to the claim of copyright infringement of the asserted copyright registration as against Respondent's accused manuals.

The other measure of damages is statutory damages that may be elected by the copyright owner in lieu of actual damages. The statutory damages for all infringements may be in the range of not less than $750 or more than $30,000 as the decider considers fair. In addition, where the copyright owner proves that the infringement was willful, the decider in its discretion many increase the award of statutory damages to a sum of not more than $150,000. (17 U.S.C §504(c)). However, the availability of statutory damages is cabined by the date of the registration. The copyright statute states, in part (17 U.S.C. ¶412):

> In any action … for infringement of the copyright of a work … no award of statutory damages or of attorney's fees, as provided by sections 504 and 505 shall be made for –
>
> (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
>
> (2) any infringement of copyright commenced after first publication of the work and before the effective date of the registration, unless such registration is made within three months after the first publication of the work.

As noted, the copyright registration issued on January 18, 2013. Under the copyright statute, statutory damages or attorney's fees, as provided by §§ 504 and 505, are not available for any copyright infringement commenced after first publication of the work and before the effective date of its registration, unless the registration is made

within three months after the first publication of the work. 17 U.S.C. § 412; *see also, e.g., Budget Cinema, Inc. v. Watertower Associates,* 81 F.3d 729, 733 (7th Cir. 1996) ("[Plaintiff] was not entitled to statutory damages or attorney's fees because the alleged infringement commenced before the effective date of [its] copyright registration."). Indeed, in *Budget Cinema*, the court held:

> Budget's complaint is objectively unreasonable in other respects as well. Budget was not entitled to statutory damages or attorney's fees because the alleged infringement commenced before the effective date of Budget's copyright registration. The Copyright Act does not permit the recovery of statutory damages and attorney's fees in such situations. 17 U.S.C. § 412. Here Budget complains that the infringing plans were dated November 17, 1994, and Budget's certificate of copyright was December 28, 1994, after the alleged infringement commenced. Budget's registration certificate is also beyond three months from the date of the alleged first publication.

(*Budget Cinema*, 81 F.3d at 733, citations omitted). The Ninth Circuit has also addressed this issue when it considered the meaning of "commence" in §412. In *Derek Andrew, Inc. v. Poof Apparel Corp.,* 528 F.3d 696, 700-01 (9th Cir. 2008), the court stated:

> Every court to consider the issue has held that infringement "commences" for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs. (quoting *Johnson v. Jones,* 149 F.3d 494, 506 (6th Cir. 1998)) …
>
> Accordingly, we join those circuits that addressed the issue before us [footnote omitted] and hold that the first act of infringement in a series of ongoing infringements of the same kind marks the commencement of one continuous infringement under §412. This interpretation, we believe, furthers Congress' intent to promote the early registration of copyrights.

(*Derek Andrew*, 528 F.3d at 700-01; in the omitted footnote, the court cited cases from the 4th Circuit, the 2d Circuit, and the 5th Circuit). The court then went on to assess whether statutory damages were available to Andrew, noting that its work was first published on August 11, 2003, and that its copyright registration became effective on June 15, 2005. (*Id.* at 699-700). Finally, the court noted it was undisputed that Poof's initial act of infringement occurred on May 9, 2005.

On the basis of these facts, the court concluded that if the first acts of infringement occurred before the copyright registration and those acts of the same kind continuing after registration there is just one continuing infringement under §412 and not a series of separate ones (*Id.* at 701-02). As a result, the court held that Andrew was not entitled to statutory damages under the copyright act. Likewise, the court held that because the infringement commenced prior to the June 15, 2005 registration and the

registration did not issue within three months of first publication of the work, Andrew was not entitled to its attorneys' fees to the extent they are based on the copyright statute. (*Id.*).

The facts in *Derek Andrew* are striking similar to those in this proceeding. For example, the copyright registration issued on January 18, 2013. It states that the work was completed in 2006. As noted above, the manuals described in the registration are all related to the GearCage product and components of it.[18] Mr. Williams testified that the GearCage product was introduced to the market in 2006 and shown at the November 2006 SEMA show. (M. Williams' testimony, 5/31/18). He also testified that 600 units of the product were made in 2007 for orders received. (*Id.*). Each of Claimant's manuals carries a copyright date of 2006. (C-24).

In its complaint in this arbitration, Claimant attached as Exhibit L a printout of the PTO's web page showing the registration of the GearCage trademark on the supplemental register, Reg. No. 4,296,605. For unknown reasons, Claimant did not seek to have its GearCage registration certificate admitted into evidence during the hearing. However, for purposes of this Award, the Arbitrator will make reference to Claimant's complaint Exhibit L. That exhibit notes that Claimant's alleged first use of the GearCage mark was December 18, 2004, and its alleged first use in commerce was also December 18, 2004. During his testimony, Mr. Williams was shown a screen shot from the Wayback Machine taken on November 24, 2010, showing the first page of the GearCage SP Cargo Rack. He testified that there was no copyright notice on that page because he did not think he could use the copyright notice at that time. (*See* R-228, admitted in evidence on 6/1/18; M. Williams' testimony, 6/1/18; *see also* R-219 which is the instruction manual for Claimant's GearCage SP Cargo Rack, the first page of which is identical to the page shown in R-228). The photograph and text found in R-228 are identical to the first page of the GearCage SP Cargo Rack manual found in C-24 at C0024_0014, with the exception that the latter carries a 2006 copyright date. All of this leads to the conclusion that the manuals shown in C-24 that are referred to in the copyright registration C-21 were published by Claimant in or after 2006 and certainly more than three months before the January 18, 2013 registration date.

The evidence established that the text and other content of Respondent's accused manuals were also published well before three months before the copyright registration issued. (*See* Table XVII above, showing Respondent's manuals bearing dates of April 1, 2008, May 31, 2012, September 24, 2012, and July 1, 2041). Only the July 1, 2014, manual falls after the copyright registration. That manual (R-102) is Revision E of the manual found as Revision D (R-100) which was dated May 31. 2012. The only difference between these two manuals is the name of the product, changed from "GearCage™ SP Cargo Rack" throughout R-100 to "Cargo Carrier" throughout R-102; both products carry the same SKU number in these manuals. The only other difference was that a list of patents found at the bottom of page 2 in R100 was deleted in R-102.

---

[18]   The one exception is the product identified as the Moover Transporter System. However, the manual for its states that the system is "A GearCage™ Based Technology. (*See* C-24 at C-0024_0006).

Based on this, the Arbitrator finds and concludes that the July 1, 2014, R-102 manual was a continuation of the R-100 manual with insubstantial changes in the text and content. Under the authority of *Budget Cinema* and *Derek Andrew* and similar cases from other courts, the Arbitrator finds and concludes that all of the accused acts of infringement commenced after Claimant's first publication of its works and more than three months before Claimant's copyright registration issued and those acts of the same kind continuing after the registration are continuing under §412, that such continuing act do not give rise to separate liability. Consequently, the Arbitrator finds and concludes that under 17 U.S.C. §412, Claimant is not entitled to receive statutory damages or attorney's fees that are provided for in 17 U.S.C. §§504 and 505.

Although Claimant has failed to establish entitlement monetary and statutory damages, it also seeks a permanent injunction under 17 U.S.C. §502(a) against Respondent's continued use of the accused product manuals and, presumably, any works that are derivative of the manuals found in Claimant's copyrighted compilation. It appears that Claimant contends it is entitled to an injunction because Respondent has infringed the copyright.

In *eBay v. MercExchange,* the Supreme Court rejected the idea that "an injunction automatically follows a determination that a copyright has been infringed." *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 292-93 (2006) The Court reaffirmed the traditional four-factor showing a plaintiff must make to obtain a permanent injunction in any type of case, including a copyright case:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 391. The Court reiterated that even upon such a showing, whether to grant the injunction still remains is an act requiring the use of "equitable discretion." (*Id.*).

During the hearing, Claimant did not present evidence addressing these four factors and on that basis it did not establish entitlement to an injunction under the copyright statute. However, this point will be discussed below when Claimant's allegations of unfair competition are taken up.

### B.  Prevailing Party Relating to the Copyright Infringement Issues

Each party seeks its attorneys' fees and costs under 17 U.S.C. §505 where reasonable fees and costs "may" be awarded to the prevailing party in a copyright action. The Supreme Court has stated that there is no precise rule or formula for applying §505 to make a determination of who is the prevailing party and whether that party should receive its fees and costs. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994).

In this case, the Arbitrator concludes that each party is to some degree prevailing. Claimant prevailed on the issues of copyright validity and the right to seek to enforce its registration, including the separate manuals within it. Its evidence also showed that Respondent's manuals contained substantially identical text and photographs as found in the manuals Claimant submitted in support of its registration. Claimant did not establish that Respondent engaged in untoward conduct when it prepared its manuals because Claimant essentially provided templates to Respondent, gave Respondent permission to use them, and was thereafter fully aware of the content of Respondent's manuals and the use of them before and after the termination of the License Agreement. Respondent prevailed on the issues of actual damages, indirect damages, statutory damages, and injunctive relief.

Weighing these points, the Arbitrator exercises his discretion and finds and concludes that under 17 U.S.C. §505 neither party should receive its attorneys' fees and costs in connection with the copyright issues in this proceeding.

## C.    Claimant's DMCA Claim

Claimant contends that Respondent has violated the Digital Millennium Copyright Act ("DMCA") by removing Claimant's copyright management information from the materials and manuals Claimant provided to Respondent and then replacing that information with Respondent's name. The relevant parts of the DMCA asserted by Claimant are 17 U.S.C. §1202(a), (b), and (c), stating in relevant part:

### § 1202. Integrity of Copyright Management Information

(a) **False Copyright Management Information.**—No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—

(1) provide copyright management information that is false or

(2) distribute or import for distribution copyright management information that is false

(b) **Removal or Alteration of Copyright Management Information.**—No person shall, without the authority of the copyright owner or the law—

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management the law, or information has been removed or altered without authority of the copyright owner or the law

**(3)** distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,

knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

**(c) Definition.**—As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies … of a work or … displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy … or display of a work:

**(1)** The title and other information identifying the work, including the information set forth on a notice of copyright.

**(2)** The name of, and other identifying information about, the author of a work.

**(3)** The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

\*\*\*

**(6)** Terms and conditions for use of the work.

**(7)** Identifying numbers or symbols referring to such information or links to such information.

A comparison of the respective manuals of the parties highlights Claimant's assertion. On the first page of Claimant's Manual for the GearCage SP Cargo Rack, Let's Go Aero's name appears on the top left side of the document, the legend "© Copyright 2006 Let's Go Aero, Inc." appears on the lower right side. (C-24 at C-0024_0014). Let's Go Aero's name also appears on the lower right side of pages 2 through 5 of the manual (C-0024_0015-0018). Let's Go Aero's name and a toll free telephone number appears in a warranty paragraph on the bottom of page 2 (C-0024_0015).

In Respondent's comparable manual, R-102, Respondent's trademark "Pro Series" appears on the top left of every page, and its name, address, telephone number, and logo appear on the bottom left of every page. Respondent's name and a toll free telephone number is in a warranty paragraph on the bottom of page 2. There is no reference to Claimant anywhere in the manual and there is no copyright notice contained in it.

On the surface, it is clear that Respondent did remove or caused to be removed the information identified in 17 U.S.C §§1202(c)(1), (2), and (3). However, testimony during the hearing puts this into focus. During her cross-examination, Ms. Williams testified that in 2008 Respondent removed references to Claimant in the manuals with Claimant's permission. (S. Williams' testimony, 6/5/18).

Although the copyright management information was removed by Respondent, the statute requires that any such removal be done "without the authority of the copyright owner or the law." 17 U.S.C §1202(b). Ms. Williams testimony that Claimant permitted the removal means there can be no violation of 17 U.S.C §1202(b).

Claimant also relies on 17 U.S.C §1202(a) and contends that Respondent's use of its name and identifying information is false and Respondent provided or distributed copyright management information that is false. Here, however, the statute not only requires that the information be false but also that such providing or distributing be done "knowingly and with the intent to induce, enable, facilitate, or conceal infringement." (*Id.*). During the hearing, Claimant presented no evidence or proofs that Respondent intended to "induce, enable, facilitate, or conceal infringement" when it distributed manuals having Respondent's name and identifying information in place of that of Claimant.

Based on this evidence and lack thereof, the Arbitrator finds and concludes that Claimant has failed to prove that Respondent violated 17 U.S.C §1202.

## IV.  CLAIMANT'S TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION CLAIMS

### A.  Background

In its complaint, Claimant alleges that it has trademark rights to "Silent Hitch Pin®" via Registration No. 4,296,604; which was registered on the supplemental register on February 26, 2013 (*see* R-287), and then registered on the principal register as Registration No. 5,155,387, on March 7, 2017. (*See* R-288 and C-28). The "GearCage®" mark was registered on the supplemental register on February 26, 2013, under Registration No. 4,296,605, and remains on that register. (Claimant did not seek to introduce a copy of that registration as evidence during the hearing, but attached a PTO printout with a the registration particulars as Exhibit L to its arbitration complaint.). In addition, Claimant asserts the "Moover™" mark, which Claimant alleges it first used in 2006. Additionally, Claimant alleges that each of these marks have become distinctive as a result of secondary meaning under 15 U.S.C. §1025(f). (*See* Complaint, ¶24, pp. 6-7). Later in its complaint, Claimant identified the "LGA Trademarks" as "GearCage®," "GearSpace®," "GearDeck®," "TwinTube®," "Silent Hitch Pin®," and "Moover™." (Complaint, ¶71, p. 17).

The Silent Hitch Pin mark was first registered on the supplemental register on February 26, 2013. (R-287 at 1).[19] In its application, Claimant stated that the mark was first used on September 25, 2000, and first used in commerce on that same date. When its application was filed, Claimant sought registration on the principal register. (R-287 at 43-44). On July 20, 2011, the Examiner refused such, concluding that the mark was merely descriptive of the goods concerning which the mark was used. (R-287 at 36-39). On January 18, 2012, Claimant responded to the office action and Claimant argued that the mark was not merely descriptive because it had acquired distinctiveness based on five or more years of use. (R-287 at 27-35). Two days later, on January 20, 2012, the Examiner issue another office action in which the Claimant's assertion of acquired distinctiveness was rejected because the mark "is highly descriptive of the goods" on which it is used. (R-287 at 23-26, quote at 26). On July 20, 2012, Claimant responded to the office action and submitted documents it said provided evidence that the mark was a source identifier. (R-287 at 8-22). On August 13, 2012, the Examiner issued a final refusal to register the mark on the principal register, concluding that Claimant's information submitted to support its argument of acquired distinctiveness was insufficient because the "mark is highly descriptive …" (R-287 at 4-7, quote at 5). Thereafter, in response to the August 13 office action, on December 26, 2012, the Claimant filed a request for reconsideration and advised the Examiner that the Claimant was seeking registration on the supplemental register and amended the application accordingly. (R-287 at 2*3). The mark thereafter issued on the supplemental register.

On July 18, 2016, Claimant filed another trademark application for the Silent Hitch Pin mark, this time on the principal register. (R-288 at 2 of 19). The only other document in this exhibit is a copy of the registration certificate showing that the mark was registered on the principal register on March 7, 2017. (*Id.* at 1).

The prosecution of the application for registration of the GearCage mark followed the same path as the first part for the Silent Hitch Pin mark when it was registered on the supplemental register. GearCage was also registered on the supplemental register on February 26, 2013. Although the GearCage mark was addressed during the hearing, the prosecution history of that mark was not introduced into evidence. Because that history is relevant to the issues, the following description of the prosecution was prepared by the Arbitrator as he reviewed the prosecution history on the PTO website in the TESS portion which includes the documents submitted by Claimant and the Examiner's office actions. These are public documents and the Arbitrator takes judicial notice of them for purposes of this Award.

In its application, Claimant stated that the GearCage mark was first used on December 18, 2004, and first used in commerce on that date. Although Claimant application sought registration on the principal register, the Examiner refused such, concluding that the mark was merely descriptive of the goods concerning which the mark was used. (Office Action, July 20, 2011). In its January 18, 2012, response to the office

---

[19] The prosecution history of the mark was admitted as exhibit R-287. The pages of that exhibit were not separately numbered but the exhibit is a pdf of the prosecution history and the pagination referenced in it is the pdf page number.

action, Claimant argued that the mark was not merely descriptive and had acquired distinctiveness based on five or more years of use. (Response, January 18, 2012). On July 23, 2012, the Examiner issued a final refusal to register the mark on the principal register, concluding that Claimant's information submitted to support its argument of acquired distinctiveness was insufficient because the "mark is highly descriptive …" (Office Action, July 23, 2012). Thereafter, in response to the July 23 office action, on January 8 2013, the Claimant filed a request for reconsideration and advised the Examiner that the Claimant was seeking registration on the supplemental register and amended the application accordingly. (Response, January 8, 2013). The GearCage mark was registered on the supplemental register on February 26, 2013, and remains on that register as of the date of this Award.

Claimant asserts that "since January 29, 2012 or after the authorized sell-off of licensed [Claimant] Products," Respondent infringed these trademarks and competed unfairly in violation of the Colorado Consumer Protection Act, Colorado Revised Statutes 6-1-101 *et seq.* and section 1125(a) of the Lanham Act, 15 U,S,C, §1125(a). In its complaint, Claimant thus alleges that Respondent has infringed each of the six trademarks and in doing so has committed unfair competition. (Complaint, ¶¶73-75, pp. 17-18). For relief, Claimant seeks a finding of willful and intentional infringement, Claimant's damages, Respondent's profits, treble damages, prejudgment interest, costs, attorneys' fees, and a permanent injunction. (*Id.* at ¶¶76-78, pp.18-19).

Although Claimant's complaint makes reference to the Colorado Consumer Protection Act by citing the entire Act, in its complaint and the three post-hearing briefs it filed, it did not identify the specific provision(s) of that Act that it says were violated.

Furthermore, on May 30, 2018, before the commencement of the testimony at the hearing, the Arbitrator and counsel for the parties met to discuss a number of matters. At that time the Arbitrator asked Claimant's counsel to identify the trademarks that were at issue and counsel responded that the Silent Hitch Pin, GearCage, and Moover marks were the ones that would be addressed. This was borne out in Claimant's post-hearing briefing where Claimant only addressed the Silent Hitch Pin and GearCage marks. (*See* Claimant's Liability Brief at 38-41; Claimant's Response Liability Brief at 37-42; Claimant's Reply Liability Brief at 23-24). In addition, Claimant's damages expert Hampton only addressed the Silent Hitch Pin and GearCage marks in his expert reports. Finally, at the evidentiary hearing, Claimant did not present evidence on Respondent's alleged infringement of the "GearSpace®," "GearDeck®," "TwinTube®," and "Moover™" marks. Consequently, as to those marks, the Arbitrator finds and concludes that Claimant did not prove Respondent infringed "GearSpace®," "GearDeck®," "TwinTube®," or "Moover™" marks.

For purposes of assessing Claimant's allegations of trademark infringement and unfair competition under the Colorado Consumer Protection Act and the Lanham Act, the Arbitrator deems Claimant's silence on the "GearSpace®," "GearDeck®," "TwinTube®," and "Moover™" marks in its post-hearing briefing and by not presenting evidence of Respondent's alleged infringement of those marks during the hearing, is a waiver and abandonment of its allegations in relation to them.

Respondent argues that Claimant did not prove infringement of the GearCage mark, that the mark is descriptive and Claimant had to prove the mark acquired secondary meaning. (Respondent's Liability Brief at 26-27). On the descriptiveness point, Respondent notes that the GearCage mark was registered in the PTO on the supplemental register and this is a recognition that the mark is not inherently distinctive. (*Id.* at 27). Respondent also contends that Claimant did not and could not prove likelihood of confusion because the GearCage mark as used on the instruction manuals was not seen by the consumer at the time of purchase. Rather, the manuals were packed in closed boxes, not seen by the consumer until the product was purchased and the box opened. Respondent thus implies that the presence of the GearCage mark on the manuals did not drive the sales of the products. (*Id.* at 29). Finally, Respondent notes that its direct customers are mostly distributors and retailers and their exposure to the GearCage mark would have been as found in Respondent's catalogs and other marketing related materials. Those materials also carried Respondent's name, logo, and trademarks that would not have led those customers to have been confused by the appearance of the GearCage mark. (*Id.*).

Claimant addresses Respondent's positions by arguing that Respondent licensed the use of the marks from Claimant and licensee estoppel precludes Respondent from contesting Claimant's rights in the marks, contesting the validity of the marks, or challenging that any of them have not acquired secondary meaning. (Claimant's Liability Brief at 39-40).

On the point that the marks were "licensed" by Respondent under the License Agreement, that Agreement (C-974 at C0974_0001 to _0007) and its First Amendment (*id.* at C-0974_0008 to _0011) do not contain any reference to Claimant's trademarks, any provisions relating to trademark usage, or quality control provisions enabling Claimant to monitor the quality of Respondent's use of a mark and the quality of the products on which the mark is used. Indeed, the only reference to the marks at issue in the proceeding is found in Exhibit A to the License Agreement where the name of each product is set out. (*Id.* at C-0974_0006). The License Agreement does not identify those names as the trademark for each product. Moreover, Section 1.1 of the License Agreement gives Respondent the right, to, among other things, make, use, and sell the Licensed Products "under [Respondent's] trademarks of trade names or such other brands as [Respondent] may determine in its sole discretion …" (*Id.* at C-974_0001).

Although the License Agreement has attributes that suggest it is nothing more than a naked license, Claimant argues that " … [h]ere there was a contractual duty to protect [Claimant's] mark, which [Respondent] agreed to and did so during the license." (Claimant's Reply Liability Brief at 23). While Claimant's characterization of the License Agreement is not supported by that document, the parties have not approached it from the naked license perspective. Rather, the parties address the trademark issues from a course of dealing standpoint. That is, Respondent used the marks, such use was permitted by Claimant, and Respondent's use was the same as how the marks appeared in Claimant's instruction manuals.

## B.     Analysis of Trademark Infringement Damages

The issue that was not fully explored in the evidence is the extent of Respondent's use of the Silent Hitch Pin mark and the GearCage mark after the termination of the License Agreement on January 28, 2012. As to Respondent's sales of the sell-off allowance of 25,792 pins under the Silent Hitch Pin mark, the Arbitrator finds and concludes those sales were authorized by Claimant and, consequently, do not give rise to trademark infringement.

As to Respondent's sales of the excess **XXXX** pins, Claimant presented no evidence indicating that these pins were sold using the Silent Hitch Pin mark. Although Mr. Hampton's voluminous exhibits to his expert report set out many of Respondent's sales of pins, he does not differentiate between the 25,792 allowance and the **XXXX** overage. Indeed, Exhibit H.1 to his report (found at C-0970_2273) references his exhibits H.2, H.4 and H.5 as including source data supporting Exhibit H.1. Those latter exhibits do not identify if any of the reported sales are of the excess pins. (*See* C-970 at C-0970_4119-_4131). Notwithstanding, in his initial expert report, Mr. Hampton calculated Respondent's total revenue generated from the sales of the Silent Hitch Pin after the termination of the License Agreement as **XXXXXX** and **XXXXXX** under the GearCage mark for total sales of **XXXXXX**. (C-970a at ¶114, pp. 32-33,citing Exhibit H at C970_0034). In his supplemental report, Mr. Hampton adjusted that amount to **XXXXXX**, measured as Respondent's sales under the Silent Hitch Pin mark of **XXXXXX** and its sales under the GearCage mark of **XXXXXX**, for a total of **XXXXXX**. (C-970b at ¶18 and C-970, Exhibit H at C-970_2272).

In his testimony, Mr. Hampton stated that his calculation of Respondent's revenue relating to the Silent Hitch Pin mark, did not remove the revenue attributable to the 25,792 sell-off allowance found in the Settlement Agreement. He also said it was his opinion that the sell-off allowance should not be considered because Respondent continued to sell the pins after the January 28, 2012, Settlement Agreement. (Hampton testimony, 6/4/18).

Respondent's expert, Mr. Pierce, also calculated revenues Respondent received in connection with the Silent Hitch Pin and GearCage marks. His report notes that he determined Mr. Hampton had made several errors and Mr. Pierce corrected them. In doing so, he concluded that the total revenues from January 28, 2012, to the date of his report on April 12, 2018, was **XXXXXX**. (R-384 at ¶59, p. 18, ¶105, pp. 35-36, and Exhibit G thereto). He then removed from the calculation, the revenues attributable to the sell-off allowance that Mr. Hampton had included. By doing so, Mr. Pierce calculated Respondent's total subject revenues were **XXXXXX**. (R-384 at Exhibit G-1, p. 1). He then determined the total product cost for the products considered was **XXXXXX**. (*Id.*). He then calculated that the total incremental profit obtained by Respondent for the noted time period stated was **XXXXXX**. (R-384 at Exhibit G-1, p. 2). [20]

---

[20] Mr. Pierce's Exhibit G-1, p. 2, appears to contain an error. In the far right side of that table, he notes the total incremental profit was **XXXXXX** and then immediately below

In relation to the Silent Hitch Pin, Mr. Pierce determined that Respondent had revenue of **XXXXX** in 2015 and **XXXXX** in 2016 for a total of **XXXXX**. (*See* R-384 at Exhibit G-1, p. 1). These are the **XXXX** excess pins sold by Respondent. Against that, he determined that the product costs for those sales were **XXXXX** and **XXXXX**, respectively. (Id.). By subtracting the costs from the revenues means that for the 2015-2016 period, Respondent had a loss of **XXXXX** as a result of the sale of the excess pins.

Regarding the GearCage mark, in Claimant's November 21, 2018, submission of the list of accused products, Claimant identified Respondent's SKUs 5800200 (GearCage SP Cargo Rack, seen in R-26, dated May 31, 2012) and 5800400 (GearCage TT, seen in R-64, dated April 1, 2008) as using that mark. In its July 30, 2018, submission Claimant also identified SKUs 58002100 (GearCage Basket, seen in R-071, dated November 5, 2009) and 5800300 (GearCage Ramp, seen in R-31, dated November 5, 2009) as using the GearCage mark.

In its July 30, 2018, submission, Claimant also identified SKUs 5800400 and 5800100 as accused products; however Claimant did not identify if those products were accused of patent, copyright, or trademark infringement, or were part of Claimant's trade secret allegations. During a November 28, 2018, telephone hearing with counsel for the parties, the Arbitrator asked counsel for Claimant whether these two SKUs were in the case in light of there being no identification of the nature of the charge against them in the July 30 submission. Claimant's counsel stated that those SKUs were being withdrawn. Consequently, they will not be considered in this Award.

In his analysis, Mr. Pierce included sale and cost data for SKU 5800400 but did not include SKU 5800100. For SKU 5800400, for the years 2012 and 2013 he determined the total revenues as **XXXXX** and the total costs as **XXXX**, leaving a total gross margin for that product to be **XXXXXX**. Excluding SKU 5800400 from his calculations gives a total gross margin for all other products of **XXXXXX** rather than the **XXXXX** he reported. (*See* R-384 at Exhibit G-1, pp. 1-2). In addition, using the incremental costs Mr. Pierce calculated (*see* R-384 at Exhibit I) for the years 2012 and 2013 and applying them to the margins for SKU 5800400 results in the need to add **XXXXX** to the gross incremental profits he calculated for all of the other products. Consequently, the total gross incremental profit, upon excluding SKU 5800400 is **XXXXX** that could be attributable to Respondent's sales under the GearCage mark.

In connection with the GearCage mark, Claimant seeks damages based upon Respondent's revenue. (Claimant's Liability Brief at 39). The Lanham Act provides the measure of monetary damages available for trademark infringement. Section 1117 states:

---

that notes that the gross incremental profit was **XXXXXX**. Although in his report he does not describe why the amounts differ, his report references the latter number and that will be used by the Arbitrator. (*See* R-384 at ¶106, p. 35).

## §1117. RECOVERY FOR VIOLATION OF RIGHTS

**(a) Profits; damages and costs; attorney fees.** – When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of title 15 or a willful violation under section 1125(c) of title 15, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of title 15, and subject to the principles of equity, to recover

> (1) defendant's profits,

> (2) any damages sustained by the plaintiff, and

> (3) the costs of the action. …

In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional circumstances may award reasonable attorney fees to the prevailing party.

(15 U.S.C.§1117(a), parsing added for ease of reading). As noted in the statute, the identified types of recoveries are subject to §§1111 and 1114. For present purposes, §1111 is relevant. That section states:

## §1111. NOTICE OF REGISTRATION; DISPLAY WITH MARK; RECOVERY OF PROFITS & DAMATES IN INFRINGEMENT SUIT

Notwithstanding the provisions of section 1072 of title 15, a registrant of a mark registered in the Patent and Trademark Office, may give notice that his mark is registered by displaying with the mark the words "Registered in the U.S. patent and Trademark Office" or "Reg. U.S. Pat. & Tm. Off." or the letter R enclosed within a circle, thus ®; and in any suit for infringement under this chapter by such a registrant failing to give such notice of registration, no profits and no damages shall be recovered under

the provisions of this chapter unless the defendant had actual notice of the registration.

Both of these sections are relevant to assessing any damages for Respondent's use of the Silent Hitch Pin and GearCage marks. As to the Silent Hitch Pin, Claimant has limited its damages request as measured by Respondent's revenues. Once this was done, Respondent had the statutory burden to "prove all elements of cost or deduction" which Respondent claims. (15 U.S.C. §1117(a)). As detailed above, Respondent's expert determined the costs of manufacturing the excess pins and when those costs were deducted from the revenues obtained from the sale of them, Respondent did not have a profit from the sales. Consequently, the Arbitrator finds and concludes that there is no profit damages available to be awarded to Claimant under §1117(a) in relation to the alleged infringement of the Silent Hitch Pin trademark.

In addition, at the hearing, Claimant did not identify any actual damages it suffered as a result of Respondent's sales of the excess pins. Its expert, Mr. Hampton, commented on actual damages when he stated "I understand that actual damages sustained by [Claimant] may be measured by quantifying [Claimant's] injury as a result of infringement." (C-970a at 18). He did not quantify any such damages in his opening report. Rather, as noted above, he only calculated Respondent's revenues. (*Id.* at 32-34; *see also* Mr. Hampton supplemental report where he again only addressed Respondent's revenues, R-970b at 5). Based on the matters presented at the hearing, the Arbitrator finds and concludes that Claimant did not establish that it had any actual damages arising out of any use by Respondent of the Silent Hitch Pin mark after January 28, 2012.

Section §1117(a)(3) provides for a possible award of attorneys' fees and costs, and these matter will be addressed below.

As to Claimant's request for damages for alleged infringement of the GearCage mark, much of what was said above in connection with the Silent Hitch Pin mark applies equally to the GearCage mark. At the hearing, Claimant did not present evidence on any actual damages it might have suffered as a result of Respondent's actions after January 28, 2102. In addition, Mr. Hampton did not separately address damages regarding the GearCage mark. His report points to Respondent's revenues as the basis for damages, and his report exhibits reference only Exhibits H, H.1, H.2, H.4., and H.5, discussed above. He does not limit his tables and data to the GearCage mark and his over 3,500 pages of supporting exhibits make it extremely difficult for the Arbitrator to locate individual entries that might be applicable only to the GearCage mark.

On the other hand, Respondent's expert, Mr. Pierce, provided a focused analysis of Respondent's sales and costs attributable to the GearCage mark. As noted above, he determined that the gross incremental profit obtained by Respondent was **XXXXX**. (Pierce Expert Report, R-384 at Exhibit G-1). As also noted above, the Arbitrator has corrected that amount, by deleting the excess hitch pins, to **XXXXX** (*supra* at p. 104).

That latter amount could form the basis of a trademark damages award, but the application of 15 U.S.C. §1111 needs to be considered. As the statute states, the

trademark owner may give notice that his mark is registered by using one of the notice words, *e.g.*, "Registered in the U.S. patent and Trademark Office," etc. If such notice is not given, "no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration." (15 U.S.C. §1111).

The registration for the GearCage mark on the supplemental register issued on February 26, 2013. During the hearing, Claimant did not present evidence that it used the mark in connection with the notice wording required under the statute and did not show that it gave actual notice to Respondent of the registration. Respondent has acknowledged, however, that it was put on notice of the GearCage registration when it was sued by Claimant on June 6, 2014 in Colorado (the **Colorado Action – II**). (*See* Respondent's Liability Brief at 35). Using that date, Respondent relied on Mr. Pierce's calculations to remove revenues for 2012 and 2013 due to Claimant's lack of notice of the registration. According to Respondent, the corrected profits for the period beginning January 1, 2014, through his report date of April 12, 2018, is **XXXXXX** relating to the GearCage mark. (*Id.*).

The Arbitrator finds and concludes that the amount of **XXXXXX** is an adequate award for Respondent's use of the GearCage mark after being put on notice of its registration. Specifically, the Arbitrator finds and concludes that under 15 U.S.C. §1117(a), subject to 15 U.S.C. §111, Claimant is entitled to this amount as Respondent's profit and that Claimant did not establish that it sustained any actual damages from Respondent's use.

The Arbitrator notes that Claimant suggests it is entitled to damages for the GearCage mark predating the registration of that mark and argues that prior to the registration, the mark had acquired distinctiveness. (Claimant's Liability Brief at 37-38). From this, Claimant contends that it should receive damages starting with the termination of the License Agreement. Because the mark was not registered during the January 29, 2012, to February 26, 2013, damages would be limited to Claimant's actual damages. During the hearing, Claimant did not prove it had any actual damages as a result of Respondent's use of the mark during this time period. Indeed, as of the February 26, 2013, registration date, the PTO was not convinced that the GearCage mark had acquired distinctiveness and, as a result, the mark was registered on the supplemental register.

In addition, the Federal Circuit has considered the issue of what a trademark owner must prove when the defendant's alleged infringement began before the registration of the mark at issue. *Converse, Inc. v. ITC*, slip op. (10/30/2018, Fed. Cir.). There, the court concluded that a trademark registration confers a presumption of secondary meaning beginning only as of the date of registration and confers no presumption of secondary meaning before the date of registration. (*Id.*, slip op. at 12). The court held that if the defendant's alleged infringement occurred before the registration, the trademark owner "must establish without the benefit of the presumption that its mark had acquired secondary meaning before the first infringing use by [the defendant]." (*Id.*). The court's holding applies to this case. Here, the alleged infringement of the GearCage mark occurred for one year prior to the registration of that mark. Thus, Claimant was obligated to prove that the mark had obtained secondary meaning prior to

the registration but did not do so. The Arbitrator does recognize that *Converse* was decided after the evidentiary hearing in this arbitration, but before the close of the record. However, the Federal Circuit's opinion noted that under the Lanham Act, "the registration and its accompanying presumption of secondary meaning operate only prospectively form the date of registration, i.e., the date on which the [PTO] determined that secondary meaning had been acquired." For this point, the court cited sections of the Lanham Act, a 1994 case from the Eighth Circuit, and sections from the treatises *Callmann on Unfair Competition, Trademarks and Monopolies* (4th ed. 2012 & Supp. 2018) and *McCarthy on Trademarks and Unfair Competition* (5th ed. 2017 & Supp. 2018). (*Converse*, slip. op. at 11). These citations by the court show that the holding in *Converse* was not a change in the law and should not come as a surprise.

Under 15 U.S.C. §1117(a), the finding that Respondent infringement the GearCage mark entitles Claimant to recover its costs. In this matter, the firm of S&D Law P.C. (formerly Silber & DeBoskey, A Professional Corporation), has submitted a cost compilation spanning the period of February 2012 through June 2018, totaling **XXXXXX**. (Affidavit of Attorneys' Fees and Costs (S&D Law), executed by Martin D. Beier, Exhibit 2 thereto, which was submitted as part of Claimant's LGA's Motion for Award of Attorneys' Fees and Costs, dated October 25, 2018). In addition Claimant's counsel J. Mark Smith, of the firm of Berg Hill Greenleaf Ruscitti LLP, submitted and affidavit setting forth costs his firm incurred for the period September 2015 through August 2018, totaling **XXXXXX**. (*See* Affidavit of J. Mark Smith, Exhibit 2 thereto, submitted as part of Claimant's LGA's Motion for Award of Attorneys' Fees and Costs, dated October 25, 2018). In sum, Claimant is seeking **XXXXXX** in expenses and costs for the entirety of its dispute with Respondent, starting with the filing of **Colorado Action – II**.

Assessing costs relating to the trademark issues is difficult because the cost data submitted by Claimant's counsel was non-specific in large measure as to what issue the expended cost related. However, given Claimant's failure to establish actual damages and the limited amount of Respondent's profits that fall within 15 U.S.C. §1117(a), *i.e.*, **XXXXXX**, the Arbitrator concludes that it would be unjust and inappropriate to saddle Respondent with the entirety of, or even a large portion of, the expenses and costs sought by Claimant. On the other hand, the statute does call for costs to be awarded. In light of the limited hearing time taken by the trademark issues and the fact that they did not seem to play any significant part in the discovery or motion practice, and because Claimant became aware at least by November 6, 2017, during a status hearing, that Respondent sold about **XXXXX** hitch pins that exceeded the sell-off allowance, Claimant should have alerted that any recovery on the Silent Hitch Pin trademark could be minimal.

Based on these factors, the Arbitrator finds and concludes that the costs awardable to Claimant under 15 U.S.C. §1117(a) should be measured as a percentage of the award of **XXXXXX** made to Claimant. In this regard, the Arbitrator believes the ratio of the award amount to the amount Claimant sought in relation to the GearCage mark is appropriate. That percentage is **XXXXXX** which is equal to **XX**%. Applying this **XX**% to the award of **XXXXXX** gives a costs amount of **XXXXXX**.

In addition, pursuant to 28 U.S.C. §1961(a), prejudgment interest on the damages and cost amounts has been calculated by the Arbitrator to be **XXXXXX** and **XXXXXX** respectively, measured from the Board of Governors of the Federal Reserve System's 1-year constant maturity Treasury yield as of June 6, 2014, compounded annually (with six months only in 2014) through December 31, 2018. The 1-year constant maturity Treasury yield use was as of May 28, 2014 and was 0.10%. The total award to Claimant for its damages and prejudgment interest on them is **XXXXXX**. The total award to Claimant for its costs including prejudgment interest on them is **XXXXXX**. Thus, the total award to Claimant for the GearCage trademark claim is **XXXXXX**.

Accordingly, for Respondent's use of the GearCage trademark from January 2014 through April 12, 2018, under 15 U.S.C. §117(a) Claimant is awarded **XXXXXX** as Respondent's profits and **XXXXXX** as costs. Claimant is awarded no actual damages due to a lack of proof of such damages.

Claimant also seeks attorneys' fees in connection with its trademark claims. Reasonable attorneys' fees "may" be awarded under 35 U.S.C. §1117(a) "in exceptional circumstances." The Third Circuit has considered the meaning of "exceptional circumstances" in the Lanham Act in *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314-315 (3rd Cir. 2014). Although that case involved, among other things, a trade dress claim, fees were sought under 35 U.S.C. §1117(a). The court relied on the Supreme Court's decision in *Octane Fitness LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749, 572 U.S. ___ (2014), pointing out that while Octane Fitness was a patent case that considered the exceptional case standard under 35 I.S.C. §285, that statute has language "identical" to §1117(a) of the Lanham Act. *Fair Wind*, 764 F.3d at 315. The court went on to note that "[w]e believe that the Court was sending a clear message that it was defining 'exceptional' not just for the fee provision of the Patent Act, but for the fee provision in the Lanham Act as well." *Id.* The Arbitrator believes the Third Circuit was correct in its view and also believes the *Octane Fitness* definition of "exceptional" is appropriate. As the Supreme Court stated "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1756.

The Arbitrator is of the opinion that the trademark aspects of this case do not rise to the level of an exceptional case. Respondent did not contest that it used Claimant's marks after the termination of the License Agreement and it conceded the number of units and revenues it received for selling the excess number of hitch pins. It also provided detailed evidence of the number of units, revenues, and costs associated with sales of products under the GearCage mark. Respondent's argument that consumers would not be confused into buying its products because the instruction manuals on which the mark was displayed for a time were in the boxes containing the products and consumers would not see the mark until after the product was purchased was not frivolous. During the hearing, Respondent presented an Engineering Change Notice calling for the removal of the GearCage mark for its marketing materials and the name of its product. (R-28). Overtime, Respondent appears to have completed that activity. (*Compare* R-26, dated May 31, 2012, Rev. D, which identifies the shown product as the GearCage SP Cargo Rack to R-

101, dated September 24, 2012 Rev. D, which identifies the shown product as the Cargo Rack. The pictures of the product shown on the first page of each exhibit are identical. Reference to GearCage in R-26 has been removed in R-101.). Finally, Respondent did not argue that Claimant lost the ability to enforce its trademarks because the License Agreement had the attributes of a naked license.

Similarly, Claimant's arguments regarding infringement and license estoppel did not rise to the level of making its presentation exceptional under §1117(a).

The Arbitrator therefore finds and concludes that the trademark aspects of this proceeding are not exceptional under §1117(a) and neither party is entitled to its attorneys' fees for the trademark portion of this case.

### C.    Claimant's Unfair Competition Claim

Claimant's complaint includes a claim for unfair competition in its Fifth Claim for Relief. That claim is part of Claimant's trademark infringement allegations, but relies on the Colorado Consumer Protection Act 6-1-101, et. seq. ("CCPA") as the basis for the claim. (See Complaint, ¶73).

Although Claimant's complaint references the CCPA, it does so with a broad brush, citing the entire Act and only one specific provision of the Act, *i.e.*, CCPA 6-1-113. (Complaint at ¶76). That provision is directed to the types of damages that are available for a proven violation of the Act. In its three post-hearing briefs, Claimant does not cite to any part of the Act that it contends has been violated. Apparently, Claimant wants the Arbitrator to search through the fifty-five separately enumerated actions that constitute deceptive trade practices in Colorado, together with the numerous cross-references to other articles and sections of the Act that are also considered deceptive trade practices, and pick any that may support Claimant's charge. (*See* CCPA 6-1-105).[21]

This point is important because the damages section of the CCPA is only "available in a civil action for any claim against any person who has engaged in or caused another to engage in any deceptive trade practice *listed in this article*." (CCPA 6-1-113, emphasis added). The plain wording of the statute is that if an activity that is asserted to be a deceptive trade practice is not listed in the CCPA, that activity is not covered by the damages section.

Claimant relies on *Insight Global LLC v McDonald*, 2018 WL 2092486 (D. Colo. May 3, 2018) and *Netquote Inc. v. Byrd*, 504 F. Supp. 2d 1126 (D. Colo. 2007) in support of its unfair competition argument. In particular, in *Insight* the court noted the parties agreed as to the elements of an unfair competition claim under Colorado law: "[a] plaintiff must establish that (1) the defendant copied the plaintiff's products or services, or misappropriated the plaintiff's name or business values; and (2) the defendant's conduct is likely to deceive or confuse the public because of difficulties distinguishing

---

[21]    For example, section 6-1-105(jjj) states that a violation of section 6-1-726 is considered a deceptive trade practice.

between the parties' products, services, or business values." (*Insight*, at *4). *Insight*, in turn, cites *Netquote* for the element of business values. From these cases, Claimant argues that Respondent copied Claimant's GearCage and Pixie bike rack and misappropriated Claimant's business values. (Claimant's Liability Brief at 40).[22]

As to the product copying point, the *Netquote* court noted that the common law tort of unfair competition has been limited to protection against copying of nonfunctional aspects of consumer products which have acquired secondary meaning. (*Netquote*, 504 F. Supp. 2d at 1131, quoting *Univ. of Colorado Foundation, Inc. v. American Cyanamid*, 880 F. Supp. 1387, 1403 (D. Colo. 1995). Regarding business values, the court recognized that the most important consideration was whether the defendant's conduct would confuse or deceive the public because of the difficulties in distinguishing between the plaintiff's and the defendant's products. (*Netquote*, 504 F. Supp. 2d at 1131). In the words of the court (*id.*):

> Thus, state and federal courts applying Colorado law have consistently held that the tort of unfair competition requires, first, that the defendant has copied the plaintiff's products or services or misappropriated plaintiff's name or operations in some regard, and second, that this conduct is likely to deceive or confuse the public because of the difficulties in distinguishing between the plaintiff's and defendant's products and services.

In light of all of this, the Arbitrator views Claimant's unfair competition claim relating to "copied" products as an attempt to recast its patent infringement assertion against Respondent's accused bike racks as unfair competition. However, that is preempted by the patent statute. In addition, as to both the bike racks and the GearCage products, Claimant did not establish that any of them had acquired secondary meaning. Moreover, Respondent's marketing of these products prominently used its name and trademarks and this would decrease the likelihood that its customers, which are large retailers (such as Wal-Mart, Amazon, and others), would be deceived or confused. On this point, Claimant argues that the fact that Respondent's products are sold by these large public resellers may cause the public to be deceived or confused. (Claimant's Liability Brief at 40). Claimant pointed to no evidence to support this conclusion and introduced no consumer survey on the confusion or likelihood of confusion points. Moreover, Claimant presented no evidence that the non-functional aspects of its bike rack had acquired secondary meaning.

Finally, CCPA 6-1-105 does not list as a deceptive trade practices "trademark infringement," "product copying," or "misappropriation of business values."

---

[22] "Pixie" was Claimant's name for the V-shaped bike rack, with the hat bracket clamping mechanism, that it first showed at the SEMA 2007 trade show. An example of this rack is found as the last pdf page in R-167, which Mr. Williams testifies was a flier showing the Pixie rack and used at the SEMA 2007 show. (M. Williams' testimony, 6/4/18).

The Arbitrator notes that although Claimant's complaint refers to the CCPA as the basis for its unfair competition claims, Claimant does not reference that statute in any of its post-hearing briefs and has not tied any of its allegations or the evidence to specific sections of the CCPA.

The Arbitrator finds and concludes that Claimant has not established that Respondent engaged in or caused another to engage in any deceptive trade practice listed in CCPA 6-1-105. Moreover, Claimant did not establish an amount of actual damages it sustained as a result of Respondent's actions of which it complains. Consequently, Claimant is not entitled to relief under CCPA 6-1-101, et. seq.

Nonetheless, the Arbitrator is troubled by Respondent's use of photographs, drawings, and text, that originated from Claimant, in its instruction manuals after the effective date of the Settlement Agreement. While Respondent represents that the products are no longer being sold, or the manuals have had some revisions made to them, the Arbitrator appreciates Claimant's position that Respondent might resume sales of these products at some future point.

Consequently, the Arbitrator orders that not later than sixty (60) days from the date this Award is enforced, Respondent is enjoined from using, and will cease the use of, the photographs, text, and line drawings found in its manuals admitted in this case as exhibits R-26, R-32, R-72, R-99, R-100, and R-102. If Respondent decides to continue or resume selling the products shown in such instruction manuals, it must use photographs of its product and vehicles, if vehicles are shown, text that differs from the text in those exhibits in format, appearance and wording, and line drawings that it develops to show the relationship of the components of each product and how those products are to be assembled.

## V. CLAIMANT'S MISAPPROPRIATION OF TRADE SECERTS AND CONFIDENTIAL INFORMATION CLAIM

Claimant's post-hearing briefs direct many pages to its claim that Respondent has misappropriated Claimant's trade secrets and confidential information. (*See* Claimant's Liability Brief at 21-28; Claimant's Response Liability Brief at 13-25; Claimant's Reply Liability Brief at 1-5, 10-12). This claim is brought under the Colorado Uniform Trade Secrets Act. (Claimant's Liability Brief at 21). Thus, the Act provides a starting point.

The Colorado Uniform Trade Secrets Act ("CUTSA") defines a trade secret as:

> "Trade secret" means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available

to persons other than those selected by the owner to have access thereto for limited purposes.

CO Rev Stat §7-74-102(4)(2017). The sine qua non of a trade secret is that the owner of the information must have taken steps to prevent the information from becoming public.

The statute also defines misappropriation as:

(2) "Misappropriation" means:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(I) Used improper means to acquire knowledge of the trade secret; or

(II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was:

(A) Derived from or through a person who had utilized improper means to acquire it;

(B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(III) Before a material change of such person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

CO Rev Stat §7-74-102(2)(2017). The statute provides that a continuing misappropriation constitutes a single claim. CO Rev Stat §7-74-107(2)(2017). The Colorado Supreme Court has held that the nature of CUTSA militates against dividing a single body of proprietary information disclosed to the same person, at substantially the same time and in furtherance of the same commercial venture, into multiple separate trade secrets. *Gognat v. Ellsworth*, 259 P.3d 467, 504 (Colo. Supreme Court 2011).

In this arbitration, Claimant has asserted trade secret protection over a large number of items and that it provided these items to Respondent. The following table collects those items from Claimant's post-hearing briefs.

**TABLE XVIII - CLAIMANT'S ASSERTED TRADE SECRETS**

| Claimant' Asserted Trade Secrets Referenced in its Liability Brief, pp. 4-5 and in its Response Liability Brief, pp. 19-20 |
|---|
| product studio photography,<br>product marketing information,<br>InDesign art,<br>product line-art,<br>product planning documents,<br>product market surveys,<br>reseller contact and sales information,<br>reseller order history,<br>reseller pricing,<br>product training presentations,<br>product Q&A's,<br>product FAQ's,<br>product shipping configurations,<br>product instruction manuals,<br>product specifications,<br>product engineering prints,<br>product BOM's,<br>product vendors,<br>product HIS codes, (sic "HTS")[23]<br>container loading outlines,<br>pallet loading outlines,<br>product reviews,<br>product editorials,<br>product inventory,<br>product purchase costs,<br>product sales leads,<br>product EPS files,<br>product clip-art,<br>URL links to product,<br>product packaging specifications,<br>product packaging dimensions and weights, product line growth plans,<br>issued patents and patents pending,<br>product packaging die lines,<br>product logo's,<br>product trademarks,<br>product import history, |

---

[23] The reference to HIS was corrected by Claimant's counsel on December 3, 2018, to HTS, standing for Harmonized Trade Schedule, which is used to determine customs duties, or tariffs, on goods imported into the U.S. The Schedule is a document maintained and published by the U.S. International Trade Commission and can be found on the Commission's web site.

| Claimant' Asserted Trade Secrets Referenced in its Liability Brief, pp. 4-5 and in its Response Liability Brief, pp. 19-20 |
|---|
| product private label partners, infringing product data and research. |

During the hearing, Ms. Williams was directed to Claimant's instruction manuals and testified that information contained in them was not confidential. In particular, she testified that Claimant tries to publish all of its manuals on-line and that they are available to download for no charge. (S. Williams' testimony 6/5/18). For example, she testified that C-100, an instruction manual of the GearCage TT Cargo Rack, had "nothing confidential" in it. (*Id.*). That manual bears a copyright date of 2007-2012 (C-100 at C-0100_0001) and includes lists of parts (bills of material), exploded product line art drawings for assembly, assembly and installation instructions, among other things. Likewise, part of the GearCage SP Cargo Rack was found on the internet as of November 24, 2010. (R-228). Claimant provided its instruction manuals to its customers who bought its products and the content of them cannot be considered a trade secret. She described that exhibit C-472 was a pricing information sheet that included Claimant's minimum advertised prices, special order prices, stocking dealer prices covering 18 of Claimant's products. She testified that the sheet was provided to Claimant's customers and is not confidential. (*Id.*). In addition, she testified that exhibit C-36 was an email she sent to David Tallieu, employed by Respondent, on January 21, 2008. Attached to that email was a spread sheet in which she provided information to Mr. Tallieu. That information included the reseller price, the minimum advertised price, the packaged dimensions, the weight, the description, and part number for 9 of Claimant's products. She testified that this information was not confidential. (*Id.*).

A number of the items listed by Claimant appear to be directed to information that was made public by it. These include:

> URL links to product, product packaging dimensions and weights, issued patents and patents pending, product logo's, product trademarks.

During the hearing, Claimant did not provide any evidence or theory as to how a URL link could be a trade secret. That link, by definition, is part of a web site that can be accessed by the public. Product packaging dimensions can be measured by anybody who has received the package, as can the package weight. Product logo's and product trademarks are, by definition, made public when they are used. For example, Claimant's trademark registration for GearCage asserts that Claimant first used that mark in commerce on December 18, 2004. After that date, the mark could not be a trade secret.

Claimant's assertion of trade secrets over patents and patent applications is also questionable. The '725 patent issued on August 26, 2003, well before the License Agreement between Claimant and Respondent. Indeed, the silent hitch pin that is the subject of that patent was publicly displayed by Claimant during the 2000 SEMA trade

show. (Claimant's Liability Brief at 4). Consequently, whatever could be gleaned from the issued patent or from the product displayed at the 2000 SEMA show cannot meet the secrecy requirements of CUTSA. The method of use described in the '550 patent was also made public by Claimant, first on August 26, 2003, when the '725 patent issued (the '550 patent is a continuation of the '725 patent and has the same text and drawings) and on June 3, 2004, when the application for the '550 patent was published by the PTO, and then again on September 20, 2005, when the patent issued. The subject matter of the '141 patent was made public when its application was published on November 19, 2009. Although this was after the January 2, 2008, date of the License Agreement, whatever might have been confidential or trade secret in respect of the contents of the application lost that designation upon publication. Finally, as to the '456 patent, the product described in it was displayed by Claimant during the November 2007 SEMA trade show and was shown in a flier distributed at that show. (*See* R-22 at pdf page 6). The observable and described features of that product and the manufacturer's suggested retail price were thus made public by Claimant and cannot be considered as confidential information or a trade secret. Indeed, the flier noted that one rack could be joined to another for "instant 4 bike transport capability." (*Id.*).

During the hearing, Claimant provided a generalized description of the types of information it considered to be trade secrets and set those items out in its post-hearing briefs, as identified above. However, Claimant went no further. For example, Claimant states that "product reviews" and "product editorials" are trade secrets but did not provide any examples or evidence of such. The Arbitrator finds and concludes that product reviews done by a third party, as product reviews are typically prepared, would not rise to the level of a trade secret; this is also applicable to product editorials.

There may be some of Claimant's internal information it provided to Respondent that could have qualified as a trade secret under Colorado law, but whether it was stale information having no value or was a trade secret at the time the License Agreement was terminated was not explored with Claimant's witnesses during the hearing. During the hearing, Mr. Williams testified that he decided to choose to do business with Respondent over the others he was talking to because Respondent had a large percentage of the business in the industry. (M. Williams' testimony, 5/31/18). Ms. Williams echoed this in her testimony when she stated that Respondent had all of the accounts that Claimant was going to approach. (S. Williams' testimony, 6/5/18). Apparently, the retailers who might become customers of Respondent were well known to it and Claimant before the License Agreement was executed.

In its post-hearing Liability Brief, Claimant refers to "four CD's containing [Claimant's] current and historical intellectual property" that were allegedly sent to Paul Caruso, of Respondent, in November 2007. (Claimant's Liability Brief at 7). The reference to those four CDs will not be considered by the Arbitrator as any proof in this matter. During the hearing, on May 31, 2018, Claimant moved the admission of exhibit R-243 which is a letter from Mr. Williams to Mr. Caruso, dated November 7, 2007. Respondent objected to the letter's reference to four CDs because Respondent did not believe the CDs were produced in discovery. Claimant said that it would seek to find the CDs in the discovery it produced and the Arbitrator reserved a ruling on the objection so

Claimant could locate the CDs This same topic came up at the start of the hearing on June 1, 2018, and the Arbitrator again reserved a ruling on Respondent's objection. On June 4, 2018, during Mr. Williams' resumed testimony, the topic arose again. Claimant's counsel advised that the CDs could not be located in its discovery. As a result, the Arbitrator sustained the objection and did not admit R-243. Consequently, Claimant's reliance on any reference to the four CDs is stricken. On this point, the Arbitrator has noted that the last page of admitted exhibit R-153 (page CPP1973) contains a copy of exhibit R-243. The reference to four CDs on that last page of that exhibit is also stricken.

Many of the documents on which Claimant relies to show the types of information that Claimant provided to Respondent are dated prior to the effective date of the License Agreement. These include, for example, Mr. Williams' emails to Respondent found in exhibits R-154 (November 18, 2007 email), R-156 (November 5, 2007 email), and R-167 (November 8, 2007 email). The information described in the emails includes potential customers and vendors and pricing. Because this information was provided while the parties were still negotiating the License Agreement, there is a question as to how it could be protected as trade secrets or confidential information.

On this point, Claimant has argued that prior to the License Agreement, Claimant and two other companies signed nondisclosure agreements and these companies were acquired by or otherwise were or became associated with Respondent or its predecessor.

In particular, Claimant contends that it had signed a nondisclosure agreement ("NDA") with Metaldyne. During his testimony on June 1, 2018, Mr. Williams stated that he signed an NDA with Metaldyne on December 1, 2001. When he began to describe the relationship between Metaldyne and Respondent, counsel for Respondent objected on the basis that there was a lack of foundation as to Mr. Williams knowledge. It then became clear that Mr. Williams did not have personal knowledge of any such relationship and the objection was sustained. Mr. Williams then stated that he had read part of the deposition of Thomas Benson and that was part of the information he had. (M. Williams' testimony, 6/1/18). Mr. Benson deposition was taken in this proceeding on January 16, 2018. It is apparent to the Arbitrator that Mr. Williams did not have personal knowledge of the relationship between Metaldyne and Respondent at the time he said he signed the NDA or thereafter.

In addition, during the hearing, Claimant did not seek to admit any NDA between Claimant and Metaldyne. This is important because Claimant argues that this NDA was "a formal non-disclosure agreement with Metaldyne and its successors" and cites testimony from Mr. Williams on May 31, 2018, and from Mr. Kutzscher on June 5, 2018. (Claimant's Liability Brief at 4-5). Claimant also states that Mr. Williams disclosed the silent hitch pin "sometime in the second half of 2000 after signing the Metaldyne NDA." (*Id.*). The Arbitrator has some concerns about these arguments. First, the Arbitrator's notes taken on May 31, 2018, do not show that Mr. Williams testified about anything to do with a Metaldyne NDA on that date. The Arbitrator's notes taken on June 1, 2018, as indicated above, show that Mr. Williams stated that he signed an NDA with Metaldyne on December 1, 2001, and this flowed out of the SEMA 2001 show. The date of the disclosure of the silent hitch pin was covered by Mr. Williams in his May 31 testimony.

He testified that at the 2000 SEMA he showed that pin in his booth and Hidden Hitch had a booth next to his booth. Mr. Kutzscher was present at the Hidden Hitch booth and asked Mr. Williams if he could provide nine of the pins so Mr. Kutzscher could use them in his product displays. Mr. Williams testified that he provided the pins to Mr. Kutzscher and also testified that Respondent acquired Hidden Hitch in 2004. (M. Williams' testimony, 5/31/18). It appears that Claimant's argument in its Liability Brief is incorrect as to the timing of the "disclosure" of the pin to Mr. Kutzscher and the asserted execution of the Metaldyne NDA.

The other NDA that Claimant contends it had with a company acquired by Respondent was with Fulton Performance Products. Mr. Williams testified that he signed such an NDA in September, 2006. (M. Williams' testimony, 5/31/18). An unsigned version of a document headed "Nondisclosure Agreement" identifying the parties as Claimant and Fulton Performance Products was admitted as exhibit C-1008. Besides being unsigned, the document has no indication of any effective date or any date whatsoever. This point is important because, during his testimony, Mr. Kutzscher identified another document that he characterized as a nondisclosure agreement. In response to questions from Claimant's counsel on direct examination, Mr. Kutzscher stated that Respondent had a type of agreement for use in starting licensing negotiations and identified exhibit C-993 as such an agreement. (Kutzscher testimony, 6/5/18). That agreement was signed on November 9, 2007, by Mr. Williams on behalf of Claimant and by Eric Nickerson on behalf of Respondent. It also has Claimant's fax number, name and date of faxing to Respondent. (C-993).

During his June 5 testimony, Mr. Kutzscher referred to exhibit C-993 as a nondisclosure agreement. However, the exhibit C-993 is not a traditional nondisclosure agreement. In it, Claimant agreed that for any information it provided to Respondent regarding any ideas for products that are towing related and cargo related products, Respondent "is not required to hold your product idea in confidence, and no confidential relationship is established between [Claimant] and [Respondent]." (C-933, ¶5 at C-0993_0002). According to Claimant, in November 2007, Mr. Williams disclosed "his ideas" to Mr. Caruso and these ideas involved 2 and 4 bike versions of the bike rack and other matters. (Claimant's Liability Brief at 7). Under the November 9, 2007, agreement, these ideas would not be confidential.

The problem confronting the Arbitrator is that there was testimony that three agreements may be involved. As to the Metaldyne and Fulton agreements, there was no detailed testimony as to the corporate relationship between either Metaldyne or Fulton and Respondent. For example, while it does appear that Respondent acquired each company at some point, the timing of those transactions and the nature of them, including whether Respondent acquired assets only or also liabilities and on-going contracts, was not explored by either party.

This situation is further muddled by Section 8 in the License Agreement, which states (C-974 at C-0974_0004):

The parties agree that the terms and conditions of the Nondisclosure Agreement executed by the parties will apply to this Agreement in their entirety, notwithstanding any expiration of the Nondisclosure Agreement.

As noted above, there is nothing in the License Agreement making clear what agreement is being referenced. Is it the alleged Metaldyne document, the Fulton document, or the more recent agreement that Mr. Kutzscher called a nondisclosure agreement?

Moving forward in time to the Settlement Agreement does not assist in answering the question. Respondent notes that Section 20 of the Settlement Agreement contains a merger provision stating (C-976, §20 at C-0976_0008):

This Agreement is the entire agreement between the Parties with respect to the subject matter hereof, and all other prior agreements, covenants, promises and conditions, verbal or written, between these Parties are superseded and incorporated by this written agreement.

Respondent relies on this provision arguing that if the Metaldyne and Fulton agreements had actually existed, they were cancelled by the express terms of the Settlement Agreement and, as a result, Respondent had no continuing duty to Claimant concerning. Claimant's alleged trade secrets. (Respondent's Liability Brief at 13). From this, Respondent also argues that because the Settlement Agreement has no confidentiality or use restrictions on any of Claimant's purported trade secrets, Claimant did not take steps to preserve the secrets as required under the CUTSA §7-74-102(4). (*Id.*).

Claimant responds to this argument by referring to Section 6 of the Settlement Agreement (C-976, §6, at C-0976_0004), which states:

The releases in paragraphs 1, 4, and 5 do not (and are not intended to ) release or waive any claim, demand, action, or cause of action arising from the unlawful use of the other's intellectual property occurring after the Effective Date.[24]

Claimant highlights the phrase "arising from the unlawful use of the other's intellectual property occurring after the Effective Date" found in Section 6 and contends that at a minimum any "unlawful 'use' would be that 'use' of [Claimant's] IP that was prescribed in the License Agreement." (Claimant's Response Liability Brief at 14). From this, Claimant further argues that the License Agreement defines what should be considered to be an unlawful use. In particular, Claimant points to Section 8 of the License Agreement,

---

[24] The reference to Section 1 involves the parties' agreement that the License Agreement and Amendment are terminated and neither party is indebted to the other regarding any claim arising prior to the Effective Date of the Settlement Agreement. Section 4 is Respondent's general release given to Claimant and Section 5 is Claimant's general release given to Respondent.

quoting a part of that provision as: "Each party agrees … not to use [the other party's disclosed confidential information] except to the benefit of the disclosing party and in furtherance of this [License] Agreement." (*Id.*, *see also* C-947, §8 at C-0974_0004). From this, Claimant concludes that the License Agreement taken together with the Settlement Agreement means that any use by Respondent of any of Claimant's confidential information or trade secrets for reasons other than the benefit of Claimant is an unlawful use under Section 6 of the Settlement Agreement. (Claimant's Response Liability Brief at 14).

Taken to its logical conclusion, Claimant's argument can be understood to mean that if Respondent were to use Claimant's IP and make payments to Claimant that use would be for Claimant's benefit and would not be "unlawful." However, that would also mean such actions by Respondent would be unlicensed because the License Agreement had been terminated.

Claimant misses the point because through the Settlement Agreement the parties expressly terminated the License Agreement and cancelled that agreement and all others. As such, Claimant's argument is an attempt to resurrect some of the terms of the License Agreement and that argument is unavailing.

By its plain meaning, the phrase "the unlawful use of the other's intellectual property occurring after the Effective Date" found in Section 6 of the Settlement Agreement simply means that if, after the Effective Date, one party uses the other party's intellectual property in an unlawful manner that use is not released. Indeed, Claimant's complaint implicitly adopts this meaning when it asserts patent, copyright, and trademark infringement along with it other claims.

Earlier in this Award, the Arbitrator set out in Table XVIII Claimant's asserted trade secrets and then identified those concerning which testimony from Claimant eschewed trade secret protection and those that do not warrant such protection. The following table identifies the remaining items, with those just describe deleted.

### TABLE XIX - CLAIMANT'S REMAINING ASSERTED TRADE SECRETS

| Claimant' Asserted Trade Secrets Referenced in its Liability Brief, pp. 4-5 and in its Response Liability Brief, pp. 19-20 |
| --- |
| product studio photography, <br> product marketing information, <br> InDesign art, <br> product planning documents, <br> product market surveys, <br> reseller contact and sales information, <br> reseller order history, <br> product training presentations, <br> product Q&A's, <br> product shipping configurations, |

| Claimant' Asserted Trade Secrets Referenced in its Liability Brief, pp. 4-5 and in its Response Liability Brief, pp. 19-20 |
|---|
| product specifications,<br>product engineering prints,<br>product vendors,<br>product HIS codes, (sic "HTS")[25]<br>container loading outlines,<br>pallet loading outlines,<br>product inventory,<br>product purchase costs,<br>product sales leads,<br>product EPS files,<br>product clip-art,<br>product packaging specifications,<br>product line growth plans,<br>product packaging die lines,<br>product import history,<br>product private label partners,<br>infringing product data and research. |

While much of this information might have had value to Claimant and Respondent at the beginning of the License Agreement, it is difficult to conclude that all of it would have had continuing value at the time the License was terminated. For example, Claimant's product inventory in January 2008 might have been of interest to Respondent because, as part of the relationship, Ms. Williams testified that Claimant's products were shipped out of its inventory directly to Respondent's customers until Claimant's inventory was exhausted. (S. Williams' testimony, 6/5/18). However, in 2012 when the License Agreement was terminated, it is questionable whether knowledge of Claimant's inventory levels four years earlier would have had any on-going competitive or business values. Ms. Williams also testified that she had no information that after January 28, 2012, Respondent had used any of the information found in exhibit C-36 and also stated Respondent had relations with customers that Claimant was interested in opening. (*Id.*).

At bottom, for much of Claimant's asserted trade secrets, Claimant did not provide evidence directed to the specifics of the secrets or why they might have competitive advantages and values. While Claimant argues that Ms. Williams testified that test data and product testing data were disclosed to Respondent, Claimant provided no evidence on what that test data measured or the tests used to measure it. (Claimant's Liability Brief at 9).

---

[25] As noted in footnote 23, HTS stands for Harmonized Trade Schedule, which is found on the web site of the U.S. International Trade Commission

On the misappropriation point, Claimant's briefs focus on its argument that "the License required [Claimant] to stop selling its own products, meaning that [Claimant] turned 'everything' over to [Respondent]..." (Claimant's Liability Brief at 8). That, of course, is the result of the exclusivity of the License Agreement, which granted Respondent an Exclusive License to the Licensed Technology so it could make, manufacture, have made, use, import, offer for sale, and sell the Licensed Products. (C-974, §1.1 at C-0974_0001). Surprisingly, Claimant now takes the position that the License Agreement was "not for patents but was for *[Claimant's] Products*." (Claimant's Liability Brief at 18, emphasis in original). This argument is incorrect. The License Agreement defines Products as those listed on Exhibit A to the License (found at C-0974_0006). It also identifies Claimant's intellectual property as "such intellectual property, including certain patents, patent applications, complete designs and designs in process, that relate to the design, manufacture and sale of products specified on Exhibit A …" (C-974, §1 at C-0974_0001). The Agreement then defines Licensed Technology as "[t]he intellectual property owned by [Claimant] and related to the design, manufacture and sale of Products …". (C-974, §2 at C-0974_0001). It is thus clear that the License to Respondent was an exclusive license to Licensed Technology, with that Technology including patents and patent applications.

The timing of when Respondent received information from Claimant is also an important consideration under CUTSA. In this proceeding, the parties stipulated as a fact that:

> 31.    All of the alleged trade secrets allegedly misappropriated by [Respondent] were provided by [Claimant] prior to 1/28/12.

(Stipulated Facts, ¶ 31, submitted April 20, 2018). This means that the asserted trade secrets were provided to Respondent in connection with the License Agreement.

Claimant pinpoints the sections of the CUTSA upon which it relies for its misappropriation claim. (Claimant's Liability Brief at 21). These are CO Rev. Stat. §7-74-102(2)(b)(I) and §7-74-102(2)(b)(II)(A) and (B). For convenience these sections are reproduced below.

> (2) "Misappropriation" means:
>
> ***
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> (I) Used improper means to acquire knowledge of the trade secret; or
>
> (II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was:

> (A) Derived from or through a person who had utilized improper means to acquire it;
>
> (B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

In parsed form, these sections of the statute address three different possible misappropriations:

> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who: (I) Used improper means to acquire knowledge of the trade secret;
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who: … (II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was: (A) Derived from or through a person who had utilized improper means to acquire it;
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who: … (II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was: … (B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

As noted, each part of the statute expressly requires "[d]isclosure" or "use" plus other actions to fall within the definition of misappropriation. In this case, Claimant has not alleged or proven that Respondent disclosed any of the asserted trade secrets to any third party. Rather, the thrust of Claimant's arguments is that Respondent engaged in "use" of the secrets after the termination of the License Agreement. To support this, Claimant also contends that Respondent utilized improper means to acquire the secrets. Finally, Claimant argues that Respondent acquired the secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use. Each of these arguments will now be addressed.

As to the use requirement, Claimant did not present direct evidence that Respondent used any of the trade secrets identified in Table XIX above after the termination of the License Agreement. Rather, Claimant's approach was essentially that Respondent was making, having made, and selling the accused products before the License was terminated and selling them afterward and, therefore, Respondent must have used the alleged trade secrets after the License ended.

An example of this is during the April 18, 2018, deposition of Mark Walkowski, a Rule 30(b)(6) designee of Respondent, Mr. Walkowski was asked to list the companies that Respondent used to make the hitch pin, GearCage product, the NV-2 bike rack, and

the SportWing bike rack during the time from 2012 through 2017. Mr. Walkowski named those manufacturers for that time frame.[26]

During the hearing and in its post-hearing briefs, Claimant did not provide evidence or argument that the names of Respondent's vendor manufacturers were given to it by Claimant or that Claimant had any pre-existing relationship with any of them.

This is similar to all of the items remaining on Table XIX. During the hearing, Claimant did not describe what those items were, why they were of value to Claimant, and how Respondent used them after termination of the License Agreement.

Claimant contends that Respondent acquired the asserted trade secrets by using improper means through the "Caruso Plan." As described below, 131-135, Claimant's position is that this "Plan" was devised before the execution of the License Agreement and actually resulted in the execution of that Agreement and its First Amendment, all of which was so Respondent could get its hands on Claimant's trade secrets and other intellectual property. Claimant suggests that this is Respondent's modus operandi because it had done the same thing to others before it implemented the "Caruso Plan." Claimant relies on the testimony of Jerry Smith, Garth Gridley, and Tim Dexter as supporting its theory that Respondent engaged in a pattern of predatory practice.

In this connection, Claimant first points to the testimony of Jerry Smith. (Claimant's Liability Brief at 14-15). According to Claimant, sometime in 2002-03, Mr. Smith was asked to meet with Respondent in its Wisconsin facility and show his towing related products to Respondent. (*Id.* at 15; Smith testimony, 6/1/18). He also testified that he entered into an agreement with Respondent and started getting royalty checks in 2003 and this continued to January 2010. (Smith testimony, 6/1/18). He said he later learned that the product was continuing to be sold by Respondent and learned that Respondent had received two patents on the product; he identified the patents as US 6,783,144 and 6,983,950. (*Id.*).

The Arbitrator questions the relevance of Mr. Smith's testimony. The patents he noted are, indeed, owned by Respondent according to the PTO assignment records. Because Mr. Smith referred to the patents and Claimant relies on them, the Arbitrator takes judicial notice of them and their prosecution histories as found on the PTO's PAIR site.

As to those patents, each traces its priority date to a provisional patent application that was filed by Respondent on April 3, 2001, Serial No. 60/281,140. Consequently, these filings were done before Mr. Smith testified he met with Respondent and undercut Claimant's reliance on his testimony.

Claimant relies on the testimony of Mr. Gridley. In his testimony, Mr. Gridley described that he had developed an interior liner for SVU vehicles that was placed inside

---

[26] This portion of his testimony was designated attorney eyes only and will not be quoted herein. (Walkowski Dep. 4/18/18, at pp.21-25.

the vehicle to protect the interior. He stated that the liner was constructed with nylon, welded using radio frequencies, had straps that went out the back window of the vehicle, and was suspended from the exterior of the vehicle. His name of the product was Cargo Sock. (Gridley testimony, 6/5/18). He stated that he displayed this product at the 2008 SEMA show and met Gail Matheus, of Respondent, at that show and she expressed interest in the product. At that time, Mr. Gridley stated that he was in negotiations with a Canadian company for a period of time, but no agreement resulted. (*Id.*). Mr. Gridley then testified that in late 2009 or sometime in 2010 he reached out to Respondent to see if Respondent was interested in the Cargo Sock product and in early or late 2010, he sent a sample of the product to Respondent and also provided a copy of his patent on the product to Respondent. (*Id.*). During his testimony, he did not identify this patent, although he said it issued before the SEMA 2008 show and he displayed both the product and a copy of his patent on his web site and the patent issued on February 2, 2007. Several weeks after he provided the patent to Respondent, he testified that Ms. Matheus called him and stated there was a problem with the patent and Respondent was not interested in discussing a possible relationship involving it. (*Id.*). Ms. Matheus did not describe the problem and Mr. Gridley did not testify that he asked about the nature of the problem.

About eleven months later sometime in 2011, Mr. Gridley received an email from Tim Dexter who said that he saw Mr. Gridley's product, in a Wal-Mart store, that had the Reese brand on it, looked like Mr. Gridley's product, and was being sold by Respondent. Mr. Gridley did not contact Reese at that time because he did not have the funds to take any action. (*Id.*).

During his testimony, Mr. Gridley did not discuss the features of the patent or compare them to Respondent's product that he saw.

On cross-examination, Mr. Gridley testified that the first time he spoke with Claimant's Mr. Williams was in 2012 when Mr. Williams contacted him. At that time, Mr. Williams said he had a licensed with Respondent that was terminated and Mr. Williams believed he had been cheated and that was unethical.

Finally, Claimant addresses the testimony of Tim Dexter who testified that he designs automotive accessories, with over **XX%** of the products being cargo management products. He testified that he had approached Respondent in about 2004 and starting in 2007 had dealings resulting in several license agreements for two products. (Dexter testimony, 6/6). He also said he had an NDA with Respondent but did not have a signed version of it in front of him during his testimony (he testified by telephone). The products that resulted in a license were a roof top carrier and a collapsible and expandable roof top carrier (*Id.*). He testified that Respondent paid him an upfront design fee for the products and when they started to be sold he received royalties for about one year. (*Id.*). He described that at one point he received a call from Ms. Matheus who asked if he owned the intellectual property on the roof carriers and he responded "no." According to him, Ms. Matheus stated that Respondent would then take the product. (Id.). He also testified that sometime in 2017 he saw a Reese brand roof top carrier in a Wal-Mart store that was "almost identical" to the one he designed for Respondent. (*Id.*).

Finally, Mr. Dexter testified that he received a November 27, 2011, letter from Respondent, signed by Francis Bernhart, indicating that the license agreement of February 7, 2005 had expired. (*Id.*).[27]

The Arbitrator does not agree that the testimony of Messrs. Smith, Gridley, and Dexter support a conclusion that Respondent's actions as related to each shows that Respondent was predisposed to any "predatory practices" toward Claimant. Indeed, the circumstances relating to each of them as to their dealings with Respondent differ significantly when compared to the relationship between Claimant and Respondent.

This also applies the "Caruso Plan" which Claimant describes as hatched in order to get access to Claimant's product line. (*See infra* at 131-135). Claimant argues that Respondent's "predatory practices prove and support the existence of the Caruso Plan which constitutes fraud, malice and willful and wanton disregard of LGA's rights relevant to [Claimant's Misappropriation Claim]." (Claimant's Reply Liability Brief at 8).

The issue surrounding this is that accepting the existence of a "Caruso Plan" requires the Arbitrator to ignore the fact that Respondent, a public company, paid Claimant **XXXXXX** when the License Agreement was signed, followed by royalty payments. (M. Williams' testimony, 6/4/18). And, it did so to get access to Claimant's products, all with a plan in place to later get rid of Claimant.

However, the release Claimant provided in the Settlement Agreement effectively negates its reliance on any alleged "Caruso Plan." As noted above, by that release, Claimant released "any claims, demands, actions or causes of action of every kind and description, which [Claimant] has, had, may have or may have had against [Respondent]; … whether known or unknown, arising from any act or omission by any of the [Respondent] parties or arising from any fact or circumstance occurring prior to the Effective Date." (C-976, §5 at C-0976_0003-0004).

By that release, Claimant cannot rely on the "Caruso Plan" as the basis for any improper means used by Respondent to acquire any of Claimant's trade secrets because a claim based on that Plan arose prior to the Effective Date of the Settlement Agreement.

Given the release, Claimant's lack of evidence regarding the nature of its asserted trade secrets and any continuing value they might have had after the License Agreement was terminated, and lack of proof that Respondent used any of those trade secrets after the License Agreement was terminated, the Arbitrator finds and concludes that Claimant is not entitled to an award based on Claimant's asserted violation of the Colorado

---

[27] Claimant's description of Mr. Dexter's testimony highlights why it would have been important to have had a court reporter transcribe the testimony. Claimant referred to a product called "Pursuit" and another called "Platypus" and that Ms. Bernhart threatened that Mr. Dexter would be sued if he contested the termination of payments. (Claimant's Liability Brief at 16). The Arbitrator's notes taken during Mr. Dexter's testimony do not reflect these product names or testimony about any threat.

Uniform Trade Secrets Act because Claimant failed to establish all of the elements required under that Act.

As to damages, Claimant's expert, Mr. Hampton, opined that Claimant's incremental profit related to Respondent's accused products would be an appropriate damages amount and he calculated that as at least **XXXXXX**. (C-907b, ¶6, at 9). His supporting tables showed that his calculation is premised on a lost profits analysis. (C-0970_2245-50). In his tables, Mr. Hampton determined that Claimant's lost revenues in relation the 2- bike and 4-bike racks would have been **XXXXXX** and that equates to **XXX**% of the entire revenue stream he calculated. (*See id.* at C-0970_2246). In other words, his total lost incremental profit is **XXX**% of this calculated revenue for these bike racks. The implicit assumption in Mr. Hampton's calculations is that the market for Claimant's bike rack would outpace the overall market for bike racks in general. He did not do any market analysis or market share study to determine the players in the bike rack market and how or why Claimant's products would be selected over others.

During the hearing, Ms. Williams noted that at the time Claimant introduced its V-shaped rack at the 2007 SEMA show, there were no other V-shaped racks. That may have been the case, but that does not recognize that there were and are a number of other racks that have been available to consumers for years. For example, Respondent's catalogs shows numerous bike racks, only 2 of which have a V-shape. (*See* R-290, 2010 catalog, at 308-310; R-293, 2012 catalog, at I-8-I-14; R-296, 2014 catalog, at I-3-I-5). Because Mr. Hampton's analysis did not take into account the presence of other types of bike racks, his conclusions that Claimant would have achieved the level of lost profits that he calculated is questionable.

Because the Arbitrator has concluded that Claimant did not establish a misappropriation, Claimant is not entitled to any recovery under its unjust enrichment claim.

## VI. CLAIMANT'S PATENT MISMARKING CLAIM

Claimant alleges that Respondent's use of the patent numbers associated with Claimant's patents, *i.e.*, the '725 and '550 patents, after the termination of the License Agreement constitutes false marking under 35 U.S.C. §292. In its complaint, Claimant identifies Respondent's products it accuses Respondent of applying a false patent marking as the "Silent Hitch Pin Infringing Product or any Other Infringing Products." (Complaint, ¶95 at p. 21). In the complaint, Claimant defined Other Infringing Products as the designs for the GearCage and the Bike Rack. (*Id.* at ¶28, p. 8).

In its Liability Brief, Claimant focuses on the '725 and the '550 patents, and cites to several of Respondent's instruction manuals in support. (Claimant's Liability Brief at 45, citing to exhibit R-26, p. CEQ-057164, R-32, p. CEQ-057226, and R-101, p. CEQ-068106. The R-26 and R-101 manuals are for Respondent's SKU 5800200 product; the R-32 manual is for Respondent's SKU 5800300 Ramp). The manuals show the numbers for the '725 and '550 patents and several other patent numbers relating to patents not at issue in this proceeding. In addition, in its brief, Claimant states that its "claim for False

Marking is contained in the Unfair Competition claims." (Claimant's Liability Brief at 45). However, Claimant's discussion of its Unfair Competition claims does not mention false marking or patent numbers and appears to be limited to trademark infringement and its assertions that Respondent misappropriated Claimant's products. (*See* Claimant's Liability Brief at 38-41). Claimant did not refer to the false marking claim in its Response Liability Brief or its Reply Liability Brief.

Respondent's position on the false marking issue is that it never marked a product or an advertisement for a product with any Claimant patent number. (Respondent's Liability Brief at 5). While Respondent acknowledges that the patent numbers appear on some of its instruction manuals, it argues that those manuals were in closed boxes and are not the type of marking that falls under §292. (*Id.*). Respondent also asserts that under the Settlement Agreement it was entitled to sell the 25,792 hitch pins and because reference to the '725 and '550 patents was appropriate for those pins, there could be no violation of §292 as to them. (*Id.*). Regarding the excess pins that Respondent sold, it argues that Claimant failed to show they were sold with any patent numbers associated with them. (*Id.*). In addition, Respondent contends that Claimant did not prove that Respondent had an intent to deceive the public in relation any patent numbers it used after the License Agreement was terminated. (*Id.*). Finally, Respondent asserts that Claimant did not prove any "competitive injury" that is a necessary element under §292. (*Id.*). (*See also* Claimant's Liability Brief at 44-46 and Respondent's Opposition Liability Brief at 47-48 for more detailed discussions of these points.).

In its Opposition Liability Brief, Respondent noted that in 2014 it had removed the patent numbers from its manual for the SKU 5800200 product. (Respondent's Opposition Liability Brief at 48; *see* R-102 which is dated July 1, 2014, and is Rev. E of R-101, Rev. D, dated September 24, 2012; *see also* R-26, which is identified as Rev. D, dated May 31, 2012, for SKU 5800200). Further, Respondent referenced its expert's report showing that Respondent did not exceed the hitch pin sell-off allowance until 2015, which was after the removal of the patent numbers relating to the pin. (*Id.*, citing R-384, Pierce Expert Report at Exhibit G-1 thereto). Respondent also points out that neither Claimant's damages expert nor Claimant itself provided any opinion or evidence on damages to Claimant flowing from the asserted patent false marking. (*Id.*).

Because Claimant's false marking allegation is based on 35 U.S.C. §292, it is appropriate to address the elements of false marking as found in the statute. In relevant part, §292 states:

> (a) Whoever, without the consent of the patentee, marks upon, or affixes to, or uses in advertising in connection with anything made, used, offered for sale, or sold by such person within the United States, or imported by the person into the United States, … the patent number, or the words "patent," "patentee," or the like, with the intent of … deceiving the public and inducing them to believe that the thing was made, offered for sale, sold, or imported into the United States by or with the consent of the patentee; …

(b) A person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury.

(35 U.S.C. §292). This portion of the patent statute was amended, as found above, by the enactment of the AIA, when signed into law on September 16, 2011. The statute, as amended, it applicable to this proceeding.

Section (a) of the statute sets out the elements of a false marking. There must be (1) use of a patent number, the word patent, etc., by a person, (2) without the consent of the patentee, with (3) that use marked on or affixed to anything made, used, offered for sale within the US or imported by that person into the US, (4) with the intent of deceiving the public or inducing the public to belief that the thing was made, offered for sale, sold or imported by or with the consent of the patentee.

Section (b) also sets out the elements for a recovery for a violation of Section (a). Those elements are that the person must have (1) suffered a competitive injury as a result of such violation, in order to recover (2) damages adequate to compensate for injury.

Each of these elements for both sections will now be assessed in light of the evidence presented during the hearing.

Section (a): Element (1) – Was there a use of a patent number, the word patent, etc., by a person? The evidence established that Respondent used the numbers of the '725 and '550 patents after the termination of the Settlement Agreement on January 28, 2012, through July 2014.

Section (a): Element (2) – Was the use without the consent of the patentee? Claimant concedes that the use of the patent numbers relating to the silent hitch pin, (*i.e.*, the '725 and '550 patents) was with its consent for the sell-off of Respondent's inventory of 25,792 pins. This is found in Claimant's Liability Brief where it states: "[s]tarting with the termination of the License, any inclusion of [Claimant's] patent numbers was *unauthorized, with the exception of the sell-off of [Respondent's] inventory of [silent hitch pins.]*" (Claimant's Liability Brief at 45, emphasis added.). While Claimant then relies on exhibits R-26, R-32, and R-101 to show the use of the patent numbers, according to Mr. Pierce's report exhibit G-1, the sales of the hitch pins did not exceed the sell-off allowance until 2015. On this basis, the reference to the patent numbers relating to the silent hitch pins that are found in R-26, R-32, and R-101 were authorized by Claimant, as it recognizes in its Liability Brief. Claimant presented no evidence that countered Mr. Pierce's determination that the excess number of pins that were sold separately or along with other products sales occurred in 2015 and 2016. Those other products appeared to have been in conjunction with sales of the SKU 5800200 product. (*See* R-384, Pierce Expert Report at Exhibit G-1 thereto, item entries 2 and 7 for SKU 63146, a hitch pin, and SKU 5800200, called the GearCage SP Cargo Rack, the Cargo Rack, and the Cargo Carrier; Exhibit G-1 does not list any revenue derived from the sale of SKU 5800300 during the 2012-2018 time period).

Section (a): Element (3) – Was the use of the patent number(s) marked on or affixed to anything made, used, offered for sale within the US or imported by Respondent into the US? The patent number(s) appeared on the instruction manuals but there was no evidence presented that they were marked on or affixed to the individual products. Section 292 does not describe what "marks on or affixes to" covers. However, Section 287 aids in applying §292. (35 U.S.C. §287(a)). To meet the patent notice requirement, patentees may give notice to the public that a product is patented either: (a) "by fixing thereon" on the product the word "patent" or the abbreviation "pat." followed by the patent number or (b) "by fixing thereon" on the product the word "patent" or the abbreviation "pat." together with and internet address that associates the patent number to the patented article. (*Id.*). The use of "fixing thereon" connotes actual physical marking on the product. This conclusion is supported by the remainder of §287(a) which provides that if the character of the product is such that the patent notice cannot be affixed to it then the notice may be put on a label that is connected to the product or its packaging, with the label containing the patent notice. (*Id.*). The products at issue in this proceeding are clearly of the type upon which a patent number could be imprinted or on a decal or plate bearing the number attached. The Arbitrator finds and concludes that the use of patent numbers on instruction manuals that are boxed with the products is not the type of use that is intended under §287(a) and is not the type of use that would give rise to a violation of §292.

Section (a): Element (4) – Did Claimant prove that Respondent used the patent numbers with the intent of deceiving the public or inducing the public to believe that the thing was made, offered for sale, sold or imported by or with the consent of the patentee? Based on the evidence, the Arbitrator finds and concludes that Claimant did not prove Respondent had any intent of deceiving the public or inducing the public to belief that subject products were made, offered for sale, sold or imported by or with the consent of Claimant. As noted above, Claimant authorized the use of the patent numbers, at least in relation to the sell-off allowance.

Section (b): Element (1) – Did Claimant prove that it suffered a competitive injury as a result of the alleged violation of §292? There is no dispute that Claimant and Respondent are competitors. However, in its briefs, Claimant does not identify any competitive injury it suffered as a result of Respondent's use of the patent numbers and none of the facts that Claimant asserts entitles it to damages have been tied back to Respondent's use of the patent numbers, even if that use had not been authorized by Claimant.

Section (b): Element (2) – Did Claimant prove damages adequate to compensate for any injury to it arising out of Respondent's use of the patent numbers? Claimant's damages expert, Mr. Hampton, did not identify any damages that arose out of any assumed violation of §292. His reports (C-970a, opening report dated February 2, 2018; C-970b, supplemental report dated April 5, 2018; and C-971, rebuttal report dated April 26, 2018) do not have any separate section devoted to an analysis of damages attributable to alleged violation of §292. Indeed, as far as the Arbitrator can determine, Mr. Hampton did not refer to that statute at all.

In sum, the Arbitrator finds and concludes that Claimant has not proven that Respondent violated 35 U.S.C. §292(a) and Claimant also has not proven that this suffered a competitive injury under 35 U.S.C. §292(b) or it has had any damages under the latter section.

## VII.    CLAIMANT'S CIVIL CONSPIRACY CLAIM

Mr. Williams testified Claimant's conspiracy claim is based on Respondent's filing of a patent application in 2010. (M. Williams' testimony, 6/1/18). That civil conspiracy claim, as pled in Claimant's complaint, involves Respondent's "continuing to process [Respondent's patent applications] knowing of their invalidity, in as much as Marty Williams was the true inventor and assignor to [Claimant], and by selling the [Claimant's] inventions on or after January 29, 2012 in violation of 'Claimant's] rights therein." (Complaint, ¶100 at 22). It is undisputed that the applications to which Claimant refers were applications that led to U.S. Patent 9,254,790 ("Respondent's '790 patent" issued on February 9, 2016) and foreign applications filed with the World Intellectual Property Organization and based on the U.S. application. In addition, Claimant alleged that on and after January 29, 2012, the applicants for Respondent's patent applications "failed to submit a petition to correct inventorship in [Respondent's patent applications] to reveal that they acquired intimate and confidential knowledge of [Claimant's] proprietary designs and inventions and patents, the design thereof and other incidents of [Claimant's] intellectual property with respect thereto and misappropriated and improperly used such in [Respondent's patent applications]". (*Id.*,¶102). In sum, Claimant's allegations relating to Respondent's patent applications involve its view that Respondent filed the applications without naming Mr. Williams as an inventor, prosecuted those applications without disclosing pertinent information to the PTO, misappropriated the applications, failed to recognize that Claimant was the rightful owner of the applications, prosecuted the applications knowing they contained false assertions of ownership, and did so in a concerted effort to "injure or usurp [Claimant's inventions, trademarks and copyrights] all to the damage of Claimant." (*Id.* ¶¶102-104 at 22-23).

As to these allegations, Claimant identifies the alleged conspirators as Respondent the company and the Applicants for the patents. Those applicants were named in paragraph 32 of the complaint and include the eight individuals named as inventors in Respondent's '790 patent. The face of that patent shows the patent was assigned to Cequent Performance Products, Inc., which is the Respondent in this arbitration and that the attorney, agent, or firm that represented the applicants in the prosecution was McDonald Hopkins LLC.

In addition to identification of the named inventors as conspirators, Claimant includes David Cupar, Esq. as one of the conspirators. (Complaint, ¶32 at 9). Mr. Cupar is a partner in the McDonald Hopkins firm and has acted as Respondent's lead counsel in this proceeding and also in the **Colorado Action – I**, **Colorado Action – II**, the **Illinois Action**, and the appeal to the Federal Circuit of a decision from the court in **Colorado Action – II**.

For unknown reasons, while Respondent's '790 patent plays heavily in Claimant's civil conspiracy charge, neither party sought admission of the patent as an exhibit in this proceeding. Nonetheless, because the patent is a public record and is referred to by the patent number in Claimant's complaint and the parties' post-hearing briefs, the Arbitrator has taken judicial notice of that patent and its prosecution history as available on the PTO's public PAIR web site. (See Complaint, ¶35 at 10).

In addition to naming Mr. Cupar, Respondent, and the inventors listed in Respondent's '790 patent as conspirators, Claimant also asserts that Respondent "and other third-party resellers also agreed, combined and conspired with each other to deprive [Claimant] of its rights in [Claimant's] inventions, copyrights and trademarks by licensing, advertising and selling such inventions while mismarking these products and materials and falsely representing that these re-sellers and/or [Respondent] own them or may re-sell them, and that [Claimant's] inventions belong to , or were designed by these others and/or [Respondent]." (Complaint, ¶105 at 23; see also Complaint ¶¶106-107). In another words, according to Claimant, Mr. Cupar, the named inventors, Respondent, and all companies that resold any of the accused products are co-conspirators.

In its Liability Brief, Claimant refers to 22 pages in that brief as a "factual history" supporting it civil conspiracy charge. (Claimant's Liability Brief at 45, referencing pages 2 through 23).[28] Those pages are specifically directed to Claimant's allegations of trade secret misappropriation and unjust enrichment.

In it Response Liability Brief, Claimant clarified it conspiracy claim by noting that the underlying torts it asserts support a conspiracy were unfair competition and unfair trade practices. (Claimant's Response Liability Brief at 46). In addition, Claimant argued that its conspiracy claim also rests on Respondent's knowledge of Claimant's prior patents and that Respondent did not disclose those to the PTO during the prosecution of Respondent's '790 patent. (*Id.*). Specifically, Claimant relied on its D917 patent and its "'294 patent." (*Id.*). On this point, Claimant is incorrect.

First, during the prosecution of the application leading to Respondent's '790 patent Respondent submitted an Information Disclosure Statement to the PTO on June 10, 2014. In that statement, Respondent identified, among others, one patent and one published application that listed Mr. Williams as the inventor. The patent was D917; the application was application publication number 2011/0240700. That application was published on October 6, 2011, and issued as the '456 patent on December 2, 2014 (the '456 patent is discussed in some detail above). On June 18, 2014, the Examiner initialed the Information Disclosure Statement signifying he had considered the patents and applications Respondent had listed. In the remainder of the prosecution of Respondent's '790 patent, the Examiner did not cite to or rely on either of these two Williams' patents, or the published application.

---

[28] Although Claimant's Liability brief refers to pages 2-23 as the factual history, the pdf version of that brief has the history at pages 3-19 and the pdf pagination will be cited in this Award.

Second, although Claimant refers to a '294 patent, no such patent was discussed or addressed during the evidentiary hearing. To determine if Claimant's reference was an error, the Arbitrator performed a patent search using the PTO's publicly available patent search page. The search used the terms "Marty" and "Williams" as the applicant's name and resulted in a list of patents in which Mr. Williams is the named inventor. One such patent was design patent D738,264 that is for a V-shaped bike rack, which the Arbitrator assumes is the patent Claimant intended to cite. The application for that patent was filed on November 6, 2013, and the patent issued on September 8, 2015.[29] The patented design shows a V-shaped bike rack having "feet" at the bottom allowing it to stand on a floor. There is no component shown that would permit the rack to be attached to a hitch on a vehicle and the V arms appear to be fixed so they cannot be moved in an arc-like manner. In light of what is shown in this patent, the Arbitrator concludes that the rack shown in the D264 patent would have been cumulative to the rack shown in the published application which became the '456 patent and that shown in D917, both of which had been disclosed the PTO by Respondent.

In connection with the prosecution of Respondent's '790 patent, the application for that patent was published on January 5, 2012. Under the release provision of the Settlement Agreement, Claimant released Respondent from:

> any claims, demands, actions or causes of action of every kind and description, which [Claimant] has, had, may have or may have had against [Respondent]; including, but not limited to, the counterclaims that [Claimant] asserted or could have asserted in the [Colorado Action – I] as well as any right of action which [Claimant] may have, whether known or unknown, arising from any act or omission by any of the [Respondent] parties or arising from any fact or circumstance occurring prior to the Effective Date.

(C-976, §5, at C-0976_0003-0004). The Effective Date was January 28, 2012. Consequently, whatever Respondent did relating to the preparation, filing and prosecution of Respondent's '790 patent up to that date was released by Claimant and therefore cannot be considered in assessing Claimant's conspiracy allegations. This broad release also has an impact on other aspects of Claimant's conspiracy claim, as discussed below.

In support of its conspiracy claim, in its post-hearing briefing, Claimant presents a lengthy discussion of its view of the nature of Respondent's actions from prior to the execution of the License Agreement to after the institution of this arbitration proceeding. (Claimant's Liability Brief at 3-27; Claimant's Response Liability Brief at 44-47; Claimant's Reply Liability Brief at 26-29).

---

[29] The information concerning the D264 patent was obtained from the publically available PTO PAIR web page and contains an image of the prosecution history of that patent. Because this is a publically available document on a government web site, the Arbitrator takes judicial notice of it and its contents.

While it would take nearly as many pages as the Arbitrator has written to this point to describe Claimant's contentions, the centerpiece is Claimant's assertion of a "Caruso Plan." Claimant asserts that even before the License Agreement was executed, Respondent's Caruso devised a plan to get access to Claimant's information. This involved getting Claimant to sign the License Agreement, with the further plan of at some point getting the License Agreement amended to the detriment of Claimant. The plan also included the need to terminate the License Agreement in a way that would make it too expensive for Claimant to contest the termination. Once all that was completed, Respondent would have the ability to use Claimant's information without having to deal with Claimant. As part of this "Plan" Claimant points to the alleged NDA with Metaldyne and then with Fulton, a draft license agreement sent to Claimant by Mr. Kutzscher that was a revision of an early draft license written to be between Fulton Performance Products and revised to refer to Cequent (*i.e.,* Respondent) instead of Fulton. This draft was forwarded to Claimant on February 14, 2007, and returned later that same day to Mr. Kutzscher with Claimant's changes inserted. (C-1007 at C-1007_0001-0004).

The draft agreement is found in two separate exhibits. Exhibit R-167, which is a November 8, 2007, email from Mr. Williams to Mr. Caruso attaches that draft and Mr. Williams refers to it as the proposal that Mr. Kutzscher requested from him in the spring of 2007. (R-167 at pdf p. 1. The attached draft identifies the proposed parties as Claimant and Fulton Performance Products. (Id. at pdf p. 3). The draft found in exhibit C-1007 has changes that are not reflected in the R-167 draft. Apparently, in his November 8, 2007, email to Mr. Caruso, Mr. Williams did not forward the revised draft he had exchanged with Mr. Kutzscher eight months earlier.

At the time he sent the draft to Mr. Williams, Mr. Kutzscher was the director of sales for recreational vehicles and had his office in Port City, Ontario, Canada. He was not located in Respondent's Michigan offices at the time. (Kutzscher testimony 6/5/18). Thereafter, in November 2007, Claimant was provided with and signed the November 9, 2007, agreement regarding disclosures of product ideas and materials to Respondent. (C-993). As this was occurring, the parties were negotiating the business terms of a license agreement. In a November 5, 2007, email to Mr. Williams, Mr. Caruso outlined "key deal points," such as an exclusive global license available to all of Respondent's business units, new patents generated by Claimant would be added, an advance on future royalties paid on the effective date of the license, a royalty rate of 7% of net sales, with a lower rate for mass merchants. (R-148). In that email, Mr. Caruso noted the "need to begin our due diligence" and included a list of information being requested of Claimant. (*Id.*). Shortly afterward, on November 11, 20007, Mr. Williams sent an email and attachments to Mr. Caruso in which Claimant proposed giving Respondent exclusive rights to the silent hitch pin and the V-shaped bike rack line for **XXXXXX** and a running royalty of 7%. In addition, Claimant proposed to issue a common stock purchase warrant equal to about **XX**% of Claimant's outstanding stock, at an exercise price of **XX** per share. As an alternative, Mr. Williams proposed that Claimant would give Respondent a non-exclusive right to the silent hitch pin and the V-shaped bike rack line for **XXXXXX** and a **X**% running royalty. (R-169).

While the License Agreement was being negotiated, Claimant provided responses to Respondent's due diligence requests. (e.g., R-170, dated November 18, 2007). The parties also exchanged additional terms for the License. (R-153, M. Williams email to P. Caruso, dated December 6, 2007, noting that Claimant is in agreement that it "is out of the sale side [of the silent hitch pin and V-shaped racks] for the exclusive period.").

In the end, on January 2, 2008, the parties executed the License Agreement. The License Agreement gave Respondent a worldwide limited exclusive license for the Licensed Technology and any improvements made to it by Claimant. The License granted Respondent rights to make, have made, sell, offer for sale, and import each of the products listed in Exhibit A to the License. (C-974 at C-0974_0001, ¶1.1 and Exhibit A at C-0974_0006).

The Agreement also provided that unless earlier terminated by Respondent, the Agreement had a Term that expired on the "cancellation or expiration of the patents covering the Licensed Technology for the Licensed Products." (C-974 at C0974_0002, ¶2). This termination provision gave Respondent the right to terminate without penalty or consideration of any kind and put no limits on Respondent's termination rights. However, Claimant's ability to terminate had a restriction. Claimant could only terminate the Agreement upon "[Respondent's] failure to cure a material breach of the Agreement within 60 days after receipt of written notice of the material breach from [Claimant]." (Id.).

The License Agreement also has a provision that is important to the assessment of Claimant's conspiracy charge, as well as its unfair competition allegations. That section 7 states:

> **7.      Ownership**   As between the parties, [Claimant] will retain ownership of the Licensed Technology, and any improvements, modifications or enhancements made thereto by [Claimant]. *Any improvements, modifications or enhancements made to the Licensed Products or Licensed Technology by [Respondent] shall be owned by [Respondent].* [Claimant] shall have the right to utilize the improvements, modifications or enhancements made by [Respondent] in the Licensed Products.

(C-974, §7 at C-0974_0004, emphasis added). Of interest is that this provision was found in the earlier drafts in nearly identical form, with the exception that Respondent was identified as Fulton and then Cequent in those drafts and each contained a concluding sentence not found in section 7 of the License. For completeness, the provision in the earlier drafts was found in section 5, which stated:

> **5.      Ownership**   As between the parties, [Claimant] will retain ownership of the Licensed Technology, and any improvements, modifications or enhancements made thereto by [Claimant]. Any improvements, modifications or enhancements made to the Licensed Products or Licensed Technology by

[Respondent] shall be owned by [Respondent].[Claimant] shall have the right to utilize the improvements, modifications or enhancements made by [Respondent] in the Licensed Products. [Claimant] shall have the right to offer sublicenses to these improvements with a reasonable royalty payable to [Respondent].

(R-167, §5 at pdf p. 4; C-1007, §5 at C-0974_0003). The last sentence that would have given Claimant the right to sublicense improvements made and owned by Respondent and subject to royalty payments was deleted in the License Agreement the parties signed.

Respondent argues that the subject matter of Respondent's '790 patent is an improvement to Claimant's V-shaped bike rack made by Respondent and is therefore owned by Respondent. (Respondent's Reply Liability Brief at 28). Mr. Williams testified he was involved in the development of the design that ultimately became Respondent's '790 patent and the design in reflected in Claimant's D717 patent. (M. Williams' testimony, 5/31/18). He also testified that he has drawings from February 2008 that showed an oval hub [an oval hub is seen in the figures of Respondent's '790 patent and figure 1 of the D717 patent]. (Id.). However, during the hearing, no such drawings were shown or admission requested and Mr. Williams did not corroborate with contemporaneous documentation any work he might have done on the bike rack shown in Respondent's '790 patent. In addition, Mr. Williams was not asked to review the claims of that patent and point out any portions of them concerning which he had any input.

The evidence at the hearing showed that on January 14, 2008, Respondent received a proposal from Fredricks Design for concept support to evolve the Pixie bike rack to a Rola design, *i.e.,* from the type of rack that Respondent licensed from Claimant to another type of rack. (R-126 at pdf p. 1). On February 19, 2008, Fredricks Design provided a PowerPoint to Respondent that set out the results of its dimensional research on the conceptual design. (R-127). Claimant acknowledges that this concept design was not known to it at the time. (Claimant's Liability Brief at 19, n. 11).

Based on the evidence presented during the hearing and the lack of contemporaneous corroboration that Mr. Williams was involved in the development of the bike rack shown and claimed in Respondent's '790 patent, the Arbitrator finds and concludes that the rack shown and claimed in Respondent's '790 patent was an improvement, modification, or enhancement to the Pixie bike rack which was one of the Licensed Products subject to the License Agreement. Under section 7 of that License Agreement, Respondent is the owner of such improvement, modification, or enhancement. (C-974, §7, at C-0974_0004).

As a result, the Arbitrator finds and concludes that it was not improper for Respondent to seek patent protection and prosecute the application that led to Respondent's '790 patent. Consequently, its prosecution of the '790 patent after the effective date of the Settlement Agreement was not improper and cannot support an actionable conspiracy claim. In addition, the Arbitrator is not convinced that Claimant submitted sufficient evidence that one or more of the inventors named in the '790 patent were not properly named. Claimant did not explore with any of them during depositions

or at the hearing any of the claims of that patent and their individual activities directed to any element of those claims.

Claimant also contends that the alleged "Caruso Plan" included the amendment to the License Agreement. (Claimant's Liability Brief at 48 and at 19, n. 10). That First Amendment, effective on March 16, 2009, modified the License Agreement in several respects:

1.      In the License Agreement, the exclusivity period for all Licensed Products was from January 2, 2008, to December 31, 2009, after which the License became non-exclusive. (C-974, §§1.1, 1.2 at C-0974_0001-0002). In the First Amendment, the Licensed Products were divided into two group. For the first group (Pixie, Silent Hitch Pin, Gear Cage, and Gear Bed) the exclusivity period ran from March 16, 2009, to the expiration of patents incorporating those Products. For the second group (Gear Deck, Gear Space, Twin Tube, and Juice Box) ran until January 2, 2010, and became non-exclusive thereafter. (C-974, §§ 1.1, 1.2 at C-0974_0008).

2.      The License Agreement had no minimum annual royalty requirement on Respondent. The First Amendment required Respondent to make minimum annual royalty payments, starting with a **XXXXXX** extension fee payable by January 5, 2010; **XXXXXX** payable by January 31 in 2011 and 2012; **XXXXXX** payable by January 31 2013; and **XXXXXX** payable by January 31 of each year thereafter. (C-974, §1.3, at C-0974_0009 and Exhibit C thereto at C-0974_0011).

3.      The Frist Amendment included a requirement that Respondent purchase Claimant's remaining inventory of identified Licensed Products in an aggregate amount not the exceed **XXXXXX**. (C-974, §3.5, at C-0974_0009-0010).

4.      The First Amendment modified the merger provision found in the License Agreement by referring to both the License Agreement and the First Amendment as representing "the entire understanding of the parties with respect to its subject matter and supersedes all previous representations, understandings or agreements, oral or written including any prior license agreements between the parties." (C-974, §D., at C-0974_0010).

As described above, by the release found in the Settlement Agreement, Claimant released all claims, known or unknown, it had or may have had against Respondent. Because the dealings relating to the First Amendment occurred before the effective date of the Settlement Agreement, any claims in respect of the negotiation of that First Amendment or the actions of Respondent regarding it were released and cannot form a part of any conspiracy claim.

## VIII.   RESPONDENT'S BREACH OF SETTLEMENT AGREEMEMT CLAIM

In its counterclaims, Respondent contends that Claimant breached the section 23 Dispute Resolution provision of the Settlement Agreement. (Answer and Counterclaim One, ¶¶15-21, p. 19). In parsed form that section of the Settlement states:

23. **<u>Dispute Resolution.</u>** In the event of any dispute, claim, … arising from or relating to the Agreement or the breach thereof, the Parties shall use their best efforts to settle the dispute, claim, …. To this effect, they shall consult and negotiate with each other in good faith and, … attempt to reach a … solution satisfactory to both parties. If they do not reach such solution within a period of 60 days, then, upon notice by either party to the other, all disputes, claims, … shall be finally settled by arbitration administered by the American Arbitration Association in accordance with the provisions of its Commercial Arbitration Rules. Venue for the arbitration proceedings shall be in Chicago …

According to Respondent, Claimant filed its complaint in the **Colorado Action – II** on June 6, 2014 (case 1:14-vc-01600-MEH, filed on June 6, 2014) and filed a Second Amended Complaint in that action on July 31, 2014. On June 14, 2014, counsel for Claimant informed counsel for Respondent that claimant did not agree that the allegations in the complaint it filed on June 6 were within the "ambit" of the arbitration provision in the Settlement Agreement. (R-250). In its Counterclaim One, Respondent alleges that Claimant did not consult or negotiate with Respondent prior to filing the **Colorado Action – II** and also did not provide notice to Respondent, before the complaint was filed, as to what disputes were at issue and that Claimant would assert those disputes with the American Arbitration Association. (Counterclaim One, ¶¶17-18, p. 19).[30]

Thereafter, on September 17, 2014, Respondent moved the Colorado court to compel arbitration and to administratively close the action or stay it until the outcome of an arbitration. (Claimant's Motion to Compel Arbitration, Doc. 29, filed 9/17/14). On October 8, 2014, Claimant filed its "Response to [Respondent's] Motion to Compel Arbitration Doc. #29." In that response, Claimant contended that none the allegations in its complaint implicated the arbitration provision in the Settlement Agreement and, in any event, the Colorado court did not have any authority to compel arbitration, citing *Ansari v. Qwest Communications Corp.*, 414 F.3d 1214, 1219-20 (10th Cir. 2005), but the court did have jurisdiction to deny the motion to compel. (Claimant's Response to Respondent's Motion to Compel Arbitration Doc. #29, at 13). In turn, on October 27, 2014, Respondent filed its reply and advised the court that it had filed a motion to compel arbitration with the Illinois court and argued that the matters set out in Claimant's complaint are subject to the arbitration provision. As a consequence, Respondent suggested that the Colorado should stay the proceeding before it so that the Illinois court could determine whether to compel arbitration. (Respondent's Reply. Doc. #43, 10/27/14, at p. 8).

All of this led to the Colorado court ultimately issuing an order on January 28, 2015, in which the court found that certain of Claimant's allegations in its complaint were subject to arbitration but others were not. The court noted that the motion

---

[30] In this arbitration, the parties provided pleadings they filed with the Colorado and Illinois courts and the Federal Circuit. Those pleadings are referenced in this section of the Award.

to compel arbitration was pending in the Illinois court and then stayed its order as to the claims it found arbitrable until a resolution of the motion in Illinois. The court also ordered the parties to file briefs on whether the claims deemed not subject to arbitration should be stayed. (Order, Doc. #46, 1/28/15, p. 22-23). Thereafter, on March 26, 2015, the Colorado court granted Respondent's motion to stay the proceedings before it in light of the notice of appeal Respondent filed with the Federal Circuit. The court noted that under the Federal Arbitration Act, Respondent had "a right to immediately appeal" the court's prior order that some of the claims in Claimant's complaint were not subject to arbitration and stated that Respondent's "appeal is non-frivolous." (Order, Doc. 54, 3/26/15, p. 3-4).

On March 3, 2016, the Federal Circuit issued a decision dismissing the appeal, noting that the parties had agreed that all issues regarding arbitrability would be decided anew by the Illinois court. (*Let's Go Aero, Inc. v. Cequent Performance Products, Inc.*, (slip op. 3/3/16, at 11-13, Fed. Cir. 2016).

Finally, on July 28, 2016, the court litigations came to a close. On that date, the Illinois court issued a decision finding that all of the claims in Claimant's second amended complaint were subject to the arbitration clause in the Settlement Agreement, but also determined that an arbitrator would determine any remaining disputed arbitrability issues under the AAA rules. The court thus compelled arbitration. (Memorandum Opinion and Order, Case No. 1:14-cv-08457, Doc. #41, 7/28/16, N. D. Ill., at 17-18).

On November 14, 2016, the undersigned was appointed as the arbitrator in this proceeding. On January 5, 2017, the Arbitrator issued Order No. 2, finding that all of the claims asserted by Claimant in the **Colorado Action – II** second amended complaint were subject to the arbitration provision in the Settlement Agreement.

Claimant argues that it is not liable for any breach of the Settlement Agreement because Respondent waived the mediation provision when it did not move to enforce mediation and, instead, moved to compel arbitration. (Claimant's Response Liability Brief at 1). In addition, Claimant contends that mediation would have been futile due to Respondent's "bad faith." (*Id.*). This purported bad faith centered around Claimant's letter of April 27, 2012, sent after the Settlement Agreement was signed and in which counsel for Claimant requested that information provided to by Claimant to Respondent be returned. That information was described as:

> certain materials reflecting the development, design, construction and manufacturing of the Licensed Products, including but not limited to engineering files and prints, design sketches, product photography, product instructions, part lists, sketch art, product assembly files, logo files and trademark artwork ("Proprietary Materials") to [Claimant]. These materials are proprietary. As the License Agreement is terminated, there is no longer any reason for [Respondent] to retain such materials.

(R-263 at 2). In addition, in that letter, Claimant drew a line in the sand by advising Respondent that:

> no entity, including [Respondent], will be permitted to make use of the Patents and Associated Intellectual Property, including but not limited to engineering (reverse or otherwise), manufacturing, producing, selling, marketing or advertising products that utilize or incorporate the Patents or Associated Intellectual Property, without explicit written authorization from [Claimant]. [Claimant] intend to – and will – enforce its full panoply of rights as the owner of the Patents and Associated Intellectual Property, including the exclusive rights to the use of same.

(*Id.* at 1). According to Claimant, Respondent's bad faith was evidenced by Respondent "playing dumb" in its response to the April 27 letter. (Claimant's Response Liability Brief at 2). In its May 15, 2012 response, Respondent noted that the Settlement Agreement provided releases by each party of all claims against the other and supersedes all other agreements between the parties. Respondent then indicated because Claimant did not raise the return of materials as an issue before the Settlement Agreement was executed, Claimant has essentially released any claim for them. (R-262).

In the letter, Respondent said that it did not know of any "development, design, construction and manufacturing" documents provided to it by Claimant. Respondent ended the letter by requesting:

> Please ask [Claimant] what "proprietary materials" it believes it provided to [Respondent] that should be returned.

(R-262). During the hearing, there was no evidence that Claimant responded to this request.

The Arbitrator is not convinced that Claimant's reliance on this exchange of correspondence is evidence of Respondent's "bad faith." Rather, as the parties should be aware, the License Agreement did not have any requirement that Respondent return to Claimant any information Claimant provided. Indeed, the License Agreement did not even have a provision requiring Claimant to mark documents it deemed to be confidential or embodying a trade secret so both parties could be on notice of such. Moreover, the License Agreement did not obligate Claimant to provide confidential information to Respondent. (C-974, §8 "Either party may disclose confidential and/or proprietary information from time to time to the other …", at C0974_0004). Although the parties agreed in the License Agreement to "maintain such disclosed [confidential and/or proprietary information] as confidential and not to use such …" there was nothing untoward in Respondent's request for a description of what "proprietary materials" were provided to it by Claimant, in light of the fact that the Settlement Agreement did not address a return of information at all. (Id.)

Following these 2012 letters, the next event was two years later when Claimant filed the **Colorado Action – II** and at that time identified the disputes, claims, questions and disagreements it had with Respondent. The Arbitrator concludes that Respondent's attempts to obtain an order compelling arbitration, as opposed to one compelling mediation, was not a waiver of any breach of contract claim. However, Respondent presented no evidence going to the issue of whether any mediation would have had prospects of success such that its attorneys' fees and expenses would have been avoided. Consequently, Respondent did not establish a right to damages for any breach of contact claim.

In fact, throughout this entire time frame, the parties have had multiple opportunities to mediate their disputes. The first is as described above in relation to the Settlement Agreement. The second was in the Northern District of Illinois, where the case was transferred to Magistrate Judge Cox to consider whether a settlement conference should be scheduled. (Minute Order, Doc. # 34, Case 1:14-cv-08457, dated May 17, 2016.). The parties advised the Arbitrator that no such settlement conference was held. The third was in connection with the Arbitrator's Order No. 3, entered on February 16, 2017. That Order resulted from a February 10, 2017, preliminary hearing in this matter and documented agreements reached between the parties during that hearing and other matters ordered by the Arbitrator. Section 33 of that Order stated that:

> **33. Mediation**  The parties agree to meet and confer about having
> at least one mediation prior to the [Evidentiary] Hearing.

(Order No. 3, §33 at 25). The Arbitrator is unaware as to whether or not the parties met, conferred, or mediated.

Claimant also argues that it had the right to waive its part of the arbitration provision and sue in the Colorado court and this was not a breach of the Settlement Agreement. On this point, Claimant says that Respondent could have moved the Colorado court to stay the action and seek an order compelling arbitration in Illinois, but Respondent did not do so. (Claimant's Response Liability brief at 5). Claimant is incorrect. In its Motion to Compel Arbitration filed in Colorado, Respondent "move[d] the Court to compel arbitration and to administratively close this case or, in the alternative, to stay proceedings under 9 U.S.C. § 3 pending the outcome of arbitrations. ([Respondent's] Motion to Compel Arbitration, Doc. #29 , filed 9/17/14 in Colorado Action – II at 1, 11). Respondent echoed this in its reply brief in support of its motion to compel, stating: "The Court should compel arbitration and stay this case pending arbitration." (Reply in Support of [Respondent's] Motion to Compel Arbitration, Doc. #43, filed 10/27/14 in **Colorado Action – II** at 1).

In sum, the Arbitrator finds and concludes that Respondent did not establish breach of contract damages in relation to its contract claim. However, the issue of attorneys' fees and costs awardable under the Settlement Agreement will be addressed below.

# IX.     ATTORNEYS' FEES AND COSTS UNDER THE PREVAILING PARTY PROVISION IN THE SETTLEMENT AGREEMENT

Section 16 of the Settlement Agreement provides:

> **16. Attorneys' Fees.** In the event any Party commences legal proceeding to enforce any of the terms of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs incurred, as may be allowed by the Court.

In its briefs, Claimant argues that it was the prevailing party in the **Colorado Action – II** because the district court ultimately did not order arbitration and the Federal Circuit dismissed Respondent's appeal. Respondent argues that it prevailed in part in the **Colorado Action – II** insofar as the court determined some of the claims were arbitrable and it prevailed totally in the **Illinois Action** because the court granted Respondent motion to compel arbitration in its July 28, 2016 memorandum opinion. (Memorandum Opinion and Order, Doc. #41, Case No. 1:14-cv-08457, 7/28/16 at 18). The court entered judgment in favor of Respondent to that effect on July 29, 2016. (Judgment in a Civil Case Doc. #42, Case No. 1:14-cv-08457, 7/29/16).

The Arbitrator recognizes that the parties spent considerable time and money in litigating the arbitrability issue before the Colorado and Federal Circuit courts but is of the view that the appropriate focus should be on the proceedings that resulted in a final judgment regarding whether or not to compel arbitration. The Arbitrator has this view because both parties contributed to the tangle that resulted in the Colorado action and the Federal Circuit appeal. Claimant did not believe the dispute resolution provision in the Settlement Agreement applied to its claims and was trying to avoid arbitration. Respondent believed the provision did apply and wanted to engage in arbitration. In hindsight, perhaps a simple telephone discussion to arrive at a way to resolve that dispute would have saved the parties time and money. A joint motion to the Colorado court to stay the proceedings before it while the issue of compelling arbitration was taken up by the Illinois court could have very likely reduced the efforts in Colorado and eliminated the Federal Circuit appeal entirely. But, that did not happen. Ultimately, the Illinois court sided with Respondent and entered judgment in its favor.

The Arbitrator finds and concludes that neither party is a " prevailing party" in the **Colorado Action – II** or the Federal Circuit appeal under section 16 of the Settlement Agreement. Consequently, neither party is entitled to its reasonable attorneys' fees and costs incurred in those actions.

The Arbitrator finds and concludes that Respondent is the " prevailing party" in the **Illinois Action** under section 16 of the Settlement Agreement. Consequently, Respondent is entitled to its reasonable attorneys' fees and costs incurred in that action.

In relation to the reasonable fees and costs to be awarded Respondent, the Arbitrator is guided by the Affidavit in Response to [Respondent's] Requests for Fees and Costs, submitted by Martin D. Beier, one of Claimant's counsel in this proceeding.

That affidavit was included as Exhibit L to [Claimant's] Response to [Respondent's] Fee and Cost Brief, filed on November 15, 2018. In his affidavit, Mr. Beier states:

> 14. <u>[Respondent] Fees Litigating the Petition to Compel in Illinois</u>: [Claimant] does not dispute that [Respondent] prevailed on the Petition filed in the Illinois proceeding within the meaning of the Settlement Agreement. Thus, [Claimant] does not dispute that if the Arbitrator deems it appropriate, [Respondent] may be awarded fees and expenses for its prosecution of the Petition to Compel filed in Illinois, that totals **XXXXXX**, calculated as follows: **XXXXXX** for fees as shown in Exhibit B(I), plus **XXXXXX** in expenses as shown on Exhibit B(II), plus **XXXXXX** in Fees and Expenses for Post-Remand work in Illinois through the granting of [Respondent's] Petition.

(Beier Affidavit, ¶14, at 4, footnote 3 omitted). In the omitted footnote, Mr. Beier referenced Exhibit D to his affidavit as showing Respondent's work done post-remand at invoiced fees and expenses of **XXXXXX** and subtracting from that the post-remand fees incurred in the Colorado litigation (**XXXXXX**) and also subtracting (**XXXXXX**) as unrelated to the motion to compel. From this Mr. Beier determined the total of **XXXXXX**, which is set out in paragraph 14 of his affidavit. There is a minor mathematical error in the total. Subtracting the two amounts from **XXXXXX** yields **XXXXXX** and that is the amount the Arbitrator will use.

In addition, in paragraph 13 of his affidavit, Mr. Beier notes that he did not include **XXXXXX** of Respondent's counsel fees attributable to work done in opposing Claimant's motion to stay the **Illinois Action** on the basis that Respondent did not prevail in that opposition. The Arbitrator finds and concludes that although Respondent may not have prevailed in opposing the stay motion, that opposition was necessitated by Claimant's filing of the motion and was part of the Illinois proceedings in which Respondent prevailed. Consequently, that amount will be included within an award to Respondent.

In sum, the Arbitrator finds and concludes that Respondent's reasonable fees and expensed incurred in the Illinois Action are as follows:

**XXXXXX** + **XXXXXX** + **XXXXXX** + **XXXXXX** = **XXXXXX**

That amount is awarded to Respondent **XXXXXX** as its fees and costs under Section 16 of the Settlement Agreement. In addition, pursuant to 28 U.S.C. §1961(a), prejudgment interest on this amount has been calculated by the Arbitrator to be **XXXXXX**, measured from the Board of Governors of the Federal Reserve System's 1-year constant maturity Treasury yield as of July 22, 2016, compounded annually (with five months only, August-December, in 2016) through December 31, 2018. The 1-year constant maturity Treasury yield as of July 22, 2016 was 0.55%. Thus, the total award to Respondent is **XXXXXX**.

# X.    THE PARTIES' ATTORNEYS' FEES AND COSTS CLAIMS

Each seeks its attorneys' fees and costs covering different time periods. Claimant submitted a Motion for Award of Attorneys' Fees and Costs that included, among other things, an affidavit from Martin Beier, of the S&D Law firm, who has acted as counsel to Claimant for about eight years in matters involving Respondent, and an affidavit from J. Mark Smith, of the Berg Hill firm, who has also acted as counsel to Claimant in this matter since 2014.

In Mr. Beier's affidavit, he notes that the total of S&D's fees is **XXXXXX**. (Beier Affidavit ¶G.7, at 6-7). However, on page 5 of his affidavit he states that a previous Summary of Attorneys' Fees Claimed had been corrected; that correction is found in Exhibit 1 to his affidavit. The correction notes that the originally submitted fee amount for S&D Law was **XXXXXX** for work from February 2012 to June 2018 and the separately stated amount of **XXXXXX** for work done on the Federal Circuit appeal. Mr. Beier added these amounts for a total fees claimed of **XXXXXX**.

In the correction, Mr. Beier corrected the fee amount for work from February 2012 to June 2018 to **XXXXXX** and retained the separately stated amount of **XXXXXX** for work done on the Federal Circuit appeal. He then added those two amounts and reported the corrected total fees claimed as **XXXXXX**, which is the same amount before the correction.

Mr. Beier's corrected amount in incorrect. The two sums he reports correctly add to total fees claimed as **XXXXXX**. (*See* Beier Affidavit, Exhibit 1, p. 1). For purposes of this Award, the Arbitrator will use the correctly added amount of **XXXXXX** as S&D Law's fees claimed.

## TABLE XX - CLAIMANT'S REQUESTED FEES AND COSTS

| Law Firm | Time Frame | Fees | Costs |
|---|---|---|---|
| S&D Law | Feb. 2012 to June 2018 | **XXXXXX** | **XXXXXX** |
| Berg Hill[31] | Sept. 2015 to August  2018 | **XXXXXX** | **XXXXXX** |
| Pendleton Wilson | June 2014 to August 2015 | **XXXXXX** | |
| Baker Hostetler | | **XXXXXX** | |

---

[31] *See* Affidavit of J. Mark Smith and Exhibit 2 thereto that list monthly fees and costs. The total fees and costs found in that exhibit for the time period reported are set out in the Table.

| TOTALS | | XXXXXX | XXXXXX |
|--------|--|--------|--------|
| **GRAND TOTAL: FEES AND COSTS** | XXXXXX | | |

**TABLE XXI - RESPONDENT'S REQUESTED FEES AND COSTS**

| Law Firm | Time Frame | Fees | Costs |
|----------|-----------|------|-------|
| McDonald Hopkins | July 2014 to Dec. 2016 | XXXXXX | XXXXXX |
| McDonald Hopkins | Feb. 2017 to Oct. 2018 | XXXXXX | XXXXXX |
| **TOTALS** | | XXXXXX | XXXXXX |
| **GRAND TOTAL: FEES AND COSTS** | XXXXXX | | |

During the November 28, 2018, telephone hearing with counsel for the parties, each counsel agreed that opposing counsel's rates, as reflected in their attorneys' fees request were reasonable.

However, Respondent notes that Claimant has a contingency fee agreement with its counsel. During his January 25, 2018, deposition, Mr. Williams testified that there was an "alternative payment arrangement with our legal team." (Respondent's Response to [Claimant's ] Motion for Award of Attorneys' Fees and Costs, submitted November 15, 2018, p. 10, quoting from the deposition of Mr. Williams). During the deposition, Mr. Williams would not identify which of the firms representing him had such arrangement and no contingency agreement has been provided to the Arbitrator.

Respondent argues, in its attorneys' fees Response, that a contingency agreement puts a cap on the amount of fees that can be awarded. (Respondent's Response to [Claimant's ] Motion for Award of Attorneys' Fees and Costs at 9, citing cases). This means that if a plaintiff were awarded damages of $1,000,000 and had a 30% contingency agreement with its counsel, the fees incurred by plaintiff would be $300,000. If the total fees would have been $800,000 if billed on a dollar per hour basis, plaintiff would not be entitled to an award of the $500,000 difference because it did not incur such amount.

In his affidavit, Mr. Beier describes that the written agreement S&D Law had with Claimant involved charges incurred on a fixed hourly basis at its standard hourly rates and those incurred on a contingent fee basis. (Beier Affidavit ¶G., at 6). Because Claimant did not produce the alternative payment arrangement agreement, the Arbitrator cannot determine what component of the fees requested by Claimant might correctly be deemed to have been incurred. Claimant did submit summaries of monthly hours expended and the dollar value of them and a summary of costs incurred together with the affidavits of Mr. Beier and Mr. Smith that identify the fees and costs.

However, as noted above, Exhibit 1 to Mr. Beier's affidavit has an addition mistake, which has been corrected. As to this Exhibit 1, the Arbitrator notes that the exhibit includes a 3 page attachment headed "S&D Law – Summary of Attorneys' Fees and Expenses, and relates to Matter 10001 which is the litigation and arbitration between Claimant and Respondent, excluding the Federal Circuit Appeal. That attachment list the monthly attorneys' fees and expenses that apparently Claimant seeks.

In the attachment, the fees are set out monthly and total for each calendar year: January 2012 through June 2018. The Arbitrator has totaled those fees and has found that they add to **XXXXXX** for this entire time frame. The attachment also reports expenses for the same time frame. The Arbitrator has totaled those listed expenses and found they add to **XXXXXX**. The differences between these numbers derived by adding the amounts found in the attachment and the amounts listed in Exhibit 1 to Mr. Beier's affidavit is not explained by him.

In addition, the Arbitrator has noted that what appear to be invoices to Claimant only list one person as the billing entity for 2018. That person is Jennifer C. Berryhill. Consequently, the Arbitrator cannot determine if counsel at S&D Law actually billed any of their services such that Claimant incurred their fees.

Claimant has identified that the costs set out in Exhibit 2 to Mr. Beier's affidavit were actually billed to Claimant, presumably by S&D Law or paid directly to third party vendors by Claimant. No affidavit or declaration was submitted stating that Claimant has paid or received invoices from the consultants and experts used by in this matter.

In its fees and costs request, Claimant argues that its costs relating to its electronic discovery consultant, Xpriori in the amount of **XXXXXX** are recoverable. As to this cost, Claimant contends that because Respondent had not produced electronic documents from an archive until March 2018, there was increased cost to get through the 35,635 documents produced then. There may have been an additional cost due to the late production but Claimant has not identified any such increase, such as by setting out the cost incurred prior to the late production and the cost incurred as a result of it.

Nonetheless, the Arbitrator finds and concludes that neither party is entitled to its attorneys' fees and/or costs in this matter, except as noted above.

# XI. ADMIINSTRATIVE AND ARBITRATOR FEES AND EXPENSES AND COSTS

i. The administrative fees and expenses of the American Arbitration Association shall be borne one-half by the Claimant and one-half by the Respondent, and the compensation and expenses of the arbitrator totaling hall be borne one-half by the Claimant and one-half by the Respondent.

# XII. FINDINGS AND CONCLUSIONS

To the extent any of the Arbitrator's findings of fact should be considered to be conclusions of law and any of his conclusions of law should be considered to be findings of fact, they shall be so considered as necessary.

The Arbitrator has considered all the evidence and testimony presented at the evidentiary hearing, the arguments of the parties in their post-hearing submissions, and the pleadings submitted in this matter. Arguments and positions taken by the parties and not addressed in this Award were considered but were unpersuasive.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

# XIII. AWARD

Based on the foregoing findings and conclusions, the Arbitrator enters the following Award:

## A. Award Based on Stipulations

i. On November 15, 2017, Claimant stipulated to the withdrawal of claim 6 of the '456 patent, stating:

> The parties stipulate to Claimant Let's Go Aero, In. ("LGA") withdrawing its claim of infringement of Claim 6 of the 8,899,456 patent. LGA requested this withdrawal because it acknowledged that the accused Cequent products do not have the "telescoping arms" recited in claim 6 as that term has been construed by the Arbitrator. This withdrawal includes an agreement by Let's Go Aero, Inc. to not assert this claim against existing products or any future products that are substantially similar to products imported or sold by Cequent Performance Products, In. (n/k/a Horizon Global Americas Inc.) or its affiliates, predecessors, successors, or subsidiaries. With this understanding Cequent Performance Products, Inc., stipulates to allow the withdrawal of Claim 6 of the '456 patent.

As a result of this stipulation, the Arbitrator finds and concludes that Claimant could not prove that Respondent infringed claim 6 of the '456 patent and incorporates the entirety of the parties' stipulation into this Award.

ii. On April 20, 2018, the parties submitted a set of Stipulated Facts. Stipulated Fact 35 stated:

> [Respondent] does not sell bikes, and did not sell bikes at any relevant time. [Respondent] does not sell the type of barrel nut covered by the asserted claims of the '141 patent and did not do so at any relevant time.

Given this stipulation, the Arbitrator finds and concludes that Claimant could not and did not establish by a preponderance of the evidence that Respondent made, used, sold, offered for sale, or imported a barrel nut covered by the asserted claims of the '141 patent at any relevant time. Consequently, Respondent did not infringe and has not infringed the asserted claims of the '141 patent.

iii. Based on the parties' stipulation submitted on October 4, 2018, quoted earlier in this Award,

> Marty L. Williams, President of Claimant Let's Go Aero, Inc. ("Williams"), acknowledges that he has assigned all of his rights in the patents asserted by Claimant in this arbitration proceedings (the "Patents") to Claimant and to no one else. The parties to this arbitration proceeding and Williams, who has joined in the stipulation, agree that the Award of the Arbitrator in these proceedings shall be binding upon them and that neither party nor Williams will make an argument in any forum that this Arbitration could not consider the Patents because the owner was not a party to the Arbitration.

The Arbitrator incorporates this October 4, 2018, stipulation into this Award and such stipulation shall be binding on each party to this arbitration and, by stipulation, also on Marty L. Williams for all purposes.

## B.    Award Relating to the '725 and '550 Patents

i. As to the '725 patent, Respondent has essentially conceded infringement in connection with the **XXXX** pins it sold that exceeded the sell-off allowance in the Settlement Agreement and has not shown the patent is invalid. As to the '550 patent, Respondent has essentially conceded infringement and has not shown the patent is invalid. On this basis, the Arbitrator finds and concludes that the **XXXX** hitch pins sold/used by Respondent, which were in excess of the 25,792 pins it was authorized to sell pursuant to the Settlement Agreement, infringed the '725 patent and the use of such pins infringed the '550 patent.

ii. The Arbitrator finds and concludes that Claimant has failed to prove that Respondent willfully infringed either the '725 or the '550 patents.

iii. The Arbitrator finds and concludes that the patent infringement component of this proceeding involving the '725 patent and the '550 patent does not rise to the level of an exceptional case under 35 U.S.C. §285.

iv. The Arbitrator finds and concludes that based on the finding and conclusion of the Arbitrator as set forth in Section **XIII.B.i.** above, the Arbitrator awards Claimant **XXXXXX** as full and complete damages for the infringement of the '725 and '550 patents. In addition, pursuant to 28 U.S.C. §1961(a), prejudgment interest on this amount has been calculated by the Arbitrator to be **XXXXXX**, measured from the Board of Governors of the Federal Reserve System's 1-year constant maturity Treasury yield as of January 1, 2014, compounded annually through December 31, 2018. The 1-year constant maturity Treasury yield as of January 1, 2014 was 0.13%. Thus, the total award to Respondent is **XXXXXX**. This amount will make Claimant whole for those units and Claimant shall not be able to recover on them in the future, either from Respondent or any third party.

v. The Arbitrator finds and concludes that Claimant is not entitled to disgorgement of any profits Respondent made as a result of its sale of the **XXXX** hitch pins in connection with patent infringement.

## C.    Award Relating to the '456 Patent

i. The Arbitrator concludes that Claimant's infringement assertions involving the '456 patent are limited to direct infringement and do not encompass contributory infringement or infringement by inducement.

ii. The Arbitrator finds and concludes that the "clamping mechanism" claim limitation of the asserted claims of the '456 patent is absent in the accused SportWing products and the accused NV-2 products. During the hearing, Mr. Williams admitted that Respondent's SKUs 139000 and 139500 do not infringe the '456 patent. Consequently, Claimant did not prove literal infringement of any of the asserted claims of the '456 patent.

iii. The evidence relied on by Claimant to argue that Respondent used a bicycle/rack combination and therefore infringed the '456 patent was shown to have been produced by Claimant prior to the issuance of the '456 patent. The Arbitrator therefore finds and concludes that Claimant has not proven infringement of the asserted claims of this patent for the additional reason that there was no evidence that the bicycle limitation of the claims was met after the issuance of that patent.

iv. Claimant did not present evidence on the application of the doctrine of equivalents to the structure found in either Respondent's SportWing accused products or Respondent's accused NV-2 products, either as related to the clamping mechanism claim limitation or the bicycle claim limitation. Consequently, the Arbitrator finds and

concludes that Claimant has not shown that any of those products infringe any of the asserted claims of the '456 patent under the doctrine of equivalents.

v. During the hearing, Respondent presented no evidence going to invalidity of the asserted claims of the 456 patent. The Arbitrator finds and concludes that Respondent has not proven by clear and convincing evidence that any of the asserted claims of the '456 patent is invalid.

vi. In light of the finding and conclusion that Claimant has not proved infringement of the '456 patent, Claimant is entitled to no damages in relation to that patent.

vii. The patent infringement component of this proceeding involving the '456 patent does not rise to the level of an exceptional case under 35 U.S.C. §285.

**D.     Award Relating to the '141 Patent**

i. See Award **XIII.A.ii.** above which is applicable to the '141 patent.

**E.     Award Relating to the D917 Patent**

i. During prosecution of the application for the D917 patent, Claimant changed the continuity assertion from a continuation to a continuation-in-part. The Arbitrator finds and concludes that this is an admission recognition that the D917 design is not found entirely in the application leading to the '456 patent and new matter was included in the drawings for the D917 patent.

ii. Based upon the drawings of the claimed invention found in the D917 patent and Claimant's use of solid lines in each of the drawings, except for Figure 3 in which the bicycle is shown in broken lines and constitutes unclaimed structure, the Arbitrator finds and concludes that the drawings of the '917 patent depict components in shape and ornamental appearance that are not found in the '456 patent. Each of those components contributes to the overall ornamental appearance of the design and cannot be ignored.

iii. Because the drawings in the D917 patent differ from those in the '456 patent in relation to the ornamental features and shapes of the components, the Arbitrator finds and concludes that the D917 patent is at most a continuation-in-part of the application leading to the '456 patent. As such, the effective filing date of the claim in the D917 patent is its filing date of December 14, 2012. Because this date is before March 16, 2013, the AIA does not apply to the D917 patent for prior art assessment.

iv. The clear and convincing evidence established that Respondent sold bicycle racks accused of infringing the D917 patent more than one year before the effective filing date of the claim in that patent. As a consequence, the Arbitrator finds and concludes that the D917 patent is invalid under 35 U.S.C. §102 (pre-AIA).

v. In light of the finding and conclusion that Respondent proved by clear and convincing evidence that the D917 patent is invalid, Claimant is entitled to no damages in relation to that patent.

vi The patent infringement component of this proceeding involving the D917 patent does not rise to the level of an exceptional case under 35 U.S.C. §285.

## F.    Award Relating to the D716 Patent

i. The Application Data Sheet submitted with the filing of the application for the D716 patent asserted that the application was a continuation of application for the '456 patent. In the D716 application's specification as filed, Claimant stated that "This application is a Continuation-In-Part and claims priority to Co-Pending Utility Patent Application 11/697,294, filed on 2007.04.05." There is an explicit inconsistency between the Application Data Sheet and the application's specification. The Examiner concluded that continuity would not be considered and instructed Claimant to delete the reference to the application for the '456 patent and the priority claim to that application but Claimant did not do so. Throughout the prosecution, Examiner continued his position that entitlement to priority would not be considered. The D716 patent later issued as a continuation of the application for the '456 patent.

ii. A comparison of the drawings in the D716 patent against those in the '456 patent shows that there is no single drawing that is the same that is found in both patents. Moreover, all of the individual components that make up the claimed design in the D716 patent are not individually found in the '456 patent. Each of those components contributes to the overall ornamental appearance of the design and cannot be ignored.

iii. The issuance of the D716 patent with the designation as a continuation of the application leading to the '456 patent is unwarranted and appears to have been an error made by the U.S. Patent and Trademark Office.

iv. Based on the foregoing, the Arbitrator finds and concludes that the D716 patent is at most a continuation-in-part of the '456 patent and the drawings found in the D716 patent contain new matter not found in the '456 patent. As a result, the effective date of the claim in the D716 patent is no earlier than the filing date for that patent, *i.e.*, June 27, 2013. Because this date is after March 15, 2013, the AIA applies to the D716 patent for prior art assessment.

v. The clear and convincing evidence, including the parties' Stipulated Fact 34, submitted April 20, 2018, established that Respondent sold bicycle racks accused of infringing the D716 patent before the effective filing date of the claim in that patent. As a consequence, the Arbitrator finds and concludes that the D716 patent is invalid under 35 U.S.C. §102(a) and (b) (post-AIA).

vi. In light of the finding and conclusion that Respondent proved by clear and convincing evidence that the D716 patent is invalid, Claimant is entitled to no damages in relation to that patent.

vii. The patent infringement component of this proceeding involving the D716 patent does not rise to the level of an exceptional case under 35 U.S.C. §285.

## G. Award Relating to the D717 Patent

i. The Application Data Sheet submitted with the filing of the application for the D717. patent asserted that the application was a continuation of application for the '456 patent In the D717 application's specification as filed, Claimant stated that "This application is a Continuation-In-Part and claims priority to Co-Pending Utility Patent Application 11/697,294, filed on 2007.04.05." There is an explicit inconsistency between the Application Data Sheet and the application's specification. The Examiner concluded that continuity would not be considered and instructed Claimant to delete the reference to the application for the '456 patent and the priority claim to that application but Claimant did not do so. Throughout the prosecution, Examiner continued his position that entitlement to priority would not be considered. The D717 patent later issued as a continuation of the application for the '456 patent.

ii. A comparison of the drawings in the D717 patent against those in the '456 patent shows that there is no single drawing that is the same that is found in both patents. Moreover, all of the individual components that make up the claimed design in the D717 patent are not individually found in the '456 patent. Each of those components contributes to the overall ornamental appearance of the design and cannot be ignored.

iii. The issuance of the D717 patent with the designation as a continuation of the application leading to the '456 patent is unwarranted and appears to have been an error made by the U.S. Patent and Trademark Office.

iv. Based on the foregoing, the Arbitrator finds and concludes that the D717 patent is at most a continuation-in-part of the '456 patent and the drawings found in the D717 patent contain new matter not found in the '456 patent. As a result, the effective date of the claim in the D717 patent is no earlier than the filing date for that patent, *i.e.*, June 27, 2013. Because this date is after March 15, 2013, the AIA applies to the D717 patent for prior art assessment.

v. The clear and convincing evidence, including the parties' Stipulated Fact 33, submitted April 20, 2018, established that Respondent sold bicycle racks accused of infringing the D717 patent before the effective filing date of the claim in that patent. As a consequence, the Arbitrator finds and concludes that the D717 patent is invalid under 35 U.S.C. §102(a) and (b) (post-AIA).

vi. In light of the finding and conclusion that Respondent proved by clear and convincing evidence that the D717 patent is invalid, Claimant is entitled to no damages in relation to that patent.

vii. The patent infringement component of this proceeding involving the D717 patent does not rise to the level of an exceptional case under 35 U.S.C. §285.

### H.    Award Relating to the D289 Patent

i. The Application Data Sheet submitted with the application for the D289 patent did not claim priority to any earlier application. In the application's specification as filed, Claimant provided a "Cross-Reference to Related Applications" section which stated that "This application is a Continuation-In-Part and claims priority to Co-Pending Utility Patent Application 11/697,294, filed on 2007.04.05." Thus, there again is an inconsistency between the Application Data Sheet and the application's specification.

ii. On August 13, 2104, the Examiner issued a notice of allowability in which he objected to, among other things, the wording of the patent's claim and made an Examiner's amendment to the claim. Thereafter, on December 29, 2014, the Examiner issued a corrected notice of allowability in which he continued his objection to the claim wording and he again amended the claim. The claim, as so amended, became the claim issued in the D289 patent.

iii. When issued, the D289 patent had no claim of priority printed on its face. In this proceeding, Claimant noted that a reissue application had been filed in relation to the D289 patent to seek continuity with the earlier '456 patent. The Arbitrator has taken judicial notice of the prosecution history of the reissue application, as reflected in the files of the PTO. Claimant submitted a copy of that prosecution history to which Respondent stipulated and the Arbitrator has admitted as Exhibit C-3000.

iv. On September 6, 2018, Claimant filed a Preliminary Statement in support of the reissue application that it filed. In that Preliminary Statement, Claimant confirmed that "[t]he present Reissue Application therefore hereby claims priority as a Continuation-in-Part of previously file Patent App. Serial No. 11/697,294. On September 27, 2018, the Examiner issued an office action in which he rejected the priority claim in the reissue application as being based on a defective reissue declaration and that the reissue oath/declaration was defective because it failed to identify at least one error which is relied upon to support the reissue application.

v. On October 1, 2018, Claimant filed its response to the office action. In its remarks, Claimant stated that the reissue was being sought because "[Claimant] failed to file a proper claim to priority … because they (sic) failed to make specific reference the (sic) prior application serial no. 11/697,294 filed on 04/05/2017 on the [Application Data Sheet]."

vi. From the filing of the original application through the filing and prosecution of the reissue application, Claimant has taken the position before the PTO that the D289 patent is a continuation-in-part of the '456 patent.

vii. A comparison of the drawings in the D289 patent against those in the '456 patent shows that there is no single drawing that is the same that is found in both patents. Moreover, all of the individual components that make up the claimed design in the D289 patent are not individually found in the '456 patent. Each of those components contributes to the overall ornamental appearance of the design and cannot be ignored.

viii. Based on the foregoing, the Arbitrator finds and concludes that the D289 patent is at most a continuation-in-part of the '456 patent and the drawings found in the D289 patent contain new matter not found in the '456 patent. As a result, the effective date of the claim in the D289 patent is no earlier than the filing date for that patent, *i.e.*, May 13, 2013. Because this date is after March 15, 2013, the AIA applies to the D289 patent for prior art assessment. As of the date of this Award, the PTO's web site shows that the D289 patent will reissue as a continuation-in-part of the '456 patent.

ix. The clear and convincing evidence, including the parties' Stipulated Fact 32, submitted April 20, 2018, established that Respondent sold bicycle racks accused of infringing the D289 patent before the effective filing date of the claim in that patent. As a consequence, the Arbitrator finds and concludes that the D289 patent is invalid under 35 U.S.C. §102(a) and (b) (post-AIA).

x. In light of the finding and conclusion that Respondent proved by clear and convincing evidence that the D289 patent is invalid, Claimant is entitled to no damages in relation to that patent.

xi. The patent infringement component of this proceeding involving the D289 patent does not rise to the level of an exceptional case under 35 U.S.C. §285.

## I. Award Relating to Respondent's Assertions of Inequitable Conduct Involving the Design Patents

i. The Arbitrator finds and concludes that Respondent has not shown by clear and convincing evidence that Claimant had the intent to deceive the PTO in relation to Respondent's prior sales of the accused products. As a result, the Arbitrator finds and concludes that Respondent has not shown by clear and convincing evidence that any of the asserted design patents is unenforceable due to inequitable conduct. However, the Arbitrator finds and concludes that the products Respondent had sold prior to the effective filing dates of the design patents would have been material to the examination of each of the design patents had they not been disclosed to the PTO.

## J. Award Relating to Claimant's Copyright Infringement Claim

i. The Arbitrator finds and concludes that Respondent has not proven the copyright registration at issue in this proceeding to be invalid.

ii. The Arbitrator finds and concludes that Claimant did not prove it was entitled to actual damages, Respondent's direct profits, if any, and Respondent's indirect profits, if any, in relation to the claim of copyright infringement of the asserted copyright registration as against Respondent's accused manuals.

iii. The Arbitrator finds and concludes that under 17 U.S.C. §412, Claimant is not entitled to receive statutory damages or attorneys' fees that are provided for in 17 U.S.C. §§504 and 505.

iv. The Arbitrator finds and concludes that under Claimant did not establish entitlement to a permanent injunction under 17 U.S.C. §502 of the copyright statute.

v. The Arbitrator exercises his discretion and finds and concludes that under 17 U.S.C. §505 neither party should receive its attorneys' fees and costs in connection with the copyright issues in this proceeding.

**K.      Award Relating to Claimant's DMCA Claim**

i. The evidence at the hearing established that Respondent removed Claimant's name and other identifying information from the manuals with Claimant's permission. During the hearing, Claimant presented no evidence or proofs that Respondent intended to "induce, enable, facilitate, or conceal infringement" when it distributed manuals having Respondent's name and identifying information in place of that of Claimant. Based on these matters, the Arbitrator finds and concludes that Claimant has failed to prove that Respondent violated 17 U.S.C §1202 or that after January 28, 2012, Respondent removed any of Claimant's copyright management information from materials without Claimant's permission.

**L.      Award Relating to Claimant's Trademark Infringement Claims**

i. The Arbitrator finds and concludes that Claimant did not submit proof that established Respondent infringed "GearSpace®," "GearDeck®," "TwinTube®," or "Moover™" marks. In addition, in its post-hearing briefing, Claimant did not argue that these marks had been infringed. The Arbitrator concludes that Claimant has waived and abandoned its allegations in relation to them.

ii. As to the Silent Hitch Pin mark, the Arbitrator finds and concludes that Respondent did not have a profit from the sales of the **XXXX** hitch pins under that mark or otherwise. Consequently, the Arbitrator finds and concludes that there are no profit damages available to be awarded to Claimant under §15 U.S.C. §1117(a) in relation to the alleged infringement of the Silent Hitch Pin trademark. Claimant did not establish that it sustained actual damages in connection with the Respondent's sale of the **XXXX** hitch pins under the Silent Hitch Pin trademark registration and therefore is not entitled to such damages.

iii. As to the GearCage mark, the Arbitrator finds and concludes that the amount of **XXXXXX** is an adequate award for Respondent's use of the GearCage mark after being put on notice of its registration. Specifically, the Arbitrator finds and concludes that under 15 U.S.C. §1117(a), subject to 15 U.S.C. §1111, Claimant is entitled to this amount as Respondent's profit and that Claimant did not establish that it sustained any damages from Respondent's use. Because the GearCage was not registered during the January 29, 2012, to February 26, 2013, damages would be limited to Claimant's actual damages. During the hearing, Claimant did not prove it had any actual damages as a result of Respondent's use of that mark during this time period. In addition, Claimant is awarded **XXXXXX** under 15 U.S.C. §1117(a). To these amounts, prejudgment interest of

**XXXXXX** is added to the damages and **XXXXXX** is added to the costs. Thus, the total award to Claimant is **XXXXXX**.

iv. The Arbitrator finds and concludes that the trademark portion of this arbitration is not exceptional under 15 U.S.C. §1117(a) and neither party is entitled to its attorneys' fees incurred in litigating the trademark infringement claims and defenses.

### M.     Award Relating to Claimant's Unfair Competition Claim

i. The Arbitrator finds and concludes that Claimant has not established that Respondent engaged in or caused another to engage in any deceptive trade practice listed in CCPA 6-1-105. Moreover, Claimant did not establish an amount of actual damages it sustained as a result of Respondent's actions of which it complains or its entitlement to lost profits or a percentage of Respondent's revenues. Consequently, Claimant is not entitled to relief under CCPA 6-1-101, et. seq.

ii. The Arbitrator orders that not later than sixty (60) days from the date this Award is enforced, Respondent is enjoined from using, and will cease the use of, the photographs, text, and line drawings found in its manuals admitted in this case as exhibits R-26, R-32, R-72, R-99, R-100, and R-102. If Respondent decides to continue or resume selling the products shown in such instruction manuals, it must use photographs of its product and vehicles, if vehicles are shown, text that differs from the text in those exhibits in format, appearance and wording, and line drawings that it develops to show the relationship of the components of each product and how those products are to be assembled.

### N.     Award Relating to Claimant's Misappropriation of Trade Secrets and Confidential Information Claim

i. Given Claimant's release given to Respondent in the Settlement Agreement, Claimant's lack of evidence regarding the nature of its asserted trade secrets and any continuing value they might have had after the License Agreement was terminated, and its lack of proof that Respondent used any of those trade secrets after the License Agreement was terminated, the Arbitrator finds and concludes that Claimant is not entitled to an award based on Claimant's asserted violation of the Colorado Uniform Trade Secrets Act because Claimant failed to establish all of the elements required under that Act. The Arbitrator also finds and concludes that Claimant is not entitled to recovery under its unjust enrichment claim.

### O.     Award Relating to Claimant's False Patent Marking Claim

i. The Arbitrator finds and concludes that Claimant did not prove that Respondent violated 35 U.S.C. §292(a) and Claimant also did not prove that it suffered a competitive injury under 35 U.S.C. §292(b) or that it has had any damages under that section.

P.        **Award Relating to Claimant's Civil Conspiracy Claim**

i. Based on the evidence presented during the hearing and the lack of contemporaneous evidence corroborating that Mr. Williams was involved in the development of the bike rack shown and claimed in Respondent's '790 patent, the Arbitrator finds and concludes that the rack shown and claimed in Respondent's '790 patent was an improvement, modification, or enhancement to the Pixie bike rack which was one of the Licensed Products subject to the License Agreement. Under section 7 of that License Agreement, Respondent is the owner of such improvement, modification, or enhancement.

ii. The Arbitrator further finds and concludes that it was not improper for Respondent to seek patent protection and prosecute the application that led to Respondent's '790 patent. Consequently, its prosecution of the '790 patent after the effective date of the Settlement Agreement was not improper and cannot support an actionable conspiracy claim. In addition, the Arbitrator finds and concludes that Claimant failed to present sufficient evidence that one or more of the inventors named in the '790 patent were not properly named as inventors.

Q.        **Award Relating to Respondent's Breach of Settlement Agreement Claim**

i. The Arbitrator finds and concludes that Respondent did not establish breach of contract damages in relation to its contract claim and, consequently, is awarded no damages on this claim.

R.        **Award Relating to the Attorneys' Fees and Costs Under the Settlement Agreement**

i. The Arbitrator finds and concludes that neither party is a prevailing party under Section 16 of the Settlement Agreement in relation to the **Colorado Action – II** and the Federal Circuit appeal and is not awarded any fees and costs in relation thereto.

ii. The Arbitrator finds and concludes that Respondent is the prevailing party under Section 16 of the Settlement Agreement in relation to the motion to compel arbitration filed in Illinois Action and is awarded **XXXXXX** in relation thereto. In addition, pursuant to 28 U.S.C. §1961(a), prejudgment interest on this amount has been calculated by the Arbitrator to be **XXXXXX**, measured from the Board of Governors of the Federal Reserve System's 1-year constant maturity Treasury yield as of July 22, 2016, compounded annually through December 31, 2018. The 1-year constant maturity Treasury yield as of July 22, 2016 was 0.55%. Thus, the total award to Respondent is **XXXXXX**.

S.        **Award Relating to Attorneys' Fees and Costs**

i. Except as noted in Award Section **XIII.Q.ii.** above, the Arbitrator finds and concludes that neither party is awarded its attorney's fees and costs in this matter.

**T.     Award Relating to Administrative Fees and Expenses and Arbitrator's Compensation and Expenses**

i. The administrative fees and expenses of the American Arbitration Association totaling $19,350.00 shall be borne one-half by the Claimant and one-half by the Respondent, and the compensation and expenses of the arbitrator totaling $219,612.50 shall be borne one-half by the Claimant and one-half by the Respondent. Therefore, Respondent shall reimburse Claimant the sum of $5,025.00 representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.


Dated: January 17, 2019

*Donald W. Rupert*

Donald W. Rupert, Esq.
Arbitrator